

**ACE REPORTING SERVICES • ACE VIDEO SERVICES**
620 Cincinnati Club Building • 30 Garfield Place • Cincinnati, Ohio 45202-4364
513/241-3200 • FAX 513/241-7958 • 800/277-7165

January 21, 2003

Mark Krumbein
36 East Seventh Street
Suite 2020
Cincinnati, Ohio 45202

Re:  Deposition of **Mark Krumbein**
Date of Deposition: 01/10/03
**Gerald Clemons vs. Betty Mitchell**

Dear Mr. Krumbein:

As you will recall, you did not waive the right to read and sign your deposition. A copy of the deposition taken in the above referenced matter is now available in our office for review, weekdays from 9:00 a.m. to 4:30 p.m. Please call to schedule an appointment to come in to review. You witness will have the opportunity to list any corrections on an errata sheet, sign and date the errata sheet, and sign the signature page.

In accordance with the Federal Rules of Civil Procedure, you must read the transcript, and sign the errata sheet and signature page within 30 days. Should you have any questions, please do not hesitate to call.

Sincerely,

*Sherry Gregory*
Sherry Gregory

No. 1-67111
Enclosures

cc:   **Richard S. Ketcham**
       Tara L. Berrien

RECEIVED

JAN 2 ⁀ 2003

ATTORNEY GENERALS OFFICE
CAPITAL CRIMES SECTION

```
 1              UNITED STATED DISTRICT COURT
 2               SOUTHERN DISTRICT OF OHIO
 3
 4    ------------------------------------
                                          :
 5    GERALD CLEMONS,                     :
                                          :
 6              Plaintiff,                :
                                          :
 7         vs.                            :    CASE NO.
                                          :    MS-1-00-017
 8    BETTY MITCHELL, Warden,             :
                                          :
 9              Defendant.                :
                                          :
10    ------------------------------------
11
12
             DEPOSITION OF:    MARK KRUMBEIN
13
             TAKEN:            By the Plaintiff
14                             Pursuant to Agreement
15           DATE:             January 10, 2003
16           TIME:             Commencing at 11:00 a.m.
17           PLACE:            Office of Dale G. Schmidt, Esq.
                               904 Highland Towers
18                             1071 Celestial Street
                               Cincinnati, Ohio  45202
19
             BEFORE:           Sherry L. Music, CR
20                             Notary Public
                               Commonwealth of Kentucky
21
22
23
24
```

**Ace Reporting Services  (513) 241-3200**
30 Garfield Place, Suite 620  Cincinnati, Ohio  45202

Page 2

```
 1  APPEARANCES:
 2
       On behalf of the plaintiff:
 3
            Richard S. Ketcham, Esq.
 4         of
            Ketcham & Ketcham
 5          755 South High Street
            Columbus, Ohio 43215
 6
       and
 7
            David J. Graeff, Esq.
 8          P.O. Box 1948
            Westerville, Ohio 43086
 9
10     On behalf of the defendant:
11          Tara L. Berrien, Esq.
              and
12          Charles Wille, Esq.
            Capital Crimes SOT
13          30 E. Broad Street, 26th Floor
            Columbus, Ohio 43215
14
15
16              - - -
17
```

Page 3

```
 1              I N D E X
 2  MARK KRUMBEIN                            PAGE
 3    Direct Examination by Mr. Ketcham        4
      Cross-Examination by Ms. Berrien        24
 4    Redirect Examination by Mr. Ketcham     32
 5
 6
              (No exhibits.)
 7
                  - - -
```

Page 4

```
 1              MARK KRUMBEIN
 2  of lawful age, a witness herein, being first duly sworn as
 3  hereinafter certified, was examined and deposed as follows:
 4              DIRECT EXAMINATION
 5  BY MR. KETCHAM:
 6    Q.  Once again, this is the deposition by
 7  agreement of Mark Krumbein. My name is Rick Ketcham with
 8  Dave Graeff representing Gerald Clemons in the federal
 9  habeas corpus. I believe there's no preliminary matters.
10  Mark, would you state your name for the record and your
11  office address?
12    A.  Sure. My name is Mark Krumbein,
13  K-r-u-m-b-e-i-n. My office address is 36 East 7th Street,
14  Suite 2020, Cincinnati, Ohio 45202.
15    Q.  And you're engaged in the private practice of
16  law?
17    A.  Yes, I am.
18    Q.  How long have you been a private lawyer?
19    A.  Approximately 20 years.
20    Q.  What type of practice do you have, generally?
21    A.  Criminal defense and traffic.
22    Q.  Mostly criminal defense and traffic?
23    A.  Yes.
24    Q.  And you are qualified to handle capital cases
```

Page 5

```
 1  under Rule 20, what used to be Rule 65?
 2    A.  Recently I did let my Rule 20 qualifications
 3  expire, but I went up to the seminar to get requalified and
 4  I'm just awaiting an approval. I don't think I will have a
 5  problem.
 6    Q.  Okay. So you were one of the counsel for
 7  Gerald Clemons at his capital trial in 1996?
 8    A.  Yes, I was.
 9    Q.  I take it you were -- I think it was still Rule
10  65, then, you were certified?
11    A.  Yes, I was.
12    Q.  How many capital cases have you handled
13  approximately?
14    A.  I'm currently on my 11th, I believe.
15    Q.  Okay. How many have you handled before Gerald
16  Clemons?
17    A.  I could probably figure out exactly if you give
18  me just a second. I have to think for a second.
19    Q.  Sure.
20    A.  I'm going to estimate eight before Gerald
21  Clemons.
22    Q.  So you've only had two or three since Gerald
23  then?
24    A.  Yeah. I've slowed down on it, yes.
```

2 (Pages 2 to 5)

Page 6

1     Q. Besides Gerald Clemons have you had any other
2 capital cases where the verdict came back with a death
3 recommendation?
4     A. Yes, I have.
5     Q. Approximately how many?
6     A. Let's see. Since Clemons I had one come back
7 as -- I'm sorry. No. I have had none since Clemons. I had
8 one that ended up being a plea to a lesser charge. It was a
9 capital case in, I think, 2000, I believe. And then the
10 current one we're just getting started on. Those are the
11 two. And then before that I'm not sure. I could go back.
12 I'm going to guess -- I'm just going to guess out of the --
13 let's see -- eight, I probably had -- I know the first one I
14 did it was a not guilty on one of the aggravated murders
15 knocked down to spec. And that man got 20 to life at trial
16 and there were some others. Some worked out as pleas, some
17 did get the death penalty. I'm just not sure.
18     Q. Do you have any idea approximately how many you
19 have on death row?
20     A. There's a list that comes out. I could look it
21 up but I can't remember. I think there are three or four.
22     Q. Three or four, maybe?
23     A. Just guessing out of the eleven.
24     Q. Speaking of the Gerald Clemons case, were there

Page 7

1 ever any plea negotiations in that case at all, any kind of
2 plea ever offered?
3     A. Let me think. I actually cannot remember any
4 more. Dale kept our file and I just don't remember anymore.
5     Q. Were you and Dale Schmidt appointed at the same
6 time?
7     A. I believe so.
8     Q. Do you remember what stage of the proceedings
9 you were appointed?
10     A. No, I don't. It was very early on.
11     Q. Very early on?
12     A. But I just don't remember exactly when.
13     Q. And did you go to see Gerald shortly after you
14 were appointed?
15     A. I don't have a memory of it anymore, but I
16 always do.
17     Q. Did you and Mr. Schmidt ever get together and
18 divide up what you were going to do in this case as far as
19 who was going to do what or anything?
20     A. I have been counselor with him three times and
21 I don't remember anymore. I just don't. It's been so long.
22     Q. It would be safe to say then, both of you tried
23 to be responsible for everything?
24     A. Sure.

Page 8

1     Q. Do you recall when you were -- how would you go
2 about developing strategy for this case with Mr. Schmidt?
3     A. Well, just by learning all of the facts. And
4 then we did have some expert. My recollection on this case
5 it was Nancy Schmidt-Goessling. And just trying to -- I
6 remember one of the strategies we used was trying to show
7 that it wasn't premeditated. We tried to show that he
8 always carried a gun when he was driving over the road. And
9 that we tried to also show that many truck drivers routinely
10 carry guns and even though it's normally illegal. Then we
11 had some verification of that during the trial. And also we
12 showed, for instance, he was a member of a target club in
13 Indiana. I know we brought that into evidence, showing that
14 he normally had a gun and didn't get it for the specific
15 purpose of shooting anyone.
16     Also we established that that day he had been
17 asking about a route that he wanted to drive his truck and
18 wanted to see if the truck was okay to drive mechanically
19 because it had had some problems. And along those lines
20 that is what we were trying to develop, showing that this
21 just happened spontaneously and there wasn't any planning.
22     Q. Would it be fair to say that there was no
23 possibility of a defense that he was not the shooter? That
24 was established, correct?

Page 9

1     A. Right, that's correct. He was arrested at the
2 scene of the shooting. There was no issue on that. People
3 had seen him. He just stayed right there.
4     Q. So any defense that you were working on would
5 involve basically state of mind, probably?
6     A. Yes.
7     Q. Something like that?
8     A. Basically, yes.
9     Q. You said you had some expert help. Dr. Nancy
10 Schmidt-Goessling. She's a psychologist, isn't she?
11     A. Yes, she is.
12     Q. And she works for the court clinic, does she
13 not?
14     A. Yes, she does.
15     Q. Employee of the court?
16     A. Yes. She has a private practice and she also,
17 she was the head of the court clinic at the time.
18     Q. In this case she was appointed by the court as
19 the court clinic, correct?
20     A. That's correct.
21     Q. You did not privately retain her?
22     A. No.
23     Q. So she was working for the court?
24     A. Yes.

3 (Pages 6 to 9)

Page 10

1     Q. And her reports were submitted both to the
2 prosecution and the defense and the court?
3     A. Yes. There were some rules on at what point
4 they would be given over to the prosecutors and things of
5 that nature, which the judge established but eventually they
6 did.
7     Q. But you had no control over who it went to?
8     A. No, not in the long run, no.
9     Q. He appointed her pretty much early on, didn't
10 he? Judge Nadel?
11     A. That's my recollection.
12     Q. Okay. And did you ever ask him for funds for
13 an independent psychological evaluation?
14     A. He would not allow that.
15     Q. Did you ever ask for it?
16     A. I don't remember anymore. That's his policy.
17     Q. He appointed her pursuant to a statute, did he
18 not, that requires that the reports be given to both
19 parties?
20     A. I don't remember.
21     Q. Don't remember that?
22     A. No.
23     Q. You're aware that there are statutes that
24 authorize funds for experts in a capital case when they are

Page 11

1 reasonably necessary?
2     A. Yes, I am.
3     Q. Did you make any written motion to Judge Nadel
4 asking for an independent psychologist?
5     A. I don't recall anymore.
6     Q. You said it was his policy not to give one, but
7 do you recall if you made it a matter of record to get such
8 an expert and have it denied on the record? Do you if you
9 did that?
10     A. I don't know.
11     Q. Speaking of experts, there was some talk in
12 this trial about Prozac, was there not?
13     A. Yes.
14     Q. How did you first become aware of the Prozac
15 issue here?
16     A. We knew that -- may I add one thing on the
17 expert?
18     Q. Sure.
19     A. One of the things that we had considered, I had
20 had experience with Nancy Schmidt-Goessling before and I did
21 consider that she was very good at what she did. She had
22 gone over all over the state and testified and I liked her
23 and her husband's work in past cases I did. I would be the
24 first to admit that I would rather have had an independent

Page 12

1 so the other side wouldn't have had access to anything
2 unless there was a written report. But I wasn't -- I did
3 feel very strongly that she would do a good job. She's well
4 thought of by the courts and comes across well with jurors.
5 So there was some positives. But again, we knew that there
6 would be no -- we would just have to pick someone who would
7 not be paid through the state and that was a problem.
8     Q. In fact she ended up testifying for the
9 prosecution, didn't she?
10     A. She did, yes. And that was one of the things
11 about her. It was well known that she would be truthful and
12 candid. That's why she was such a good witness and well
13 thought of. However, in this case there was some negative
14 things and they wanted her to testify.
15     Q. Her report was not favorable to Gerald Clemons,
16 was it?
17     A. No, it wasn't.
18     Q. After you received this report did you make a
19 motion to the judge for another evaluation to challenge or
20 test her findings or her report?
21     A. I don't recall anymore.
22     Q. Prozac, we're starting to get into that, again.
23 How did you become aware of the Prozac issue?
24     A. There actually was a test made where there was

Page 13

1 blood showing that there was a very slight amount of Prozac
2 in his system, so right away we knew. And he told us, of
3 course, that he had been using Prozac and so that's how we
4 originally looked into that. That's why.
5     Q. At some point in time you considered insanity
6 defense. Needs to be tested for one, didn't you?
7     A. Yes.
8     Q. And I think that was done by the court clinic
9 also, wasn't it?
10     A. That's my recollection.
11     Q. When you apparently abandoned that defense at
12 some point in time, did you ever ask for a second evaluation
13 as far as the insanity goes besides what the court clinic
14 did?
15     A. Not that I recall but I am not for sure
16 anymore.
17     Q. When you found out he was on Prozac, both from
18 his telling you and from the blood, did you then investigate
19 the drug Prozac and the effects it has on people?
20     A. Yes, I did.
21     Q. And what did you do to investigate them?
22     A. I got as many materials as I could and I had
23 never used that defense before. I did some research. I
24 remember at that time it had been used about 85 times in the

Page 14

1  United States and every time unsuccessfully. That was what
2  I was able to find, at that time. And I have not kept track
3  of it since. But I went through the same process I did on a
4  battered wife syndrome case that I handled successfully. I
5  looked into it very thoroughly, as did Dale. And I also
6  consulted with Dr. Schmidt-Goessling on that. And just by
7  good luck she had been in the seminar at Cleveland where the
8  expert that the state was dealing with had been at the same
9  meeting.
10    Q.  Dr. Keck?
11    A.  I think that was it. And apparently he was
12  talking all about it to this group, I'm sure a little
13  suspecting that Dr. Schmidt-Goessling was involved with the
14  case. And had made a lot of statements at the time about
15  what he was going to do and things of that nature. But Dr.
16  Schmidt-Goessling told us, and the reason we ultimately, we
17  tried to use it sort of as a red herring, but ultimately we
18  didn't feel we could be successful with it because what was
19  happening in our understanding, is that his level of Prozac
20  in his system had dropped to almost nothing. There was just
21  a trace amount. So in effect, at the time that the
22  shootings took place he wasn't --
23    Q.  There was some conflicting testimony as to when
24  he had took the Prozac, wasn't there?

Page 15

1    A.  He told us that he had run out of -- one of the
2  problems that occurred is because they weren't paying him,
3  he had run out of money and could not purchase any more
4  Prozac.
5    Q.  Let me ask you this. In some of your pretrial
6  conferences the judge more or less indicated he would favor
7  Prozac expert if you wanted one, didn't he?
8    A.  I actually don't remember anymore.
9    Q.  Do you remember, did you ever request funds for
10  a Prozac expert?
11    A.  I don't remember.
12    Q.  This Dr. Keck that you talked about, that Dr.
13  Schmidt-Goessling talked to, are you aware that he had
14  testified on behalf of Eli Lilly, which is the manufacturer
15  of Prozac?
16    A.  Yes.
17    Q.  So realistically you wouldn't expect him to say
18  anything bad about Prozac, would you?
19    A.  No. I knew they probably had an unlimited
20  amount of money they would try to put into opposing it. And
21  that wasn't so much of an issue as the bigger problem is,
22  from my standpoint was that he really -- with the trace
23  amount that that's what I was aware of at the time we were
24  concerned that that might not be a realistic defense.

Page 16

1    Q.  Well, I believe there wasn't any medical
2  evidence in the trial in the record as to blood tests or
3  amount in his system, was there?
4    A.  We saw the evidence but I don't know that it
5  ever came into -- it wasn't put into evidence. That for us,
6  would have been a negative because we tried to sort of throw
7  that in unofficially. We had the doctor come in and testify
8  he had taken Prozac. He had prescribed Prozac to him and,
9  give the reasons. But we were afraid that it would damage
10  our -- the credibility of our defense.
11    Q.  In your research on Prozac that you indicated
12  you did, did you find that there are main studies that says
13  Prozac has a lasting effect that goes well after it's out of
14  your system?
15    A.  I talked to Dr. Schmidt-Goessling about that,
16  and my recollection is she told me at the time that that
17  amount -- that it was beyond -- it wouldn't have had any
18  effect with that little amount but I was aware of the fact
19  that after you stopped taking it it stayed in your system
20  for a while and I did look into that.
21    Q.  And she got a lot of her information from Dr.
22  Keck who he worked for Eli Lilly?
23    A.  She actually got it from me, from what the
24  defendant told me.

Page 17

1    Q.  Dr. Schmidt-Goessling is not a psychiatrist or
2  a medical doctor, correct?
3    A.  She had one in her office that was involved
4  with this, my recollection.
5    Q.  Dr. Schmidt-Goessling's report also indicated
6  to you that she didn't think Prozac was in any way
7  responsible for this. Didn't Dr. Schmidt-Goessling feel
8  that way?
9    A.  Yes. She told me that she felt that what was
10  happening is that sometimes people in similar situations,
11  this would actually have an effect of stopping them from
12  being so confused and tormented and it would free them to
13  live a more normal life and do what they wanted to do. And
14  I didn't want to touch that during the trial.
15    Q.  In your research on Prozac didn't you come
16  across some of the numerous materials that indicate opinions
17  contrary to that of Dr. Keck in that Prozac could induce
18  mania and could have an effect on people?
19    A.  Yes.
20    Q.  Is there any reason that you did not attempt to
21  get funds for an expert to provide this information to the
22  jury, this contrary to what Eli Lilly's position was?
23    A.  Their witness in our opinion was -- it didn't
24  seem to be, in our opinion, at the time, a major factor

**Page 18**

1  during the case. We had not put a defense on using Prozac
2  and their use of -- I know the newspaper -- I see you
3  looking at that.
4     Q. That's what's coming. You in fact, at one
5  point in March, interview reporters in the paper, that you
6  were going to use a Prozac defense and consult a bunch of
7  experts?
8     A. Yes. And I knew that the prosecution would be
9  reading that. And I hate to admit I wasn't beyond trying to
10 throw them off of course because our information at the time
11 was that we didn't feel that would be a good defense. And
12 we made some strategic decisions. And naturally in
13 retrospect could have tried anything. And I am not saying
14 it shouldn't been tried but that was a decision that we
15 made.
16    Q. In opening statement Mr. Schmidt did make
17 reference to Prozac and he did put Dr. Day on in the
18 mitigation, talked about Prozac, did he not?
19    A. Yeah. He was the physician.
20    Q. He was the physician.
21    A. Yeah, in the mitigation, yes.
22    Q. And in mitigation his mother mentioned Prozac?
23    A. Yes.
24    Q. So would it be fair to say you were, at least

**Page 19**

1  in some way, trying to create the inference that Prozac was
2  in some way, at least partially responsible for his
3  behavior?
4     A. Yes, an inference. Yes.
5     Q. Did you at any time ask the Court for funds for
6  an expert on Prozac since you had read some of the studies
7  that said it could cause mania? Did you ever ask for the
8  funds to get an expert to get that information in front of
9  the jury?
10    A. I don't believe so but I'm not sure.
11 Realistically we knew Judge Nadel would not give us those
12 funds but I don't recall if we formally asked or if we were
13 told in chambers.
14    Q. If the record would reflect at one point that
15 he pretty much offered to give you funds for an expert on
16 Prozac can you think of any reason why you wouldn't ask for
17 one?
18    A. No, I don't know. It's been 10 years but the
19 only thing I can think of is that if we felt from referring
20 to Dr. Schmidt-Goessling who had access to a psychiatrist in
21 her -- not her practice but in the court clinic,
22 strategically we may have thought that wasn't a good way to
23 go. But after all these years I don't remember what the
24 strategy, of what we were thinking.

**Page 20**

1     Q. Do you recall on voir dire either you or Mr.
2  Schmidt or both of you talking to the jury about Prozac?
3     A. I don't remember anymore.
4     Q. To you remember Dr. Keck testifying in rebuttal
5  mitigation about how Prozac did not affect people?
6     A. Just vaguely. I can't remember that well
7  anymore.
8     Q. If you had researched Prozac thoroughly and had
9  access to all these studies that indicated opinions contrary
10 to what Dr. Keck said, can you think of any reason why you
11 would not use those in cross examination of Dr. Keck to
12 challenge his opinion or at least get other views in front
13 of the jury on that?
14    A. I think the thing that I thought it was a
15 negative for my research, and it may be wrong, but every
16 attempt to use a Prozac defense up to that point in all
17 85-odd cases of the United States has been unsuccessful.
18 And since this was a death penalty case, I believe our
19 thinking was we didn't want to risk a very unsuccessful
20 defense especially in a county as conservative as Hamilton
21 County.
22    Q. But there is a difference between defense to a
23 criminal charge and mitigation, is there not?
24    A. Yes, there is.

**Page 21**

1     Q. And even if it does not rise to the level of
2  defense to criminal charge it nonetheless could be
3  mitigating factor, could it not?
4     A. It could be.
5     Q. To convince the jury that Prozac was some way
6  responsible?
7     A. It could be, yes.
8     Q. Do you recall that Dr. Keck was not challenged.
9  His opinion pretty much went unchallenged on the stand?
10 Nobody was confronting him with any studies that indicated
11 the contrary which you indicate you came across; do you
12 recall that?
13    A. I don't recall anymore. I am not denying that.
14 I just don't remember anymore.
15    Q. When you went into the mitigation hearing what
16 was your theory of mitigation, do you recall?
17    A. I actually don't anymore.
18    Q. Did you ever consider either at the trial phase
19 or the mitigation phase, a theory of voluntary or
20 involuntary intoxication due to the drug Prozac?
21    A. I don't believe so.
22    Q. This is in spite of the research you did?
23    A. Again, my understanding was the problem was he
24 had gone way beyond the period from what I learned that it

### Page 22

1   would be affecting him. That's what I have been told and I
2   have learned from my reading of Dr. Schmidt-Goessling. And
3   I was afraid that that would create a problem for him if
4   there wasn't enough in his system to have any effect I was
5   afraid it might backfire.
6     Q.   Back to the trial phase. Prior to trial you
7   had some motions hearings, correct?
8     A.   Sure.
9     Q.   And one of the motions that you won was the
10  motion to suppress his statement to the Avondale police?
11    A.   Evendale.
12    Q.   Evendale. Right. Because he invoked his right
13  to counsel after his Miranda rights and kept questioning
14  him; is that right?
15    A.   That's my recollection.
16    Q.   So you got that statement suppressed?
17    A.   Yes.
18    Q.   When did you make the decision to put him on
19  the stand in the trial phase; do you recall?
20    A.   I don't remember.
21    Q.   Would it be fair to say it is a decision you
22  made during the trial at some point?
23    A.   I actually -- I just don't have any
24  recollection.

### Page 23

1     Q.   Did you prepare, sit down and go over testimony
2   to prepare Mr. Clemons for his testimony?
3     A.   That is something that I would always do but I
4   don't recall it anymore.
5     Q.   Do you recall, did you tell Mr. Clemons that if
6   he testified that this prior statement that he made to the
7   police which was suppressed could be used against him in
8   cross examination?
9     A.   I just don't remember anymore. Are you talking
10  about in the trial?
11    Q.   Were you aware that even though that statement
12  was suppressed, were you aware that if he took the stand
13  that statement could be used against him then?
14    A.   Yes.
15    Q.   Did you advise him of that?
16    A.   I don't recall anymore.
17    Q.   In fact, the prosecution did use that statement
18  against him, didn't they?
19    A.   I actually don't recall anymore.
20    Q.   You indicated a little bit ago that one of your
21  main premises of defense was that he always carried guns
22  with him. And when he testified that way, do you recall the
23  prosecution using the statement to the police to the effect
24  that he told the police that he rarely or ever took guns to

### Page 24

1   work?
2     A.   I don't recall that but I'm sure I knew at the
3   time.
4     Q.   That that would be pretty devastating to the
5   defense you were trying to present, wouldn't it?
6     A.   No. There had to be an explanation. He
7   brought two guns and over 100 rounds of ammunition, and he
8   was part of a target club and he did shoot. And he told us
9   he did take it with him when he was on the road and things.
10  And the fact that, I guess, we didn't see that as enough of
11  a barrier not to bring that up. That's what he told us
12  also. I mean, it was a truthful defense. And the fact also
13  that he had checked on -- his truck was -- had some
14  mechanical difficulties. And he had checked that morning
15  and called to see if he could get a route for some work.
16  And he was walking over to see if his truck was okay. So we
17  had an honest belief that the guns were incidental to him
18  coming work that day. And there was evidence from him and
19  so we thought it was still okay. I mean, if he didn't
20  always have one that wouldn't bar him from bringing a gun
21  that day for noncriminal intention.
22    Q.   During the trial in the mitigation phase what
23  was his demeanor generally?
24    A.   His demeanor seemed to be all right.

### Page 25

1     Q.   Pretty calm?
2     A.   I would say so, yes.
3     Q.   Wasn't getting excited? Wasn't emotional?
4     A.   No.
5     Q.   Were you aware that he was on medication during
6   the trial?
7     A.   I believe I knew that. I don't remember
8   specifically.
9     Q.   Do you remember specifically commenting to the
10  jury that he was on a type of generic Prozac or Prozac-type
11  drug?
12    A.   Dale may have. I don't recall saying that
13  myself.
14    Q.   Did you or Dale, to your knowledge, ever check
15  within the jail to see exactly what medication he was on?
16    A.   I think we were told by Dr. Schmidt-Goessling
17  but I don't didn't call myself.
18    Q.   You indicated that the goal, at least the
19  mitigation part of the goal was to convince a jury that
20  Prozac may have been at least in part somewhat responsible
21  for his behavior that day, right?
22    A.   You know, if I could see the opening statement
23  maybe I could --
24    Q.   I am afraid I don't have the transcript with

7 (Pages 22 to 25)

Ace Reporting Services  (513) 241-3200
30 Garfield Place, Suite 620  Cincinnati, Ohio  45202

Page 26

1  me.
2  A. I can't remember after all these years. I know
3  it was something we put in but I don't remember the weight
4  we put on it or anything after all these years.
5  Q. Well, if, in fact, the drug that he was on
6  during the trial and during the mitigation hearing was a
7  totally different drug than Prozac that would induce
8  possibly totally different behavior in him than Prozac, do
9  you think that would have been important for the jury to
10 know since you were pushing Prozac as being partly
11 responsible for his behavior?
12 A. I see what your point is. That might have been
13 a good idea, sure.
14 Q. You spoke with him many times, obviously. You
15 were pretty much aware of his life history and everything?
16 A. Yes.
17 Q. You were aware of his military history?
18 A. In Korea.
19 Q. He had a fairly high security clearance?
20 A. Yes.
21 Q. Is there a reason that that was not presented
22 to the jury in mitigation?
23 A. I don't recall why. I know after all those
24 months there was a problem. I don't know that we ever got

Page 27

1  ahold of his records but I don't recall why. It wasn't
2  disputed, I don't believe.
3  Q. Was it ever presented to the jury that he
4  served in Korea and had a high security clearance and had
5  gotten an honorable discharge?
6  A. It would be in the record. I just don't
7  remember anymore.
8  Q. Do you think that would be a significant
9  mitigating factor in a conservative area like Hamilton
10 County, service to your country?
11 A. Oh, sure, yes. I don't know how heavy it would
12 be but it would be something that I think would be good,
13 yes.
14 Q. Did you have a chance to review your file at
15 all before you came here today? I know it was kind of short
16 notice.
17 A. No. For some reason I wasn't notified of
18 the -- I didn't get notation. I don't know what happened.
19 Dale told me.
20 Q. Mr. Schmidt told you?
21 A. Right. I was unaware of it, so I told him I
22 would be glad to come up, but I did not review.
23 Q. Have you had a chance to talk to Dale about
24 this before to refresh your memories at all?

Page 28

1  A. Just a little bit. Not very much.
2  MR. KETCHAM: Just a second here. Let me check
3  my notes.
4  (A recess was taken from 11:48 to 11:49.)
5  Q. Just one final question. Back when this case
6  was tried what was the procedure policy how the court
7  handled the alternate jurors?
8  A. I'm sorry. I don't remember anymore.
9  Q. Do you remember if they went in with the other
10 jurors or they were separated or anything like that?
11 A. I just don't remember.
12 MR. KETCHAM: Okay, well, thank you. I don't
13 have any more questions.
14         CROSS-EXAMINATION
15 BY MS. BERRIEN:
16 Q. Hi, my name is Tara Berrien. I'm with the
17 petitioner. I work for the attorney general's office. I
18 just have a few questions to ask you.
19 A. Sure.
20 Q. Did you keep a separate file on comments from
21 Mr. Schmidt?
22 A. No. My recollection Dale kept everything for
23 both of us.
24 Q. So you don't have a separate file to review?

Page 29

1  A. No.
2  Q. You said that you were challening Clemons'
3  state of mind at trial based on the facts and in
4  conversations with him.
5  A. I was challenging his state of mind?
6  Q. You were disputing his state of mind. Like you
7  were trying to dispute the premeditation for the killing?
8  A. Oh, sure, yes.
9  Q. Based on the facts and your conversations with
10 Clemons?
11 A. Right.
12 Q. So did Mr. Clemons tell you that he was insane
13 or that he blacked out at the time?
14 A. No. He didn't tell us that.
15 Q. Do you recall what he told you?
16 A. Oh, boy. I do. I don't know if this would be
17 a breach of his privacy to discuss it or not.
18 MR. KETCHAM: I think that's waived in this
19 situation.
20 A. Okay. My recollection is he remembered the
21 basic events but couldn't remember the specific events of
22 the shooting. For instance, right up to the point, you
23 know, that it was about to happen. But once the shooting
24 started taking place he said that he was very sketchy on

8 (Pages 26 to 29)

Page 30

1  details and sort of blocked it out of his mind. That's my
2  recollection.
3      Q.  Okay, so he did, like, black out or blocked out
4  the events?
5      A.  Sort of like that. Sort of all a blur.
6      Q.  Mr. Clemons also talked to you about Prozac?
7      A.  Yeah, we talked about that, sure.
8      Q.  And do you recall what he told you? Did he
9  tell you he took a pill that day?
10     A.  No. He hadn't taken a pill for some period of
11 time, just, you know, after all these years I'm going to say
12 three days, but it could have been longer than that. But he
13 had told us specifically, and my recollection of it was that
14 because they wouldn't pay him he didn't have enough money to
15 get his medicine. And it had been some period of time but I
16 do not recall offhand what it was anymore since he took it.
17     Q.  Based on your research of Prozac and the
18 materials you read and your conversations with Dr.
19 Schmidt-Goessling and also what Clemons told you, you didn't
20 think that Prozac was going to be a successful defense?
21     A.  That's correct.
22     Q.  And you also didn't present Prozac as a defense
23 or even as the only defense because of the trace amount of
24 Prozac left in Clemons' blood?

Page 31

1      A.  That's right. We tried to throw in a little
2  bit of the Prozac thing just sort of as a red herring. Not
3  a red herring but something that might, you know, somebody
4  might seize upon. But it was a very minor part of our case.
5  And we were worried that if we used that it might be losing
6  use of that defense or whatever it was at the time. And
7  since this was a death penalty case we didn't feel it was
8  worth the risk.
9      Q.  Okay. I'm sorry. Can I have one moment
10 please?
11     A.  Sure.
12         (Discussion off the record.)
13     Q.  Lastly, you researched and you found evidence
14 that Prozac can cause some violent reactions?
15     A.  Yes.
16     Q.  But you also found information out that it will
17 not cause violence?
18     A.  Right.
19     Q.  Okay.
20     A.  At the time, my recollection is it was the most
21 widely-prescribed medication on earth at the time. And
22 there are -- millions and millions of doses have been given
23 out and our understanding from talking to Dr.
24 Schmidt-Goessling what was actually -- she surmised what was

Page 32

1  actually happening, some people when their minds were free
2  and they weren't bogged down by depression and things, they
3  were taking their natural actions. Which we thought if that
4  were true that would not be something we would want to deal
5  with in the trial or in the case.
6         MS. BERRIEN:  One moment.
7         (Discussion off the record.)
8      Q.  Would it be fair to say that you thought a jury
9  would be skeptical about a Prozac defense when there was
10 such little amount of trace evidence left in Mr. Clemons'
11 blood?
12     A.  Yes.
13        MS. BERRIEN:  Okay. I have no further
14 questions. Thank you very much.
15        REDIRECT EXAMINATION
16 BY MR. KETCHAM:
17     Q.  Just a couple questions to follow up. In your
18 research on Prozac did you become aware of studies that show
19 that individuals after they stopped talking Prozac even
20 their brain compensates for the presence of Prozac and they
21 go through withdrawal responses and of studies that indicate
22 that Prozac frequently causes in that situation, anxiety,
23 dizziness, insomnia and known to exascerbate suicidal or
24 violent behavior?

Page 33

1      A.  I don't recall anymore. My understanding at
2  the time from talking to Dr. Schmidt-Goessling what I saw
3  was after a certain point when it is out of the system that
4  the effects are minimized, but I want remember specifically.
5      Q.  Were you aware of any studies that indicate
6  that it can result in paranoia and acts of aggression
7  against himself and others?
8      A.  Yes.
9      Q.  And also induces episodes of mania?
10     A.  Yes.
11     Q.  And violent behavior?
12     A.  Yes.
13     Q.  Now, in the trial phrase of this case, the
14 first phase, apparently at some point you decided you didn't
15 want to use this because you were going to put his
16 physician, Dr. Day on; do you recall that?
17     A.  I think he did testify at some point.
18     Q.  In mitigation?
19     A.  Right.
20     Q.  But do you recall the prosecution filed a
21 motion in limine to prevent him from testifying in the first
22 phase of the trial?
23     A.  I don't actually remember anymore. I believe
24 you if you tell me.

Page 34

1  Q. If the record would indicate that you did
2  attempt to put him on but I believe he was not qualified as
3  an expert in Prozac and he was not permitted to testify,
4  would you have any argument with that?
5  A. I don't think that was the situation. My
6  recollection was we sort of wanted to throw out sort of a
7  red herring thing if we could catch some sympathy from it
8  without bringing up all of the negatives of using that
9  defense. That was sort of what we were trying to do. And
10 it wasn't any key to our defense. It was just a very minor
11 thing. And I don't know if -- I can't remember if we would
12 have used him or not. I just can't remember.
13  Q. Okay. But if the record reflected you
14 attempted to and the court did not permit it, that would
15 probably be accurate if it's in the record.
16  A. Sure. I just don't remember.
17       MR. KETCHAM: I have no more. Thank you.
18       THE WITNESS: Okay. Thank you.
19       MS. BERRIEN: I have no questions.
20
21
22       _____
          MARK KRUMBEIN
23
       DEPOSITION CONCLUDED AT 12:00 P.M.
24

Page 35

1        C E R T I F I C A T E
2  COMMONWEALTH OF KENTUCKY:
             : SS
3  COUNTY OF CAMPBELL   :
4       I, Sherry L. Music, the undersigned, a duly
5  qualified and commissioned notary public within and for the
6  Commonwealth of Kentucky, do hereby certify that before the
7  giving of his aforesaid deposition, MARK KRUMBEIN was by me
8  first duly sworn to depose the truth, the whole truth and
9  nothing but the truth; that the foregoing is the deposition
10 given at said time and place by MARK KRUMBEIN; that said
11 deposition was taken in all respects pursuant to
12 stipulations of counsel; that I am neither a relative of nor
13 employee of any of their counsel, and have no interest
14 whatever in the result of the action.
15      IN WITNESS WHEREOF, I hereunto set my hand and
16 official seal of office at Newport, Kentucky this _____ day
17 of _____, 2003.
18
19
20
21      _____
   My commission expires:    Sherry L. Music
22 February 22, 2003.         Notary Public
             Commonwealth of Kentucky
23
24

10 (Pages 34 to 35)

Ace Reporting Services  (513) 241-3200
30 Garfield Place, Suite 620  Cincinnati, Ohio  45202

Case 1:00-cv-00722-MHW-NMK   Document 62   Filed 11/17/2003   Page 13 of 20

36

## A

abandoned 13:11
able 14:2
about 8:2,17 11:12 12:11
    13:24 14:12,14 15:12,18
    16:15 18:18 20:2,5 23:10
    27:23 29:23 30:6,7 32:9
access 12:1 19:20 20:9
accurate 34:15
across 12:4 17:16 21:11
action 35:14
actions 32:3
acts 33:6
actually 7:3 12:24 15:8 16:23
    17:11 21:17 22:23 23:19
    31:24 32:1 33:23
add 11:16
address 4:11,13
admit 11:24 18:9
advise 23:15
affect 20:5
affecting 22:1
aforesaid 35:7
afraid 16:9 22:3,5 25:24
after 7:13 12:18 16:13,19
    19:23 22:13 26:2,4,23
    30:11 32:19 33:3
again 4:6 12:5,22 21:23
against 23:7,13,18 33:7
age 4:2
aggravated 6:14
aggression 33:6
ago 23:20
agreement 1:14 4:7
ahold 27:1
allow 10:14
almost 14:20
along 8:19
alternate 28:7
always 7:16 8:8 23:3,21
    24:20
ammunition 24:7
amount 13:1 14:21 15:20,23
    16:3,17,18 30:23 32:10
another 12:19
anxiety 32:22
anymore 7:4,15,21 10:16
    11:5 12:21 13:16 15:8 20:3
    20:7 21:13,14,17 23:4,9,16
    23:19 27:7 28:8 30:16 33:1
    33:23
anyone 8:15
anything 7:19 12:1 15:18
    18:13 26:4 28:10
apparently 13:11 14:11
    33:14
APPEARANCES 2:1
appointed 7:5,9,14 9:18 10:9
    10:17
approval 5:4
approximately 4:19 5:13 6:5
    6:18
area 27:9
argument 34:4
arrested 9:1
asked 19:12
asking 8:17 11:4
attempt 17:20 20:16 34:2
attempted 34:14
attorney 28:17
authorize 10:24
Avondale 22:10
awaiting 5:4
aware 10:23 11:14 12:23
    15:13,23 16:18 23:11,12
    25:5 26:15,17 32:18 33:5
away 13:2
a.m 1:16

## B

back 6:2,6,11 22:6 28:5
backfire 22:5
bad 15:18
bar 24:20
barrier 24:11
based 29:3,9 30:17
basic 29:21
basically 9:5,8
battered 14:4
become 11:14 12:23 32:18
before 1:19 5:15,20 6:11
    11:20 13:23 27:15,24 35:6
behalf 2:2,10 15:14
behavior 19:3 25:21 26:8,11
    32:24 33:11
being 4:2 6:8 17:12 26:10
belief 24:17
believe 4:9 5:14 6:9 7:7 16:1
    19:10 20:18 21:21 25:7
    27:2 33:23 34:2
Berrien 2:11 3:3 28:15,16
    32:6,13 34:19
besides 6:1 13:13
BETTY 1:8
between 20:22
beyond 16:17 18:9 21:24
bigger 15:21
bit 23:20 28:1 31:2
black 30:3
blacked 29:13
blocked 30:1,3
blood 13:1,18 16:2 30:24
    32:11
blur 30:5
bogged 32:2
both 7:22 10:1,18 13:17 20:2
    28:23
Box 2:8
boy 29:16
brain 32:20
breach 29:17
bring 24:11
bringing 24:20 34:8
Broad 2:13
brought 8:13 24:7
bunch 18:6

## C

C 35:1,1
call 25:17
called 24:15
calm 25:1
came 6:2 16:5 21:11 27:15
CAMPBELL 35:3
candid 12:12
capital 2:12 4:24 5:7,12 6:2,9
    10:24
carried 8:8 23:21
carry 8:10
case 1:7 6:9,24 7:1,18 8:2,4
    9:18 10:24 12:13 14:4,14
    18:1 20:18 28:5 31:4,7 32:5
    33:13
cases 4:24 5:12 6:2 11:23
    20:17
catch 34:7
cause 19:7 31:14,17
causes 32:22
Celestial 1:18
certain 33:3
certified 4:3 5:10
certify 35:6
challenge 12:19 20:12
challenged 21:8
challenging 29:5
challening 29:2
chambers 19:13
chance 27:14,23
charge 6:8 20:23 21:2

Ace Reporting Services  (513) 241-3200
30 Garfield Place, Suite 620  Cincinnati, Ohio  45202

Charles 2:12
check 25:14 28:2
checked 24:13,14
Cincinnati 1:18 4:14
clearance 26:19 27:4
Clemons 1:5 4:8 5:7,16,21
    6:1,6,7,24 12:15 23:2,5
    29:2,10,12 30:6,19,24
    32:10
Cleveland 14:7
clinic 9:12,17,19 13:8,13
    19:21
club 8:12 24:8
Columbus 2:5,13
come 6:6 16:7 17:15 27:22
comes 6:20 12:4
coming 18:4 24:18
Commencing 1:16
commenting 25:9
comments 28:20
commission 35:21
commissioned 35:5
Commonwealth 1:20 35:2,6
    35:22
compensates 32:20
concerned 15:24
CONCLUDED 34:23
conferences 15:6
conflicting 14:23
confronting 21:10
confused 17:12
conservative 20:20 27:9
consider 11:21 21:18
considered 11:19 13:5
consult 18:6
consulted 14:6
contrary 17:17,22 20:9 21:11
control 10:7
conversations 29:4,9 30:18
convince 21:5 25:19
corpus 4:9
correct 8:24 9:1,19,20 17:2
    22:7 30:21
counsel 5:6 22:13 35:12,13
counselor 7:20
country 27:10
county 20:20,21 27:10 35:3
couple 32:17
course 13:3 18:10
court 1:1 9:12,15,17,18,19,23
    10:2 13:8,13 19:5,21 28:6
    34:14
courts 12:4

CR 1:19
create 19:1 22:3
credibility 16:10
Crimes 2:12
criminal 4:21,22 20:23 21:2
cross 20:11 23:8
Cross-Examination 3:3
    28:14
current 6:10
currently 5:14

**D**

D 3:1
Dale 1:17 7:4,5 14:5 25:12,14
    27:19,23 28:22
damage 16:9
DATE 1:15
Dave 4:8
David 2:7
day 8:16 18:17 24:18,21
    25:21 30:9 33:16 35:16
days 30:12
deal 32:4
dealing 14:8
death 6:2,17,19 20:18 31:7
decided 33:14
decision 18:14 22:18,21
decisions 18:12
defendant 1:9 2:10 16:24
defense 4:21,22 8:23 9:4 10:2
    13:6,11,23 15:24 16:10
    18:1,6,11 20:16,20,22 21:2
    23:21 24:5,12 30:20,22,23
    31:6 32:9 34:9,10
demeanor 24:23,24
denied 11:8
denying 21:13
depose 35:8
deposed 4:3
deposition 1:12 4:6 34:23
    35:7,9,11
depression 32:2
details 30:1
devastating 24:4
develop 8:20
developing 8:2
difference 20:22
different 26:7,8
difficulties 24:14
dire 20:1
Direct 3:3 4:4
discharge 27:5
discuss 29:17

Discussion 31:12 32:7
dispute 29:7
disputed 27:2
disputing 29:6
DISTRICT 1:1,2
divide 7:18
dizziness 32:23
doctor 16:7 17:2
done 13:8
doses 31:22
down 5:24 6:15 23:1 32:2
Dr 9:9 14:6,10,13,15 15:12
    15:12 16:15,21 17:1,5,7,17
    18:17 19:20 20:4,10,11
    21:8 22:2 25:16 30:18
    31:23 33:2,16
drive 8:17,18
drivers 8:9
driving 8:8
dropped 14:20
drug 13:19 21:20 25:11 26:5
    26:7
due 21:20
duly 4:2 35:4,8
during 8:11 17:14 18:1 22:22
    24:22 25:5 26:6,6

**E**

E 2:13 3:1 35:1,1
early 7:10,11 10:9
earth 31:21
East 4:13
effect 14:21 16:13,18 17:11
    17:18 22:4 23:23
effects 13:19 33:4
eight 5:20 6:13
either 20:1 21:18
eleven 6:23
Eli 15:14 16:22 17:22
emotional 25:3
employee 9:15 35:13
ended 6:8 12:8
engaged 4:15
enough 22:4 24:10 30:14
episodes 33:9
especially 20:20
Esq 1:17 2:3,7,11,12
established 8:16,24 10:5
estimate 5:20
evaluation 10:13 12:19 13:12
even 8:10 21:1 23:11 30:23
    32:19
Evendale 22:11,12

events 29:21,21 30:4
eventually 10:5
ever 7:1,2,17 10:12,15 13:12
   15:9 16:5 19:7 21:18 23:24
   25:14 26:24 27:3
every 14:1 20:15
everything 7:23 26:15 28:22
evidence 8:13 16:2,4,5 24:18
   31:13 32:10
exactly 5:17 7:12 25:15
examination 3:3,4 4:4 20:11
   23:8 32:15
examined 4:3
exascerbate 32:23
excited 25:3
exhibits 3:6
expect 15:17
experience 11:20
expert 8:4 9:9 11:8,17 14:8
   15:7,10 17:21 19:6,8,15
   34:3
experts 10:24 11:11 18:7
expire 5:3
expires 35:21
explanation 24:6

F
F 35:1
fact 12:8 16:18 18:4 23:17
   24:10,12 26:5
factor 17:24 21:3 27:9
facts 8:3 29:3,9
fair 8:22 18:24 22:21 32:8
fairly 26:19
far 7:18 13:13
favor 15:6
favorable 12:15
February 35:22
federal 4:8
feel 12:3 14:18 17:7 18:11
   31:7
felt 17:9 19:19
few 28:18
figure 5:17
file 7:4 27:14 28:20,24
filed 33:20
final 28:5
find 14:2 16:12
findings 12:20
first 4:2 6:13 11:14,24 33:14
   33:21 35:8
Floor 2:13
follow 32:17

follows 4:3
foregoing 35:9
formally 19:12
found 13:17 31:13,16
four 6:21,22
free 17:12 32:1
frequently 32:22
from 13:17,18 15:22 16:21
   16:23,23 17:11 19:19 21:24
   22:2 24:18,20 28:4,20
   31:23 33:2,21 34:7
front 19:8 20:12
funds 10:12,24 15:9 17:21
   19:5,8,12,15
further 32:13

G
G 1:17
generally 4:20 24:23
general's 28:17
generic 25:10
Gerald 1:5 4:8 5:7,15,20,22
   6:1,24 7:13 12:15
getting 6:10 25:3
give 5:17 11:6 16:9 19:11,15
given 10:4,18 31:22 35:10
giving 35:7
glad 27:22
go 6:11 7:13 8:1 19:23 23:1
   32:21
goal 25:18,19
goes 13:13 16:13
going 5:20 6:12,12 7:18,19
   14:15 18:6 30:11,20 33:15
gone 11:22 21:24
good 11:21 12:3,12 14:7
   18:11 19:22 26:13 27:12
gotten 27:5
Graeff 2:7 4:8
group 14:12
guess 6:12,12 24:10
guessing 6:23
guilty 6:14
gun 8:8,14 24:20
guns 8:10 23:21,24 24:7,17

H
habeas 4:9
Hamilton 20:20 27:9
hand 35:15
handle 4:24
handled 5:12,15 14:4 28:7
happen 29:23

happened 8:21 27:18
happening 14:19 17:10 32:1
hate 18:9
head 9:17
hearing 21:15 26:6
hearings 22:7
heavy 27:11
help 9:9
her 9:21 10:1,9,17 11:22,23
   12:11,14,15,20,20 16:21
   17:3 19:21,21
hereinafter 4:3
hereunto 35:15
herring 14:17 31:2,3 34:7
Hi 28:16
high 2:5 26:19 27:4
Highland 1:17
him 7:20 9:3 10:12 15:2,17
   16:8 21:10 22:1,3,14,18
   23:7,13,15,18,22 24:9,17,18
   24:20 26:8,14 27:21 29:4
   30:14 33:21 34:2,12
himself 33:7
history 26:15,17
honest 24:17
honorable 27:5
husband's 11:23

I
idea 6:18 26:13
illegal 8:10
important 26:9
incidental 24:17
independent 10:13 11:4,24
Indiana 8:13
indicate 17:16 21:11 32:21
   33:5 34:1
indicated 15:6 16:11 17:5
   20:9 21:10 23:20 25:18
individuals 32:19
induce 17:17 26:7
induces 33:9
inference 19:1,4
information 16:21 17:21
   18:10 19:8 31:16
insane 29:12
insanity 13:5,13
insomnia 32:23
instance 8:12 29:22
intention 24:21
interest 35:13
interview 18:5
intoxication 21:20

investigate 13:18,21
invoked 22:12
involuntary 21:20
involve 9:5
involved 14:13 17:3
issue 9:2 11:15 12:23 15:21

### J

J 2:7
jail 25:15
January 1:15
job 12:3
judge 10:5,10 11:3 12:19
    15:6 19:11
jurors 12:4 28:7,10
jury 17:22 19:9 20:2,13 21:5
    25:10,19 26:9,22 27:3 32:8
just 5:4,18 6:10,12,17,23 7:4
    7:12,21 8:3,5,21 9:3 12:6
    14:6,20 20:6 21:14 22:23
    23:9 27:6 28:1,2,5,11,18
    30:11 31:2 32:17 34:10,12
    34:16

### K

Keck 14:10 15:12 16:22
    17:17 20:4,10,11 21:8
keep 28:20
Kentucky 1:20 35:2,6,16,22
kept 7:4 14:2 22:13 28:22
Ketcham 2:3,4,4 3:3,4 4:5,7
    28:2,12 29:18 32:16 34:17
key 34:10
killing 29:7
kind 7:1 27:15
knew 11:16 12:5 13:2 15:19
    18:8 19:11 24:2 25:7
knocked 6:15
know 6:13 8:13 11:10 16:4
    18:2 19:18 25:22 26:2,10
    26:23,24 27:11,15,18 29:16
    29:23 30:11 31:3 34:11
knowledge 25:14
known 12:11 32:23
Korea 26:18 27:4
Krumbein 1:12 3:2 4:1,7,12
    34:22 35:7,10
K-r-u-m-b-e-i-n 4:13

### L

L 1:19 2:11 35:4,21
lasting 16:13
Lastly 31:13
law 4:16

lawful 4:2
lawyer 4:18
learned 21:24 22:2
learning 8:3
least 18:24 19:2 20:12 25:18
    25:20
left 30:24 32:10
less 15:6
lesser 6:8
let 5:2 7:3 15:5 28:2
let's 6:6,13
level 14:19 21:1
life 6:15 17:13 26:15
like 9:7 27:9 28:10 29:6 30:3
    30:5
liked 11:22
Lilly 15:14 16:22
Lilly's 17:22
limine 33:21
lines 8:19
list 6:20
little 14:12 16:18 23:20 28:1
    31:1 32:10
live 17:13
long 4:18 7:21 10:8
longer 30:12
look 6:20 16:20
looked 13:4 14:5
looking 18:3
losing 31:5
lot 14:14 16:21
luck 14:7

### M

made 11:7 12:24 14:14 18:12
    18:15 22:22 23:6
main 16:12 23:21
major 17:24
make 11:3 12:18 18:16 22:18
man 6:15
mania 17:18 19:7 33:9
manufacturer 15:14
many 5:12,15 6:5,18 8:9
    13:22 26:14
March 18:5
Mark 1:12 3:2 4:1,7,10,12
    34:22 35:7,10
materials 13:22 17:16 30:18
matter 11:7
matters 4:9
may 11:16 19:22 20:15 25:12
    25:20
maybe 6:22 25:23

mean 24:12,19
mechanical 24:14
mechanically 8:18
medical 16:1 17:2
medication 25:5,15 31:21
medicine 30:15
meeting 14:9
member 8:12
memories 27:24
memory 7:15
mentioned 18:22
might 15:24 22:5 26:12 31:3
    31:4,5
military 26:17
millions 31:22,22
mind 9:5 29:3,5,6 30:1
minds 32:1
minimized 33:4
minor 31:4 34:10
Miranda 22:13
MITCHELL 1:8
mitigating 21:3 27:9
mitigation 18:18,21,22 20:5
    20:23 21:15,16,19 24:22
    25:19 26:6,22 33:18
moment 31:9 32:6
money 15:3,20 30:14
months 26:24
more 7:4 15:3,6 17:13 28:13
    34:17
morning 24:14
most 31:20
Mostly 4:22
mother 18:22
motion 11:3 12:19 22:10
    33:21
motions 22:7,9
MS-1-00-017 1:7
much 10:9 15:21 19:15 21:9
    26:15 28:1 32:14
murders 6:14
Music 1:19 35:4,21
myself 25:13,17

### N

N 3:1
Nadel 10:10 11:3 19:11
name 4:7,10,12 28:16
Nancy 8:5 9:9 11:20
natural 32:3
naturally 18:12
nature 10:5 14:15
necessary 11:1

Case 1:00-cv-00722-MHW-NMK   Document 62   Filed 11/17/2003   Page 17 of 20

**40**

**Needs** 13:6
**negative** 12:13 16:6 20:15
**negatives** 34:8
**negotiations** 7:1
**neither** 35:12
**never** 13:23
**Newport** 35:16
**newspaper** 18:2
**Nobody** 21:10
**noncriminal** 24:21
**none** 6:7
**nonetheless** 21:2
**normal** 17:13
**normally** 8:10,14
**notary** 1:20 35:5,22
**notation** 27:18
**notes** 28:3
**nothing** 14:20 35:9
**notice** 27:16
**notified** 27:17
**numerous** 17:16

---
**O**

**obviously** 26:14
**occurred** 15:2
**off** 18:10 31:12 32:7
**offered** 7:2 19:15
**offhand** 30:16
**office** 1:17 4:11,13 17:3
    28:17 35:16
**official** 35:16
**Oh** 27:11 29:8,16
**Ohio** 1:2,18 2:5,8,13 4:14
**okay** 5:6,15 8:18 10:12 24:16
    24:19 28:12 29:20 30:3
    31:9,19 32:13 34:13,18
**once** 4:6 29:23
**one** 5:6 6:6,8,10,13,14 8:6
    11:6,16,19 12:10 13:6 15:1
    15:7 17:3 18:4 19:14,17
    22:9 23:20 24:20 28:5 31:9
    32:6
**only** 5:22 19:19 30:23
**opening** 18:16 25:22
**opinion** 17:23,24 20:12 21:9
**opinions** 17:16 20:9
**opposing** 15:20
**originally** 13:4
**other** 6:1 12:1 20:12 28:9
**others** 6:16 33:7
**out** 5:17 6:12,16,20,23 13:17
    15:1,3 16:13 29:13 30:1,3,3
    31:16,23 33:3 34:6

**over** 8:8 10:4,7 11:22,22 23:1
    24:7,16

---
**P**

**PAGE** 3:2
**paid** 12:7
**paper** 18:5
**paranoia** 33:6
**part** 24:8 25:19,20 31:4
**partially** 19:2
**parties** 10:19
**partly** 26:10
**past** 11:23
**pay** 30:14
**paying** 15:2
**penalty** 6:17 20:18 31:7
**people** 9:2 13:19 17:10,18
    20:5 32:1
**period** 21:24 30:10,15
**permit** 34:14
**permitted** 34:3
**petitioner** 28:17
**phase** 21:18,19 22:6,19 24:22
    33:14,22
**phrase** 33:13
**physician** 18:19,20 33:16
**pick** 12:6
**pill** 30:9,10
**place** 1:17 14:22 29:24 35:10
**plaintiff** 1:6,13 2:2
**planning** 8:21
**plea** 6:8 7:1,2
**pleas** 6:16
**please** 31:10
**point** 10:3 13:5,12 18:5 19:14
    20:16 22:22 26:12 29:22
    33:3,14,17
**police** 22:10 23:7,23,24
**policy** 10:16 11:6 28:6
**position** 17:22
**positives** 12:5
**possibility** 8:23
**possibly** 26:8
**practice** 4:15,20 9:16 19:21
**preliminary** 4:9
**premeditated** 8:7
**premeditation** 29:7
**premises** 23:21
**prepare** 23:1,2
**prescribed** 16:8
**presence** 32:20
**present** 24:5 30:22
**presented** 26:21 27:3

**pretrial** 15:5
**pretty** 10:9 19:15 21:9 24:4
    25:1 26:15
**prevent** 33:21
**prior** 22:6 23:6
**privacy** 29:17
**private** 4:15,18 9:16
**privately** 9:21
**probably** 5:17 6:13 9:5 15:19
    34:15
**problem** 5:5 12:7 15:21
    21:23 22:3 26:24
**problems** 8:19 15:2
**procedure** 28:6
**proceedings** 7:8
**process** 14:3
**prosecution** 10:2 12:9 18:8
    23:17,23 33:20
**prosecutors** 10:4
**provide** 17:21
**Prozac** 11:12,14 12:22,23
    13:1,3,17,19 14:19,24 15:4
    15:7,10,15,18 16:8,8,11,13
    17:6,15,17 18:1,6,17,18,22
    19:1,6,16 20:2,5,8,16 21:5
    21:20 25:10,20 26:7,8,10
    30:6,17,20,22,24 31:2,14
    32:9,18,19,20,22 34:3
**Prozac-type** 25:10
**psychiatrist** 17:1 19:20
**psychological** 10:13
**psychologist** 9:10 11:4
**public** 1:20 35:5,22
**purchase** 15:3
**purpose** 8:15
**pursuant** 1:14 10:17 35:11
**pushing** 26:10
**put** 15:20 16:5 18:1,17 22:18
    26:3,4 33:15 34:2
**P.M** 34:23
**P.O** 2:8

---
**Q**

**qualifications** 5:2
**qualified** 4:24 34:2 35:5
**question** 28:5
**questioning** 22:13
**questions** 28:13,18 32:14,17
    34:19

---
**R**

**R** 35:1
**rarely** 23:24

Ace Reporting Services  (513) 241-3200
30 Garfield Place, Suite 620  Cincinnati, Ohio  45202

rather 11:24
reactions 31:14
read 19:6 30:18
reading 18:9 22:2
realistic 15:24
realistically 15:17 19:11
really 15:22
reason 14:16 17:20 19:16
   20:10 26:21 27:17
reasonably 11:1
reasons 16:9
rebuttal 20:4
recall 8:1 11:5,7 12:21 13:15
   19:12 20:1 21:8,12,13,16
   22:19 23:4,5,16,19,22 24:2
   25:12 26:23 27:1 29:15
   30:8,16 33:1,16,20
received 12:18
Recently 5:2
recess 28:4
recollection 8:4 10:11 13:10
   16:16 17:4 22:15,24 28:22
   29:20 30:2,13 31:20 34:6
recommendation 6:3
record 4:10 11:7,8 16:2
   19:14 27:6 31:12 32:7 34:1
   34:13,15
records 27:1
red 14:17 31:2,3 34:7
Redirect 3:4 32:15
reference 18:17
referring 19:19
reflect 19:14
reflected 34:13
refresh 27:24
relative 35:12
remember 6:21 7:3,4,8,12,21
   8:6 10:16,20,21 13:24 15:8
   15:9,11 19:23 20:3,4,6
   21:14 22:20 23:9 25:7,9
   26:2,3 27:7 28:8,9,11 29:21
   33:4,23 34:11,12,16
remembered 29:20
report 12:2,15,18,20 17:5
reporters 18:5
reports 10:1,18
representing 4:8
requalified 5:3
request 15:9
requires 10:18
research 13:23 16:11 17:15
   20:15 21:22 30:17 32:18
researched 20:8 31:13

respects 35:11
responses 32:21
responsible 7:23 17:7 19:2
   21:6 25:20 26:11
result 33:6 35:14
retain 9:21
retrospect 18:13
review 27:14,22 28:24
Richard 2:3
Rick 4:7
right 9:1,3 13:2 22:12,12,14
   24:24 25:21 27:21 29:11,22
   31:1,18 33:19
rights 22:13
rise 21:1
risk 20:19 31:8
road 8:8 24:9
rounds 24:7
route 8:17 24:15
routinely 8:9
row 6:19
Rule 5:1,1,2,9
rules 10:3
run 10:8 15:1,3

_____S_____

S 2:3
safe 7:22
same 7:5 14:3,8
saw 16:4 33:2
saying 18:13 25:12
says 16:12
scene 9:2
Schmidt 1:17 7:5,17 8:2
   18:16 20:2 27:20 28:21
Schmidt-Goessling 8:5 9:10
   11:20 14:6,13,16 15:13
   16:15 17:1,7 19:20 22:2
   25:16 30:19 31:24 33:2
Schmidt-Goessling's 17:5
seal 35:16
second 5:18,18 13:12 28:2
security 26:19 27:4
see 6:6,13 7:13 8:18 18:2
   24:10,15,16 25:15,22 26:12
seem 17:24
seemed 24:24
seen 9:3
seize 31:4
seminar 5:3 14:7
separate 28:20,24
separated 28:10
served 27:4

service 27:10
set 35:15
Sherry 1:19 35:4,21
shoot 24:8
shooter 8:23
shooting 8:15 9:2 29:22,23
shootings 14:22
short 27:15
shortly 7:13
show 8:6,7,9 32:18
showed 8:12
showing 8:13,20 13:1
side 12:1
significant 27:8
similar 17:10
since 5:22 6:6,7 14:3 19:6
   20:18 26:10 30:16 31:7
sit 23:1
situation 29:19 32:22 34:5
situations 17:10
skeptical 32:9
sketchy 29:24
slight 13:1
slowed 5:24
some 6:16,16,16 8:4,11,19
   9:9 10:3 11:11 12:5,13 13:5
   13:12,23 14:23 15:5 17:16
   18:12 19:1,2,6 21:5 22:7,22
   24:13,15 27:17 30:10,15
   31:14 32:1 33:14,17 34:7
somebody 31:3
someone 12:6
something 9:7 23:3 26:3
   27:12 31:3 32:4
sometimes 17:10
somewhat 25:20
sorry 6:7 28:8 31:9
sort 14:17 16:6 30:1,5,5 31:2
   34:6,6,9
SOT 2:12
South 2:5
SOUTHERN 1:2
Speaking 6:24 11:11
spec 6:15
specific 8:14 29:21
specifically 25:8,9 30:13 33:4
spite 21:22
spoke 26:14
spontaneously 8:21
SS 35:2
stage 7:8
stand 21:9 22:19 23:12
standpoint 15:22

Case 1:00-cv-00722-MHW-NMK   Document 62   Filed 11/17/2003   Page 19 of 20

**42**

started 6:10 29:24
starting 12:22
state 4:10 9:5 11:22 12:7 14:8 29:3,5,6
STATED 1:1
statement 18:16 22:10,16 23:6,11,13,17,23 25:22
statements 14:14
States 14:1 20:17
statute 10:17
statutes 10:23
stayed 9:3 16:19
still 5:9 24:19
stipulations 35:12
stopped 16:19 32:19
stopping 17:11
strategic 18:12
strategically 19:22
strategies 8:6
strategy 8:2 19:24
Street 1:18 2:5,13 4:13
strongly 12:3
studies 16:12 19:6 20:9 21:10 32:18,21 33:5
submitted 10:1
successful 14:18 30:20
successfully 14:4
suicidal 32:23
Suite 4:14
suppress 22:10
suppressed 22:16 23:7,12
sure 4:12 5:19 6:11,17 7:24 11:18 13:15 14:12 19:10 22:8 24:2 26:13 27:11 28:19 29:8 30:7 31:11 34:16
surmised 31:24
suspecting 14:13
sworn 4:2 35:8
sympathy 34:7
syndrome 14:4
system 13:2 14:20 16:3,14,19 22:4 33:3

**T**

T 35:1,1
take 5:9 24:9
taken 1:13 16:8 28:4 30:10 35:11
taking 16:19 29:24 32:3
talk 11:11 27:23
talked 15:12,13 16:15 18:18 30:6,7

talking 14:12 20:2 23:9 31:23 32:19 33:2
Tara 2:11 28:16
target 8:12 24:8
tell 23:5 29:12,14 30:9 33:24
telling 13:18
test 12:20,24
tested 13:6
testified 11:22 15:14 23:6,22
testify 12:14 16:7 33:17 34:3
testifying 12:8 20:4 33:21
testimony 14:23 23:1,2
tests 16:2
thank 28:12 32:14 34:17,18
their 17:23 18:2 32:1,3,20 35:13
theory 21:16,19
thing 11:16 19:19 20:14 31:2 34:7,11
things 10:4 11:19 12:10,14 14:15 24:9 32:2
think 5:4,9,18 6:9,21 7:3 13:8 14:11 17:6 19:16,19 20:10,14 25:16 26:9 27:8 27:12 29:18 30:20 33:17 34:5
thinking 19:24 20:19
thoroughly 14:5 20:8
though 8:10 23:11
thought 12:4,13 19:22 20:14 24:19 32:3,8
three 5:22 6:21,22 7:20 30:12
through 12:7 14:3 32:21
throw 16:6 18:10 31:1 34:6
time 1:16 7:6 9:17 13:5,12,24 14:1,2,14,21 15:23 16:16 17:24 18:10 19:5 24:3 29:13 30:11,15 31:6,20,21 33:2 35:10
times 7:20 13:24 26:14
today 27:15
together 7:17
told 13:2 14:16 15:1 16:16,24 17:9 19:13 22:1 23:24 24:8 24:11 25:16 27:19,20,21 29:15 30:8,13,19
tormented 17:12
totally 26:7,8
touch 17:14
Towers 1:17
trace 14:21 15:22 30:23 32:10
track 14:2

traffic 4:21,22
transcript 25:24
trial 5:7 6:15 8:11 11:12 16:2 17:14 21:18 22:6,6,19,22 23:10 24:22 25:6 26:6 29:3 32:5 33:13,22
tried 7:22 8:7,9 14:17 16:6 18:13,14 28:6 31:1
truck 8:9,17,18 24:13,16
true 32:4
truth 35:8,8,9
truthful 12:11 24:12
try 15:20
trying 8:5,6,20 18:9 19:1 24:5 29:7 34:9
two 5:22 6:11 24:7
type 4:20 25:10

**U**

ultimately 14:16,17
unaware 27:21
unchallenged 21:9
under 5:1
undersigned 35:4
understanding 14:19 21:23 31:23 33:1
United 1:1 14:1 20:17
unless 12:2
unlimited 15:19
unofficially 16:7
unsuccessful 20:17,19
unsuccessfully 14:1
use 14:17 18:2,6 20:11,16 23:17 31:6 33:15
used 5:1 8:6 13:23,24 23:7,13 31:5 34:12
using 13:3 18:1 23:23 34:8

**V**

vaguely 20:6
verdict 6:2
verification 8:11
very 7:10,11 11:21 12:3 13:1 14:5 20:19 28:1 29:24 31:4 32:14 34:10
views 20:12
violence 31:17
violent 31:14 32:24 33:11
voir 20:1
voluntary 21:19
vs 1:7

**W**

waived 29:18

Ace Reporting Services  (513) 241-3200
30 Garfield Place, Suite 620  Cincinnati, Ohio  45202

walking 24:16
want 17:14 20:19 32:4 33:4
    33:15
wanted 8:17,18 12:14 15:7
    17:13 34:6
Warden 1:8
wasn't 8:7,21 12:2,17 13:9
    14:22,24 15:21 16:1,5 18:9
    19:22 22:4 25:3,3 27:1,17
    34:10
way 17:6,8 19:1,2,22 21:5,24
    23:22
weight 26:3
well 8:3 12:3,4,11,12 16:1,13
    20:6 26:5 28:12
went 5:3 10:7 14:3 21:9,15
    28:9
were 5:6,9,10 6:16,24 7:5,9
    7:14,18 8:1,20 9:4 10:1,3
    15:23 16:9 18:6,24 19:12
    19:24 23:11,12 24:5,17
    25:5,16 26:10,15,17 28:10
    29:2,6,7 31:5 32:1,3,4 33:5
    33:15 34:9
weren't 15:2 32:2
Westerville 2:8
we're 6:10 12:22
WHEREOF 35:15
while 16:20
whole 35:8
widely-prescribed 31:21
wife 14:4
Wille 2:12
withdrawal 32:21
witness 4:2 12:12 17:23
    34:18 35:15
won 22:9
work 11:23 24:1,15,18 28:17
worked 6:16 16:22
working 9:4,23
works 9:12
worried 31:5
worth 31:8
wouldn't 12:1 15:17 16:17
    19:16 24:5,20 30:14
written 11:3 12:2
wrong 20:15

**X**

X 3:1

**Y**

Yeah 5:24 18:19,21 30:7

years 4:19 19:18,23 26:2,4
    30:11

**1**

10 1:15 19:18
100 24:7
1071 1:18
11th 5:14
11:00 1:16
11:48 28:4
11:49 28:4
12:00 34:23
1948 2:8
1996 5:7

**2**

20 4:19 5:1,2 6:15
2000 6:9
2003 1:15 35:17,22
2020 4:14
22 35:22
24 3:3
26th 2:13

**3**

30 2:13
32 3:4
36 4:13

**4**

4 3:3
43086 2:8
43215 2:5,13
45202 1:18 4:14

**6**

65 5:1,10

**7**

7th 4:13
755 2:5

**8**

85 13:24
85-odd 20:17

**9**

904 1:17