PROCEDURAL HISTORY

The incidents giving rise to this case occurred on December 15, 1995 in Cincinnati, Ohio.

On December 15, 1995, Mr. Clemons was arrested and charged with the murder of three individuals.

The Hamilton County Grand Jury indicted Mr. Clemons on December 21, 1995 under R.C. 2903.01(A) with specifications:

a.    Count One charged that Gerald Clemons, on or about the 15th day of December in 1995, purposely, and with prior calculation and design, caused the death of David Kreamelmayer. Specification to Count One alleged a course of conduct involving the purposeful killing or attempt to kill two or more persons.

b.    The second count alleged the same with respect to the death of Christina L. Teetzel with a similar course of conduct specification.

c.    The third count alleged the same with respect to Robert Lee Kinney with a similar course of conduct specification under this count.

d.    All of the three counts also had a firearm specification labeled specification 2 as to each of the three counts.

Jury selection commenced on September 24, 1996 (J.A. Vol. I - 93); the trial phase commenced on September 27, 1996 (J.A. Vol. II - 576); the jury found Mr. Clemons guilty on October 2, 1996 of all counts and specifications in the indictment. (J.A. Vol. III - 1123-26).

The mitigation phase commenced on October 22, 1996, (J.A. Vol.

1

III - 1140); on October 24, 1996, the jury returned a recommendation that the death penalty be imposed. (J.A. Vol. III - 1187-88). The trial court imposed the sentence on November 1, 1996. (J.A. Vol. III - 1419).

Mr. Clemons directly appealed to the Ohio Supreme Court, which affirmed his conviction and sentence on July 29, 1998. State v. Clemons (1998) 82 Ohio St. 3d 438; 696 N.E. 2d 1009.

A petition in post-conviction was filed on August 16, 1997. The petition was dismissed on April 28, 1998, and Mr. Clemons appealed to the Court of Appeals, and to the Ohio Supreme Court, all of which affirmed the previous rulings.

Mr. Clemons filed an application to re-open his direct appeal. On March 2, 1999, the Ohio Supreme Court denied the application with two judges dissenting, Pfeifer and Cook. State v. Clemons (1999) 85 Ohio St. 3d 1407.

On March 10, 2000, Petitioner Clemons filed a Notice of Intent (Doc. #1), a Motion for Stay of Execution and a Ex-Parte Motion for Appointment of Counsel.

On March 14, 2000, an Order was issued staying the execution. (Doc. #4).

On August 30, 2000, Mr. Clemons filed his petition for Writ of Habeas Corpus. (Doc. #10). [In Respondent's Return of Writ, on page 16, they incorrectly state that Petitioner Clemons filed on January 6, 2003].

Petitioner Clemons was granted a stay of the proceedings on 5/11/2001 (Doc. #36), to exhaust a claim in the State court

proceedings. [Claim #28 of the petition].

After the State courts denied this claim, the stay order was lifted on 9/30/2002. (Doc. #45).

Respondent's Return of Writ was filed on November 17, 2003.

<u>FACTS</u>

Gerald Clemons was employed as a truck driver for a Cincinnati company named Trans-Continental. His employment would take him out of the city to deliver. He had been employed by Trans-Continental for approximately six weeks before December 15, 1995. (J.A. Vol. I - 602).

Tonya Hinkle was an employee of Trans-Continental on December 15, 1995. She worked with Chris Teetzel. In the early morning of December 15, 1995, she heard another employee, Dave Kreamelmayer, say, "Assault call 911". Then she heard gunshots. (J.A. Vol. I - 667-72).

She testified she saw Petitioner Clemons shoot Chris under her desk. (J.A. Vol. I - 674).

Laurie McGuire also is employed by Trans-Continental. She was at work on December 15, 1995 and at about 8:15 to 8:30 a.m., she witnessed Petitioner Clemons shoot Mr. Kreamelmayer. (J.A. Vol. I - 678-81).

According to her testimony, Petitioner Clemons stated to her, I'm not going to hurt you, I'm only after the ones who screwed me over. (J.A. Vol. I - 683; 687).

Ms. McGuire went downstairs and saw another individual, Robert Kinney, in the dispatch office with his hands to his chest, asking for help. (J.A. Vol. I - 685).

Ms. McGuire testified she looked outside the building and saw a Glendale police officer approach Mr. Clemons. He put his hands

4

behind his back and did not try to get away. (J.A. Vol. I - 686).

Evelyn Dinkgrove is an employee of Trans-Continental in the accounts payable department. (J.A. Vol. I - 735).

On the morning of December 15, 1995, she overheard a phone call between David Kreamelmayer and a driver. Ms. Dinkgrove testified the driver had missed a 7:00 p.m. "load" the previous day and the conversation was an angry one. (J.A. Vol. I - 740).

At 8:30 a.m. on December 15, 1995, she witnessed the confrontation between David Kreamelmayer and Gerald Clemons. Then she heard shots. (J.A. Vol. I - 742-44).

On cross-examination, Ms. Dinkgrove confirmed David Kreamelmayer was angry at Petitioner Clemons. He was telling him he should have taken the "load" last night. (J.A. Vol. I - 748).

Sandra Sears is a police officer for Glendale. She works road patrol. (J.A. Vol. I - 753-54).

On December 15, 1995, she was off duty, but in uniform working at a nearby business. She heard the dispatch at 8:40 a.m. (J.A. Vol. I - 754-55).

Officer Sears drove to Trans-Continental. Arriving there, she saw Petitioner Clemons walking towards her. "He was smiling." Petitioner Clemons walked up to her and said, "I'm the guy you're looking for". (J.A. Vol. I - 759-60).

Officer Sears assisted in handcuffing Mr. Clemons. (J.A. Vol. I - 763).

On cross-examination, she stated she was working an off-duty

detail at Thomas Sysco Foods. She used her private car to drive to Trans-Continental. (J.A. Vol. I - 767-69).

Officer Sears stated Petitioner Clemons said, "I shot them all"; and did not seem nervous, was not trying to run and offered no resistance when he was cuffed. (J.A. Vol. I - 770; 773).

Doctor John Howard is a forensic pathologist. He performed the autopsies on Christina Teetzel, Robert Kinney and David Kreamelmayer. (J.A. Vol. I - 720-23).

Death was caused by gunshot wounds. (J.A. Vol. I - 725-28).

The defense presented Mr. Clemons who testified in his own behalf. At the time of his testimony, he was 54 and had lived a great deal of his life in the Cincinnati area. (J.A. Vol. II - 881-82).

After giving his background, he confirmed he had been employed by Trans-Continental for about six weeks before mid-December, 1995. He was being treated by a physician, Dr. James Day. His main problem was depression. (J.A. Vol. II - 893-96).

Mr. Clemons testified his employment at Trans-Continental included "runs" to Chicago where there was a great deal of danger. For that reason, he carried a firearm with him all the time, sometimes two. He purchased a 9mm and a 25 automatic and recollects buying them in the 1992-1994 time period. (J.A. Vol. II - 901-02).

On the day before the incident, i.e. December 14, 1995, he was informed he was supposed to make a run to Ironton. Mr. Clemons testified he had been waiting all day and when the call came in, he

testified it was a rough trip, he had been drinking, so he declined. (J.A. Vol. I - 905-06).

On the morning of December 15, 1995, Mr. Clemons testified he talked to David Kreamelmayer on the telephone, and also confirmed the latter was mad. Mr. Clemons testified he then drove over there at about 8:00 a.m. His purpose was (1) to get his paycheck and (2) he wanted to get "a load". (J.A. Vol. II - 907).

His initial purpose when he went to the building was to see if his truck was ready. After finding out it was, he then went to another part of the building and noticed that his check was not posted. (J.A. Vol. II - 910-11).

A conversation ensued with Dave Kreamelmayer to see if he could get a "load". He was told he was not going to get a run that day. Mr. Clemons stated he then asked for his paycheck. Dave Kreamelmayer responded by saying you will have to see "Shane" about that. Mr. Clemons stated then Dave Kreamelmayer started charging at him, like a rhino, started fighting and from that point on, he "went into a fog and I don't remember what I did after that". (J.A. Vol. II - 917-19).

Mr. Clemons testified he does not remember shooting any of the three individuals and the next thing he remembers is walking out through the way he came in, where he saw the police and a crowd. He then went up to a woman officer and was arrested. (J.A. Vol. II - 918-20).

Mr. Clemons reiterated that when he left his house he clearly

7

wanted to get a "load" and he had the gun because he always carried one. (J.A. Vol. II - 921-22).

About the incident, "I feel terrible. I feel like a monster. I feel like somebody that has no conscience and has no self-control at all". (J.A. Vol. II - 922).

On cross-examination, he testified he has had blackouts before, "when I drink too much". (J.A. Vol. II - 947-48).

Mr. Clemons testified he does not remember shooting Robert and does not remember trying to find Christina Teetzel. He does not remember saying, "I am looking for the ones who screwed me over". (J.A. Vol. II - 948; 950; 953).

Mr. Clemons testified, again on cross, he "blacked out when Dave came at him." He has blacked out before. (J.A. Vol. II - 955).

After the trial phase, the mitigation hearing commenced on October 22, 1996. (J.A. Vol. III - 1142).

Witnesses on behalf of Mr. Clemons included his physician, Dr. James Day. (J.A. Vol. III - 1156).

He first saw Mr. Clemons on March 17, 1994. Dr. Day said Mr. Clemons had approximately eight complaints that he had documented, including a history of depression. The doctor also indicated there was a history of Mr. Clemons attempting suicide. (J.A. Vol. III - 1157-58; 1163).

The doctor discussed the depression situation with Mr. Clemons, and as a result prescribed Prozac, and an anti-depressant medicine. (J.A. Vol. III - 1163-64).

The doctor then described the history of the prescriptions through 1994, through 1995 and up to the time period of 12/13/95. (J.A. Vol. III - 1168-73).

On cross-examination, the doctor confirmed that Prozac stays in your body, i.e. residual effects, for a fairly long period of time. He estimated this at about fourteen days. He also confirmed that Mr. Clemons suffered from significant alcohol abuse, i.e. a fifth of tequila a day plus a six pack. (J.A. Vol. III - 1176-77).

The mother of Mr. Clemons, Alice McMichen, 78, of Western Hills, Cincinnati, testified on behalf of her son. (J.A. Vol. III - 1184).

When Jerry was six months old, his father, Henry [Clemons], volunteered for the service in World War II. Due to this military commitment, Jerry never saw him until he was four years old. He really had no relationship with his father, even after he returned from the war. Ms. McMichen recollects one time when they were together for about a week. She testified she divorced Mr. Clemons when Jerry was around seven or eight years old. (J.A. Vol. III - 1186-88).

Her second husband, Charlie McMichen, also had little or no relationship with Gerald Clemons. Gerald's mother testified that Charlie told Gerald never to call him Daddy. He had a daughter that lived in Marietta, Georgia, and that was his child. (J.A. Vol. III - 1188-89).

Gerald's mother described a bar that her parents [Gerald's

9

grandparents] owned where Jerry would frequent as a child. (J.A. Vol. III - 1190).

She testified Jerry graduated from Central High School, in Cincinnati, and after school he enlisted into the United States Army. After his tests, he was placed into Army security, ASA, and ultimately was sent to Korea. He got married before he left, and Jerry's wife stayed with his mother. (J.A. Vol. III - 1194).

While in Korea, he "almost had a nervous breakdown". He received an honorable discharge upon his return to America. (J.A. Vol. III - 1195-96).

Upon his return, he ultimately gained employment with a restaurant and was transferred to Florida. (J.A. Vol. III - 1197).

After spending a years away from Cincinnati, Jerry ultimately returned. With respect to the medication Prozac, she recollects being with Gerald right after he left the doctor's office.

She also remembers discussing the driving course that Jerry took. He recollects him saying he wanted to be "farther away from people and wouldn't get panicky."

With respect to the Prozac, she clearly remembers a change in that he was "different" after he began taking this medication. (J.A. Vol. III - 1200-01).

She concluded her testimony by asking the jury to spare her son's life. There were no questions by the prosecution. (J.A. Vol. III - 1204).

Gerald Clemons then gave an unsworn statement.

10

"Ladies and gentlemen of the jury: I am not going to try to explain what happened to me on December the 15 [th] at Trans-Continental because I'm so ashamed of what I did and how horrible it is to happen to everybody concerned. There are no words to express my feelings for the many people I have hurt. I can only say that I'm sorry, but I know that is not enough.

The horrible, ugly person that I became last December the 15th is not Gerry Clemons. It is not me. You, ladies and gentlemen, have heard about my life and I will not repeat any of that. I have had many hours, days and weeks in jail to think about that fatal day and have many nightmares of horror about what I did. But whatever I was then, it wasn't me. That's not what I have tried to do in my life and the way I have tried to live my life.

I know I must be punished for what I did and whatever you all decide I will understand that. Please, don't think I don't care and I am not truly sorry for my loss of control or that I could give my own life to change the hurt. Now I can only say that the sorrow, the shame and remorse that I have and I have put on my family will be with me forever." (J.A. Vol. III - 1206-07).

At the conclusion of the mitigation hearing, and the sentencing hearing, fresh counsel filed a motion for a new trial. This motion was denied by the trial court at a subsequent hearing. (J.A. Vol. III - 1424-39).

ARGUMENT
(DIRECT APPEAL CLAIMS)

FIRST GROUND FOR RELIEF: THE TRIAL COURT ERRED
TO THE PREJUDICE OF PETITIONER CLEMONS WHEN IT
DENIED A MOTION FOR CHANGE OF VENUE WHERE PRE-
TRIAL PUBLICITY PRECLUDED THE ACCUSED FROM
RECEIVING A FAIR TRIAL UNDER THE FOURTH,
FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS
TO THE CONSTITUTION.

Petitioner Gerald L. Clemons did not receive a fair trial
because of adverse pre-trial publicity in Hamilton County, and
because of the trial court's refusal to change venue.

On September 4, 1996, pre-trial motions were held. The trial
court permitted the defense to file a motion for change of venue by
leave. The judge ruled he would hold in abeyance any order for
change of venue after the voir dire of the jury. (J.A. Vol. I -
80).

When voir dire completed, defense counsel renewed the motion
for change of venue. The trial court denied it, stating the fact
that they were able to select a jury was reason enough. (J.A. Vol.
II - 490).

Gerald Clemons did not receive a fair trial because of the
trial court's refusal to change venue.

The trial court, and defense counsel, did next to nothing with
respect to questioning the prospective jurors as to what they knew
about the case, whether they had formed an opinion, and the extent
to which that opinion prejudiced their ultimate views on Mr.
Clemons' case. This lack of diligence, on the part of both the

trial judge and defense counsel, resulted in a jury that was prejudicial before the first witness testified.

The voir dire process began on November 24, 1996. The trial judge simply read off the three counts to the indictment, and never questioned the prospective jurors about pre-trial publicity. (J.A. Vol. I - 98-100). The trial judge simply asked questions as to whether any of the jurors knew Mr. Clemons, and then gave a standard instruction on the jurors' obligation to keep an open mind. (J.A. Vol. I - 125-32). The trial judge then followed up with general questions as to whether the jurors knew any reason they could not be fair and impartial. (J.A. Vol. I - 145). No question by the judge revolved around the problem of pre-trial publicity.

Throughout the voir dire, which went from September 24, 1996 through September 26, 1996, there were very limited instances where counsel asked any penetrating questions with respect to the extensive pre-trial publicity. (J.A. Vol I - 183; 187; 295-96; 326; Vol. II - 472).

The record on voir dire is a totally inadequate attempt to determine whether the prospective jurors were prejudiced. This failure on the part of defense will be discussed infra, but the point to emphasize here is the trial court had the responsibility to ensure pre-trial publicity did not infect the prospective jury panel.

The controlling cases from the United States Supreme Court include Irving v. Dowd (1961) 366 U.S. 717, 81 S.Ct. 1639 and

Rideau v. Louisiana (1963) 373 U.S. 723, 83 S.Ct. 1417.

In Irving, as a result of the pre-trial publicity, the voir dire showed that ninety percent of the prospective jurors had an opinion on guilt, at 727.

The Irving case also demonstrated that eight of the twelve jurors who became the regular panel considered him guilty, at 727.

Likewise, in Rideau, "Three members of the jury which convicted him had stated on voir dire that they had seen and heard Rideau's televised 'interview' with the sheriff on at least one occasion. Two members of the jury were deputy sheriffs of Calcasieu Parish. Rideau's counsel had requested that these jurors be excused for cause, having exhausted all of their peremptory challenges, but these challenges for cause had been denied by the trial judge", at 725.

The Rideau decision further states, " *** we hold that it was a denial of due process of law to refuse the request for a change of venue, after the people of Calcasieu Parish had been exposed repeatedly and in depth to the spectacle of Rideau personally confessing in detail to the crimes with which he was later to be charged," at 726.

The Rideau decision concludes, "Under our Constitution's guarantee of due process, a person accused of committing a crime is vouchsafed basic minimal rights. Among these are the right to counsel, the right to plead not guilty, and the right to tried in a courtroom presided over by a judge.

14

\*\*\* we do not hesitate to hold, without pausing to examine a particularized transcript of the voir dire examination of the members to the jury, that due process of law in this case required a trial before a jury drawn from a community of people who had not seen and heard Rideau's televised 'interview'", at 726-27.

Petitioner Clemons, in this case, understands that the United States Supreme Court has ruled the fact of extensive pre-trial publicity often can be rectified through proper voir dire.

In <u>Dobbert v. Florida</u> 432 U.S. 282, 97 S.Ct. 2290 (1977), the Supreme Court analyzed this concept.

"In <u>Murphy v. Florida</u>, 421 U.S. 794 (1975), we reviewed a trial in which many jurors had heard of the defendant through extensive news coverage. Characterizing our previous cases in which we had overturned a state court conviction on these grounds as involving 'a trial atmosphere that had been utterly corrupted by press coverage,' id. at 798, we recognized:

Qualified jurors need not, however, be totally ignorant of the facts and issues involved.

'To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.'

\*\*\* [W]e find from the record that the trial judge did

15

everything possible to insure an impartial trial for the defendant. The jurors, carefully and extensively examined by defense counsel to determine that they could be fair and impartial, were sequestered and [a] comprehensive gag order was placed on all participants of the trial.

\*\*\* Petitioner's argument that the extensive coverage by the media denied him a fair trial rests almost entirely upon the quantum of publicity which the events received. He has directed us to no specific portions of the record, in particular the voir dire examination of the jurors, which would require a finding of constitutional unfairness as to the method of jury selection or as to the character of the jurors actually selected", at 302-03.

In Morgan v. Illinois 504 U.S. 719 (1992), although the issue was questioning dealing with whether a juror would automatically vote for the death penalty, the holding states the following: "The trial court's refusal to inquire whether potential jurors would automatically impose the death penalty upon convicting Morgan is inconsistent with the Due Process Clause of the Fourteenth Amendment.

(a) Due process demands that a jury provided to a capital defendant at the sentencing phase must stand impartial and indifferent to the extent commanded by the Sixth Amendment.

\*\*\* (c) On voir dire a trial court must, at a defendant's request, inquire into the prospective jurors' views on capital punishment. Part of the guaranty of a defendant's right to an

16

impartial jury is an adequate voir dire to identify unqualified jurors. Morgan could not exercise intelligently his challenge for cause against prospective jurors who would unwaveringly impose death after a finding of guilt unless he was given the opportunity to identify such persons by questioning them at voir dire about their views on the death penalty", at 719-20.

Justice Scalia, although dissenting as to whether specific questioning in voir dire on this issue should be constitutionally permitted, states his analysis of previous cases: "In Mu'Min v. Virginia, 500 U.S. 415 (1991), we surveyed our cases concerning the requirements of voir dire and concluded that, except where interracial capital crimes are at issue, trial courts 'retai[n] great latitude in deciding what questions should be asked on voir dire.' Id. at 424; see also Ristaino v. Ross, 424 U.S. 589, 594 (1976). We emphasized that our authority to require specific inquiries on voir dire is particularly narrow with respect to state court trials, where we may not exercise supervisory authority and are 'limited to enforcing the commands of the United States Constitution," Mu'Min, 500 U.S. at 422. We concluded, as a general matter, that a defendant was entitled to specific questions only if the failure to ask them would render his trial 'fundamentally unfair,' id. at 426. Thus, we have held that, absent some 'special circumstance,' Turner, supra, 476 U.S. at 37, a 'generalized but thorough inquiry into the impartiality of the veniremen' is a constitutionally adequate voir dire. Ristaino, supra, 424 U.S. at

17

598. Finally, we have long acknowledged that, in light of the credibility determinations involved, a trial court's finding that a particular juror is impartial may 'be overturned only for 'manifest error,'' Patton v. Yount, 467 U.S. 1025. 1031 (1984) (quoting Irvin v. Dowd, 366 U.S. 717, 723 (1961)); see also Mu'Min, supra, 500 U.S. at 428", at 747.

Two significant points arise from these cases. First is the media coverage itself. If it is pervasive, there is the distinct possibility of actual prejudice. Second is the voir dire process. There exists a constitutional command, in particular on the part of the trial judge, to ensure a fair trial by proper questioning on his part. This did not occur here.

As stated earlier, (with citations to the record), on November 24, 1996, at the beginning of voir dire, the trial judge gave general instructions, but never questioned the prospective jurors about pre-trial publicity. This was followed by the judge asking questions to the prospective jurors as to whether they could follow the standard instructions of the trial court. Ultimately this was concluded by, again, another general question as to whether the jurors knew any reason why they could not be fair and impartial: If you are selected to sit as jurors in this case, do you know of any reason why you could not render fair and impartial verdicts? (J.A. Vol. I - 145).

Then, when the attorneys had the opportunity to question the jurors, one of their initial questions was whether any of the

18

jurors were aware of the case. Ultimately, defense counsel asked, because of the number of hands, whether anyone had <u>not</u> seen or heard anything on the case. (J.A. - Vol. I - 148-50; 166-67).

The record reflects that of those present, just two jurors raised their hand saying they could not remember hearing anything about it. (J.A. Vol I - 167).

Throughout the voir dire process, there were just limited instances where any of the counsel asked any penetrating questions with respect to pre-trial publicity. [This will be detailed infra]. The point is the judge asked no questions.

Thus, the record reveals a totally inadequate attempt on the part of the trial judge to inquire into the knowledge, and the opinions formed, on the part of the prospective jurors.

To reflect on this degree of publicity, towards the end of the voir dire, when questioning a juror, one of the defense counsel stated, "This case has been all over the country, and you understand and you have seen the papers and could you put those all out of your mind too and judge Mr. Clemons on the facts that happened in Evendale on December 15, 1995 ***". (J.A. Vol. I - 361).

As stated, the motion for change of venue was denied by the judge, the reason being that they were able to select a jury. (J.A. Vol. II - 490).

On December 12, 1996, a hearing regarding a motion for new trial was conducted. Part of that motion included extensive

19

newspaper clippings which reflects the enormous pre-trial publicity in this case. (J.A. Vol. XX - 1424).

The newspaper clippings showing this pre-trial publicity include the following headlines found in this record: "Fired worker returns, kills 2", (J.A. Vol. V - 480); "Prosecution, defense agree: Clemons killer", (481); "Office becomes horror house", (482); "'A goofy man,' brushes with law", "Violence at work", "Victim: 'I don't want to die'", (484); "Clemons' mental state on trial", (485); "Witnesses relive shooting", (486); "Deters to challenge Prozac", (488); "Dark side seen before shooting spree", (489); "Families get help coping with slayings", (490); "Police: Revenge behind shootings", "'A great deal of pain' for all", (491); "Victims' families try to make sense of the senseless", (492). (The record of the newspaper clippings are detailed from J.A. Vol. V - 493 through page 514).

During the course of the hearing conducted on the motion for new trial, the following occurred with respect to the trial judge questioning the newly appointed direct appeal attorney:

"The Court: Okay, I've got a question for you, Mr. Freeman. The bottom of page 9 of your brief or your supplemental memorandum in support of defendant's motion for new trial you make the statement in there that all of this transpired while the trial judge was burdened by the concerns and distractions of a reelection campaign and confronted by in court t.v. and the press. What do you have in the record or otherwise to substantiate that allegation

that you are making?

Mr. Freeman: Judge, it was raised as a concern to me by the defendant and by some members of his family that perhaps the timing of the case might have been an ingredient. This might have been --

The Court: What substantiation? You could just place anything without some substantiation in the record or something else to substantiate that? Can you just say anything that you want?

Mr. Freeman: With all due respect, there are exhibits attached to this pleading, roughly twenty pages of exhibits and approximately forty newspaper clippings. I'm respectfully running the issue up the flagpole and asking you to have a finding one way or the other which, of course, we will live with as to whether or not that is an ingredient.: (J.A. Vol. III - 1427-28).

The questioning by the trial judge then went on as to why fresh counsel had included this statement of the judge's reelection in the motion for new trial. Defense counsel basically responded as to what he had said earlier. (J.A. Vol. III - 1428-35). This was followed by the prosecutor saying, "In terms of the newspaper articles after the case, the potential of jurors being swept away by a case of first impression, those issues I would think you would remember, Judge, were handled during extensive voir dire of the jurors, many of whom had never heard of this case. And anyone that was somehow influenced was exhausted by this Court.

\*\*\* I assume that if his client alleged that you are selling cocaine during the course of this trial he would not include it in

21

his brief. That type of allegation that this Court was somehow so preoccupied and did not give it your full attention I just feel is reckless and false." (J.A. Vol. III - 1435-36).

As noted earlier, the voir dire, especially by the trial judge in this case, was extremely general and very limited. There was anything but an extensive voir dire, as the prosecutor was saying at the conclusion of the case, and nearly everyone had heard of the case.

It should also be noted here that at Mr. Clemons' sentencing hearing, four of the jurors were in attendance. Two of them were quoted in the newspaper that they want to be present when he is strapped into the electric chair. One of the jurors stated she does not care if it is eighteen or twenty years, she wants to be there. Another one of the jurors who was in attendance said it was her personal opinion that she did what they were instructed to do and also wanted to be present when Mr. Clemons dies: "Justice was served." (J.A. Vol. V - 514).

In DePew v. Anderson 311 F.3d 742 (6th Cir. 2003), the Court of Appeals discussed the issue of judicial bias and its interrelationship with trial publicity: "Defendant claims that he did not receive a fair trial due to bias on the part of Judge Moser, the state court judge who presided over his trial. The bias charge stems largely from a series of newspaper articles in which Judge Moser was quoted and a letter that Judge Moser wrote to the local newspaper in connection with a different murder case in

22

Butler County.

    \*\*\* We recognize the political realities that Judge Moser faced in the form of a contested race for reelection when he wrote the letter blaming the legislature for any perceived deficiencies in death penalty sentencing. Such shifting of blame for unpopular decisions is common during contested elections. The statement was merely a political response by a judge facing an election, and we do not believe it indicates that Judge Moser could not or would not render decision based on the law and the evidence before him in a specific case.

    \*\*\* Although we reject this ground for issuing the writ, we do so in light of the fact that we have already set aside the death sentence. But we are troubled by what happened here. Judge Moser was caught in a system that requires elected judges, subject to the prevailing political winds, to preside over capital cases. This episode serves as one more example of the problems faced by elected state court judges who must make unpopular decisions in order to uphold the rights of defendants before them and then be branded as 'soft on crime' by opponents and reviled by the public when they come up for reelection. In a system that relies on elected judges to hear, decide and review death penalty cases, the federal courts must be conscious of the intense political pressures our state colleagues are facing and remain especially vigilant in enforcing he procedural rights accorded the accused by the Bill of Rights", DePew at 752-53.

The point to be made here is the trial judge, up for re-election, did not ask the questions needed on voir dire with respect to pre-trial publicity. The resulting prejudice was all too evident at the November 1, 1996 sentencing hearing when four of the panel showed up to enthusiastically endorse the death sentence issued by the judge.

At page 68 of Respondent's Return of Writ, they state that the trial record must demonstrate constitutional unfairness as to the method of jury selection or as to the character of the jurors actually selected. The Respondent then cites the Sixth Circuit, Nevers v. Killinger 169 F.3d 352, 364 (6th Cir. 1999), where the decision recognizes those cases involving presumed prejudice, and actual prejudice, following a review of the voir dire, and the nature of the media coverage.

Then, at page 70 of the Respondent's Return of Writ, they state that Clemons is unable to point at any specific examples of jury impartiality, saying that the citizens who served on his jury had not formed an opinion on the case.

Finally, Respondent concludes at pages 72-73 of the Return by saying Clemons attempts to demonstrate jury partiality from newspaper articles which contain alleged quotes from jurors about their beliefs that the death penalty was appropriate. The assertion by Respondent is that Clemons cannot show that any juror formed an opinion about his sentence before hearing all evidence presented at his trial.

Other than what has been relied on in detail throughout this claim, Petitioner Clemons responds by saying how much clearer can prejudice be demonstrated, when four of the jurors show up for the sentencing, making sure that the judge is going to sentence him to death.

The Ohio Supreme Court's decision on this issue was an unreasonable application of established Supreme Court precedent. It stated at 442 that, "the court and counsel questioned the members of the venire extensively to detect bias or anything that would prevent them from acting as fair and impartial jurors."

This simply is not true. The fact it was not done constitutes an unreasonable application, and as a result it is respectfully asserted minimally Petitioner Clemons' death sentence must be reversed.

SECOND GROUND FOR RELIEF: THE TRIAL COURT ERRED TO THE PREJUDICE OF PETITIONER CLEMONS IN NOT GRANTING FUNDS FOR EXPERT ASSISTANCE CONSTITUTIONALLY REQUIRED FOR THE PREPARATION OF AN ADEQUATE DEFENSE AS GUARANTEED BY THE FIFTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION.

At the outset of this case, defense counsel stated that because Petitioner Clemons had been taking the drug Prozac. The effect it had on him would be used as a defense. ( J.A. Vol. IV - 22).

The trial court responded to the above by appointing Dr. Nancy Schmidtgoessling as the mitigation specialist. (J.A. Vol. I - 29; 4/10/96).