Dr. Schmidtgoessling was employed by the County Clinic of Hamilton County. Therefore, every report she generated was to be given to the judge and the prosecutor, along with defense counsel. (J.A. -Vol. I - 29).

The trial court erred in refusing to appoint an independent expert for Petitioner Clemons. The United States Supreme Court has ruled that the denial of expert assistance to an accused who is indigent constitutes a denial of due process. Ake v. Oklahoma (1985) 470 U.S. 68; 105 S.Ct. 1087.

The Sixth Circuit has also reviewed this identical issue.

In Powell v. Collins (6th Cir. 2003) 332 F.3d 376, the Court of Appeals reversed a death sentence principally on this subject.

The facts show that Petitioner Powell's trial counsel filed a written motion for appointment of a psychiatrist or psychologist to assist in his defense. The presiding judge orally denied the motion. Later on there was a request for reconsideration of the court's decision after defense counsel had received juvenile court records and psychological evaluations revealing mental deficiencies. The trial court, in response to the above, "*** ordered that Petitioner undergo psychological testing at the court's psychiatric center. Dr. Nancy Schmidtgoessling, a clinical psychologist at the center, was appointed as a 'friend of the court' and about a week later performed a psychological evaluation of Petitioner. On January 5, 1987, defense counsel orally renewed their request for the appointment of an expert to assist them in

reviewing Dr. Schmidtgoessling's report 'so that [counsel] can understand exactly what it means.' *** But the trial court once again denied the oral motion 'for a psychiatrist of psychologist to be at [their] elbow[s] during the course of the trial, or to have a Court-appointed psychiatrist or psychologist to discuss this Central Psychiatric report with you.'," Powell at 382-83.

Further in the Powell decision, the Sixth Circuit noted Ake "held that the Due Process Clause of the Fourteenth Amendment obligates states to provide an indigent defendant with access to psychiatric examination and assistance when the defendant has made a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial.

*** Ake also held that when appropriate, the right to expert assistance extends to the sentencing phase of capital proceedings", at 390.

In the footnote in Powell at page 390, the Sixth Circuit states, "This circuit and others have extended Ake's command of expert assistance to instances beyond those where a defendant's mental condition is at issue at trial, and beyond those of capital cases. See e.g., Glenn v. Tate, 71 F.3d 1204, 1211 (6th Cir. 1995) (holding that the capital defendant was prejudiced and thereby denied the effective assistance of counsel by his counsel's failure to seek expert testimony at sentencing regarding the defendant's organic brain problem) ***".

Importantly, the Powell decision at 391 states that "Several

27

circuits have interpreted Ake to mean that due process is not satisfied unless the defendant is provided an independent psychiatrist to aid in his defense--i.e., the appointment of a neutral court psychiatrist, such as in the matter at hand, does not satisfy due process. See, e.g., Starr v. A.L. Lockhart, 23 F.3d 1280, 1289 (8th Cir. 1994) ('[T]he trial court's ... finding, that [the defendant's] due process right to expert assistance was satisfied by the court-ordered examination and by the defense's ability to subpoena the state examiners, [was] erroneous [because] the ability to subpoena a state examiner and to question that person on the stand does not amount to the expert assistance required by Ake.'); Smith v. McCormick, 914 F.2d 1153, 1158-59 (9th Cir. 1990) ('[U]nder Ake, evaluation by a 'neutral' court psychiatrist does not satisfy due process.... [The defendant] was entitled to his own competent psychiatric expert.'); United States v. Sloan, 776 F.2d 926, 929 (10th Cir. 1985) (finding that a state's duty under Ake 'cannot be satisfied with the appointment of an expert who ultimately testifies contrary to the defense on the issue of competence'); United States v. Byers, 740 F.2d 1104, 1114 (D.C. Cir. 1984) (holding that the defendant was denied psychiatric assistance sufficient to prepare an adequate defense where he was only allowed access to psychiatrists for the government)."

After stating case law which does not support the position, the Sixth Circuit, at 392, holds "Today, we join with those circuits that have held that an indigent criminal defendant's

constitutional right to psychiatric assistance in preparing an insanity defense is not satisfied by court appointment of a 'neutral' psychiatrist--i.e., one whose report is available to both the defense and the prosecution. See Starr, 23 F.3d at 1289; Smith, 914 F.2d at 1159; Sloan, 776 F.2d at 929; Byers, 740 F.2d at 1114. As a result, in the matter before us, so long as Petitioner made the requisite preliminary showing that his sanity at the time of the offense was to be a 'significant factor at trial,' the trial court erred in failing to grant Petitioner's motion for an independent psychiatrist. See Ake, 470 U.S. at 83, 105 S.Ct. 1087."

In concluding that the denial of an expert was prejudicial, the trial decision, at 395, "The trial court's denial of an Ake expert in this case cannot be considered harmless error inasmuch as, by her own admission, Dr. Schmidtgoessling was not equipped to conduct the appropriate examination required for her to set forth all of the facts or information the jury should have considered at mitigation. ***Dr. Schmidtgoessling indicated that such testing would require a referral to a comprehensive medical facility and specialists in the appropriate fields--precisely the type of assistance Petitioner sought but was denied.

Accordingly, under these facts, unlike with the guilt phase of Petitioner's trial, the testimony of an independent psychiatrist-- particularly one who was qualified to conduct the appropriate testing of which Dr. Schmidtgoessling spoke--may have provided facts and information for the jury to consider at mitigation, which

may have led to a different recommendation by the jury at sentencing."

It should be noted that towards the end of the prosecution's case, i.e. on October 1, 1996, out of the presence of the jury, defense counsel objected to the "raw data" from Dr. Nancy Schmidtgoessling, being given to the prosecution. This objection was overruled. (J.A. Vol. II - 859).

Then, when Gerald Clemons testified in his own defense in the trial stage, he testified about the blackouts that he had experienced in the past. (J.A. Vol. II - 947-48).

Mr. Clemons testified he believed the blackouts were caused by the Prozac: "I think it was the Prozac." (J.A. Vol. II - 948).

The above responses were while Mr. Clemons was on cross-examination. (J.A. Vol. II - 925-56).

In the mitigation phase of the trial, which began on October 22, 1996, Alice McMichen, the mother of Petitioner Clemons, testified on his behalf. (J.A. Vol. III - 1184).

During the course of her testimony, she also stated that after her son began taking Prozac, he was "different". (J.A. Vol. III - 1201).

More of this issue will be addressed infra in a separate claim, but it should be stressed here that Petitioner Clemons made the requisite showing of the need for an independent expert in this field.

Dr. Schmidtgoessling, as a matter of record, was not equipped

30

to testify in this field.

In their Return of Writ, Respondent, at page 76, states that Clemons' claim that she was not an independent mental health specialist is of no moment, as a defendant is not entitled to choose the expert of his liking or to receive funds to hire his own expert.

As has been pointed out, this particular appointment by the court was meaningless, since again by her own admission, she is not an expert in the field that was so needed here. The defense is entitled to an _independent_ expert. The choice may not be his, but the constitutional requirement of one that is not connected with the prosecution is clear.

When on rebuttal for the State, in the mitigation phase, Dr. Paul Keck testified as an expert that Prozac had no ill effects, this was devastating to any mitigation on the part of Gerald Clemons. He had no response to this, since no expert had been provided to him. (J.A. Vol. III - 1215; 1221-22).

At page 443 of the _Clemons_ decision, the Ohio Supreme Court held, in denying this claim, that, "Dr. Schmidtgoessling would have been able to testify as to issues involving Prozac." This is an incorrect statement, as noted above.

The result thus is a decision that is both contrary to the holding in _Ake_, and also an unreasonable application of the facts.

What was constitutionally required in this case was the trial court appoint an independent expert under _Ake_ who was familiar with

31

the general effects of Prozac, and in particular, the effects of the drug on Gerald Clemons.

The fact that this was not done resulted in a constitutional denial of expert assistance on the part of Gerald Clemons in the mitigation phase, and as a result, Petitioner Clemons' death sentence cannot stand.

> THIRD GROUND FOR RELIEF: PETITIONER GERALD CLEMONS WAS DENIED HIS RIGHT OF DUE PROCESS AND ASSISTANCE OF COUNSEL AS GUARANTEED BY THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION BECAUSE THE RECORD REFLECTS TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE TO PETITIONER CLEMONS.

Petitioner Clemons, because of the conduct of his attorneys, had no chance for relief from the outset of his pre-trial proceedings. The record reveals that after defense counsel filed a plea of not guilty by reason of insanity, (J.A. Vol. I - 14-16), the trial court ordered the Hamilton County Court Psychiatric Center to perform the evaluation.

To further cloud the situation, one of the mental health officials who examined Petitioner Clemons shortly after his plea of not guilty by reason of insanity, was Dr. Nancy Schmidtgoessling, who also was ordered by the trial judge to be the mitigation specialist on behalf of the defense. (J.A. Vol. I - 29).

Defense counsel's decision to file the not guilty by reason of insanity defense resulted in the prosecution receiving all information, i.e. of Petitioner Clemons' character, and background, from the evaluation reports required to be distributed not only to

32

the defense but also the prosecution.

The very person who did this evaluation, was again, defense counsel's own mitigation specialist. Thus, the mental health expert that defense counsel would use as an expert on developing a mitigation strategy theme for the defense, was also the same individual who communicated with the prosecution on the various aspects of Petitioner Clemons' mental status (as a result of the not guilty by reason of insanity request).

By the failure on the part of defense counsel to recognize this conflict, they created their own ineffectiveness.

Since their own mitigation specialist, Dr. Nancy Schmidtgoessling, was wearing "two hats", defense counsel could (1) meet with her and discuss the strategy of the case and face the possibility that the prosecutor would hear all this "work-product", or (2) do nothing, realizing that by not consulting with her, the prosecutor would perhaps not know what defenses' strategy was at mitigation.

Dr. Schmidtgoessling did not testify at the mitigation hearing; and thus, any psychological bases from her in assisting the jury in its verdict on behalf of Petitioner Clemons was lost.

In Skaggs v. Parker 235 F.3d 261 (6th Cir. 2001), the death penalty was reversed by the Sixth Circuit when it was discovered that the "psychologist" was not licensed, and in fact, was ill equipped in this field. Obviously, Dr. Schmidtgoessling is clearly an expert in the field, and also experienced, having testified in

33

several cases before, but the effect of her dual responsibilities created a situation where defense counsel could not put her on the stand as an effective advocate for Gerald Clemons.

In the Skaggs decision, at page 267, it states, "Before trial, Skaggs's counsel informed the court that he wished to raise a mental illness defense at trial. Because Skaggs was an indigent defendant with appointed counsel, he had the right to a psychiatric expert under Ake v. Oklahoma. The court appointed two psychiatric experts to assist Skaggs, but both experts refused to serve. The court then ordered the KCPC [Kentucky Correctional Psychiatric Center] to evaluate Skaggs, but Skaggs's counsel instead requested funds for an independent expert. Upon approval by the court, counsel thereafter secured the services of [Elya] Bresler. During the guilt phase of Skaggs's trial, Bresler falsely testified that he was a licensed clinical and forensic psychologist. He also falsely claimed to have a Bachelor's degree, a Master's degree, and Doctorate degrees from San Diego State University and the University of California, and to be licensed in numerous states, including Kentucky."

Further on in the decision, i.e. at 269, the Sixth Circuit states, "After having observed Bresler's bizarre and eccentric testimony, did counsel have a duty to find a different psychiatric expert for the retrial of the penalty phase? Put differently, did counsel have a responsibility to present meaningful mitigating evidence? We think that they did. We find that Skaggs's counsel

34

acted below an objective standard of reasonableness at sentencing, essentially providing no legitimate mitigating evidence on Skaggs's behalf, and that this failure severely undermines our confidence in the just outcome of this proceeding.

Failure to present mitigating evidence at sentencing constitutes ineffective assistance of counsel. See <u>Austin v. Bell</u> 126 F.3d 843, 849 (6th Cir. 1997) (holding that defense counsel's failure to investigate or present any mitigating evidence because counsel believed that it would be of no benefit constituted ineffective assistance of counsel when several witnesses were available and willing to testify on defendant's behalf, as the failure to present mitigating evidence undermined the adversarial process and rendered the death sentence unreliable)."

In the present case, Gerald Clemons presented no mitigating evidence dealing with his psychological background, and the mitigating effects with respect to his conduct at the time of the offense. Dr. Day, Petitioner Clemons' family physician, as noted, testified but presented no testimony which is crucial in these type of mitigation hearings.

Not only did Dr. Schmidtgoessling not testify at the mitigation hearing, but the prejudice was especially pronounced because the prosecution had full use of her reports and findings.

In their Return of Writ, at page 32, the Respondent justifies defense counsel's actions by quoting from a deposition taken of one of the defense counsel. He basically says that the reason he went

35

along with the court appointment, instead of an independent psychologist, is that he liked her and he liked her husband's work. He states that he would be the first to admit that he would rather have an independent, but he felt strongly that she was going to do a good job.

Again, as stated previously, defense counsel basically confirms his ineffectiveness here. He not only is saying he did not realize he was entitled to an independent expert, but believed that this particular individual was an expert and equipped to provide the necessary information for the defense at mitigation.

Finally, at page 32 of the Return of Writ, the defense counsel concluded his response by saying, "But again, we knew that there would be no - we would just have to pick someone who would not be paid through the state and that was a problem." This statement is also incorrect, since Petitioner Clemons was constitutionally entitled to an independent expert, and if indigent, it would be paid by the State.

Thus, the actions of defense counsel resulted in no evidence dealing with the psychological background of Gerald Clemons which is so important to be presented to the jury at this phase of the trial.

Defense counsel were also ineffective at the voir dire proceedings with respect to the motion for change of venue.

As noted, one of the defense attorneys stated during the course of voir dire that this case had been publicized all over the

country.

Recognizing this, to ensure that the prospective panel was not biased, penetrating and detailed questions are constitutionally required with respect to the venue issue, and pre-trial publicity.

Simply asking (in limited instances) whether jurors had formed an opinion on the case because of the publicity is never enough to determine the degree of the prospective juror's bias.

Questions as to where they heard about the case, when they heard about the case, who they talked to about the case, the contents of the conversation, whether they were detailed or brief, with whom they talked to and how often, will invariably bring out the details needed to determine whether the publicity has created this atmosphere of bias.

Jurors are normally reluctant to volunteer things like the above, unless again, specific questions are presented to them.

This is especially significant here, since the trial judge was overly general in his own questions (see claim one) when he addressed the prospective panel as to publicity. It should be remembered that in April, 1996, this judge, at a pre-trial proceeding, stated there is no way he is going to continue this case from its September 24, 1996 trial date. (J.A. Vol. I - 38).

Separate from the trial judge, the voir dire by defense counsel was completely inadequate, Detailed questioning was needed since the Ohio Supreme Court has held that the best reflection of whether a venue change is required is the actual questioning of the

prospective panel. <u>State v. Maurer</u> (1984) 15 Ohio St. 3d 239, 473 N.E.2d 768; <u>State v. Lundgren</u> (1995) 73 Ohio St. 3d 474.

The inadequate questioning of the prospective jurors began early on: "Mr. Schmidt [defense counsel]: The fact that maybe you have seen something in the press about it, would that affect you, the stories that you have seen or read and you understand what we are trying to do? We are trying to cleanse your minds and just be fair and start off from scratch and not have something in your minds now that might just say, oh boy, I favor the State or I feel sorry for the guy either way. We don't want that. We just want you on an even keel and can you do that, Mr. Silva? *** Mr. Schmidt: Anyway, does anybody have any problems with that and any stories that you read about this and have you heard anything or talked to anybody about this? Yes, what a terrible thing and you see the paper. Has anybody ever talked to anybody and expressed something that you can't put out of your mind and be a juror? If we don't have fair jurors we could just put this in the computer and come up with an answer but that is not way we have it here and that's not a good way. You have got - you have got to know computers and the Judge and decide these facts. You take what you hear and not have any predetermined ideas. Do you understand that? I hope you understand. Thank you." (J.A. Vol. I - 167-69).

The prosecutor also followed along similar lines when questioning on pre-trial publicity: "Mr. Deters: I just had a few questions. I think you indicated that you had heard some reports

about this case? Prospective Juror Geers: Yeah, in the newspaper and television. Mr. Deters: Sir, would you be able to put those out of your mind and base your verdicts upon what your hear here? Prospective Juror Geers: I read the articles and watched but never delved into it. Mr. Deters: You would have no problem being fair and impartial in this case? Prospective Juror Geers: No problem with that at all." (J.A. Vol. I - 183).

Another limited instance where defense counsel questioned on pre-trial publicity occurred with prospective juror Angel: "Mr. Schmidt: " *** Did you read anything about this in the newspaper in December or see anything on the news. Prospective Juror Angel: I heard it on the news. Mr. Schmidt: And did anything - and naturally we formed somewhat of an opinion when we hear about that. I mean, it's like you see a policeman chase somebody down the street and say that is a criminal he is chasing you don't know. Bur I assume that you formed an opinion and so when you read things in the newspaper and you have a tendency to form opinions. Did you form an opinion on this? Prospective Juror Angel: No. Mr. Schmidt: Other than it was a terrible thing? Prospective Juror Angel: That's right. Mr. Schmidt: But you didn't know what, how or whatever. Do you still have some questions and you don't have an opinion now or do you have an opinion? Prospective Juror Angel: No. Mr. Schmidt: You are still open-minded and you understand? Prospective Juror Angel: Yep." (J.A. Vol. I - 264-65).

A situation where one of the prospective jurors, Mills,

volunteered that he remembered seeing something about it resulted in the following: "Prospective Juror Mills: It occurred to me afterwards or I thought I remembered something last Christmas time or something about this after the shooting. Mr. Schmidt: You don't remember too much of it? Prospective Juror Mills: No, it was a busy day. Mr. Schmidt: Did you form an opinion? Prospective Juror Mills: No. Mr. Schmidt: You just though it was terrible; is that correct? Prospective Juror Mills: Yes. Mr. Schmidt: And I guess we have been saying that and seeing a lot of that lately. And just the mere fact that there has been a lot of it, do you think that that would affect your thinking to being a fair and impartial juror? Prospective Juror Mills: I don't think so." (J.A. Vol I - 295-96).

Further on in the voir dire, it was determined that prospective juror Howison had heard about the case. "Mr. Schmidt: Back when it happened? Prospective Juror Howison: Yeah. Mr. Schmidt: Did you form an opinion about it? Prospective Juror Howison: No, sir. Mr. Schmidt: Any kind of an opinion? Prospective Juror Howison: No, sir. Mr. Schmidt: Watched it on t.v.? Prospective Juror Howison: A little bit but not much. *** Mr. Schmidt: All right. This case has been all over the country and you understand and you have seen the papers and could you put those all out of your mind too and judge Mr. Clemons on the facts that happened in Evendale on December 15th, 1995; is that correct? Prospective Juror Howison: Yes." (J.A. Vol I - 361).

Finally, towards the end of voir dire, prospective juror

Zimmer stated she remembered hearing something about the jury selection process. She stated that she had not followed it previously in the papers or on the t.v. and thus had not formed an opinion. (J.A. Vol. II - 472-73).

The above represents the manner in which defense counsel handled the extensive pre-trial publicity in this case. Stating the obvious, i.e., that the incident had generated publicity on a national basis, defense counsel neglected to ask penetrating questions of each individual juror. The only way that one can determine whether a juror is prejudice because of the pre-trial publicity is through this mechanism. This is especially true when the degree of publicity that occurred in this case, is present.

In addition to the fact that counsel fell below the Strickland standard in questioning the jurors, and to the trial court, the specific questions, counsel also was under an obligation to document the adverse publicity through the Cincinnati newspapers. If it had not been for fresh counsel filing a motion for new trial, and including in specific detail the many newspaper articles that reflected the adverse publicity on Mr. Clemons [Claim One], there would have been nothing in the record to demonstrate the degree of publicity generated in the Cincinnati metropolitan area.

There is a sharp difference in filing an oral motion for a change in venue, and the subsequent responsibility under the professional standards to actively pursue a change of venue in lieu of this pervasive publicity.

41

Under <u>Strickland v. Washington</u> (1984) 466 U.S. 668, 687; 104 S. Ct. 2052, in addition to the fact that counsel's performance was deficient, the prejudice is apparent, when one again peruses the newspaper articles that were included in Petitioner Clemons' motion for new trial. [Claim One].

Also, as previously noted, four jurors appeared when Mr. Clemons was sentenced to death on November 1, 1996. Of those four, two were interviewed and stated unequivocally that they want to be present when Mr. Clemons is executed.

This thus is not a case where a degree of publicity was generated, and then months later the trial of the particular case ensued. This is a case where an enormous amount of publicity occurred in December, 1995, and continued throughout the next year, the eve of the jury trial itself in the fall of 1996.

With the trial judge insisting that this case proceed to trial on September 24, 1996, on the eve of his own re-election, this created a situation where it is even more crucial that defense counsel present a detailed and coordinated questioning to the prospective jurors so that there can be no doubt that the jurors that were picked would be those who could rely completely on the evidence presented at trial. The fact that this did not occur, means that defense counsel were ineffective, and the result created an unfair trial for Petitioner Clemons.

With respect with this two-tiered issue on counsel's ineffectiveness, the Ohio Supreme Court, at page 450, stated, "In

42

our view, defendant's assertions under this proposition of law are nothing more than a second guess. Counsel could not reasonably foresee that the mitigation report would produce information so damaging to defendant that they would have little choice but to forgo presenting the mitigation expert's report to the jury. In deciding not to use the report, defense counsel were able to keep the damaging information away from the jury."

This, of course, totally misses the issue here, since the whole idea of independent expert assistance is to provide the information on the effects of Prozac on Gerald Clemons. Dr. Schmidtgoessling, by her own admission, was not equipped to review and analyze this significant phase of the mitigation.

With respect to the change of venue issue, again at pages 450-51 of the Clemons' decision, the Supreme Court states, "*** defendant contends that counsel were ineffective in failing to remove the cause to another venue. The record does not support this claim. Initially, counsel moved for a change in venue, but the motion was properly held in abeyance pending completion of voir dire of the jury. At the close of voir dire, defense counsel again asserted the venue motion, and the motion was then denied by the trial court. Contrary to defendant's intimations, trial counsel did attempt to get venue changed. It cannot be ineffective assistance merely because the trial judge did not grant the motion."

As stated earlier in this claim, defense counsel did renew the motion. However, it was the manner of questioning, or the lack of

43

questioning, that created the ineffectiveness here. There is simply no way that defense counsel can determine whether a prospective juror is biased, if the proper questions are not presented.

At page 34 of the Return of Writ, they state that counsel asked penetrating questions to ensure impartiality. It is respectfully asserted from what has been noted throughout this claim, that counsel asked anything but penetrating questions, but instead spent little or no time on a topic that was enormously significant. [It was stated at the outset of this case by counsel with respect to media attention, that this was voted one of the top ten stories of the year by the Cincinnati Enquirer. (J.A. Vol. I - 57)].

Respondent concludes, at page 34, by saying that because voir dire was done in a group setting, penetrating questions would have ran the risk of eliciting responses that inflamed other prospective jurors, jarred memories or sparked curiosities about the case and media coverage. The obvious response to this is that any experienced trial attorney would simply ask that because of the extensive media coverage, individual voir dire be done with respect to this particular issue.

The result is that counsel's performance was contrary the decision of <u>Strickland v. Washington</u>, and Petitioner Clemons respectfully asserts this claim is meritorious.

44

FOURTH GROUND FOR RELIEF: PROSECUTORIAL
MISCONDUCT OCCURRED IN THIS CASE, SPECIFICALLY
IN THE OPENING STATEMENT, CLOSING ARGUMENT AND
THE PENALTY PHASE PROCEEDINGS WHICH RESULTED
IN PREJUDICE TO PETITIONER CLEMONS TO THE
EXTENT THAT HE WAS DENIED A FAIR TRIAL UNDER
THE FOURTH, FIFTH, SIXTH, EIGHTH AND
FOURTEENTH AMENDMENTS TO THE CONSTITUTION.

This Court issued an order, pursuant to Respondent's motion
for dismissal on procedural default, on 9/17/2003. (Dk #52).

In that order, parts of claim four were procedurally
dismissed, and thus will not be included here.

Subsequent to that 9/17/2003 order, a status conference was
conducted on 10/9/2003. (Dk #53).

Pursuant to that conference, and pursuant to an order issued
on 10/14/2003 (Dk #55), Petitioner Clemons was given until
10/15/2003 to file a notice of additional support with respect to
the prosecutorial misconduct claim, i.e. claim number four in the
petition. (Order; 10/14/2003 Dk #55).

Briefly, the additional support had been litigated on the
State level, and detailed at length in the Ohio Supreme Court's
decision with respect to Mr. Clemons.

The notice of filing of support to claim four was filed with
this Court on 10/14/2003 (Dk #56), and included those claims, and
also attached those portions of the Ohio Supreme Court decision
which reflected the adjudication on the merits.

These comments by the prosecutor will be detailed further on,
but initially the law with respect to prosecutorial misconduct

45

should be briefly set forth.

In <u>Darden v. Wainwright</u> (1986) 477 U.S. 168; 106 S.Ct. 2464, the Supreme Court reviewed the prosecution's closing argument to determine whether it is constitutionally unfair.

In the syllabus in <u>Darden</u>, at 168, the decision notes that the issue is whether "the prosecution's closing argument during the guilt phase of the trial rendered the trial fundamentally unfair and deprived the sentencing determination of the reliability required by the Eighth Amendment."

In affirming the conviction, the <u>Darden</u> decision, also in the syllabus, holds that the comments by the prosecutor " *** did not manipulate or misstate the evidence, or implicate other specific rights of the accused, and much of their objectionable content was responsive to the opening summation of the defense (available under a state procedural rule). Moreover, defense counsel were able to use their final rebuttal argument to turn much of the prosecution's closing argument against it."

There are important points in the decision itself which should be emphasized here.

At page 179, it is noted that, "Closing argument came at the end of several days of trial. Because of a state procedural rule n4 petitioner's counsel had the opportunity to present the initial summation as well as a rebuttal to the prosecutor's closing arguments. The prosecutors' comments must be evaluated in light of the defense argument that preceded it, which blamed the Polk County

46

Sheriff's Office for a lack of evidence, n5 alluded to the death penalty, n6 characterized the perpetrator of the crimes as an 'animal,' n7 and contained counsel's personal opinion of the strength of the State's evidence. n8"

The Darden decision had previously noted that all courts before the Supreme Court decision had upheld the conviction, even though the prosecutor's comments were improper: "Under this standard of review, we agree with the reasoning of every court to consider these comments that they did not deprive petitioner of a fair trial. n13 The prosecutors' argument did not manipulate or misstate the evidence, nor did it implicate other specific rights of the accused such as the right to counsel or the right to remain silent. See Darden v. Wainwright, 513 F. Supp. [947], at 958. Much of the objectionable content was invited by or was responsive to the opening summation of the defense. As we explained in United States v. Young, 470 U.S. 1 (1985), the idea of 'invited response' is used not to excuse improper comments, but to determine their effect on the trial as a whole. Id. at 13. The trial court instructed the jurors several times that their decision was to be made on the basis of the evidence alone, and that the arguments of counsel were not evidence. *** Defense counsel were able to use the opportunity for rebuttal very effectively [defense counsel argued first and then last], turning much of the prosecutors' closing argument against them by placing many of the prosecutors' comments and actions in a light that was more likely to engender strong

47

disapproval than result in inflamed passions against petitioner.
n14", Darden at 181-83.

Towards the end of the Darden decision, the Court refers to
Caldwell v. Mississippi, 472 U.S. 320 (1985): "The principles of
Caldwell are not applicable to this case. Caldwell involved
comments by a prosecutor during the sentencing phase of trial to
the effect that the jury's decision as to life or death was not
final, that it would automatically be reviewed by the State Supreme
Court, and that the jury should not be made to feel that the entire
burden of the defendant's life was on them", at 183.

The decision later on, also at 183, holds that, "The comments
in Caldwell were made at the sentencing phase of trial and were
approved by the trial judge. In this case, the comments were made
at the guilt-innocence stage of trial, greatly reducing the chance
that they had any effect at all on sentencing. *** In this case,
none of the comments could have had the effect of misleading the
jury into thinking that it had a reduced role in the sentencing
process."

Caldwell is significant here because of the Sixth Circuit's
recent decision in DePew v. Anderson, 311 F.3d 742 (6th Cir. 2003),
where it held that the local prosecutors' statements were
inadmissible, inflammatory and misleading during the penalty phase
of a capital murder trial in Ohio, and thereby violated
petitioner's Eighth amendment rights justifying relief.

At page 744 of DePew, "In this case, the question is whether

48

an Ohio prosecutor's repeated inadmissible comments at sentencing effectively precluded the jury's consideration of the defendant's sole mitigating circumstance in violation of the Eighth Amendment and constituted an unconstitutional comment on the defendant's failure to testify."

Some of the comments in DePew that the Sixth Circuit found offensive are found at page 747: "First, the prosecutor asked a defense witness on cross-examination, 'You knew he [the defendant] got cut in a knife fight over at King Kwik, didn't you?' This statement implied that the defendant had been previously involved in a knife fight, an implication with no foundation or factual basis. Also, the prosecutor stated to the jury that any sentence less than death could result in parole, alluded to facts not in evidence, and asked the jury why Mr. DePew did not call certain witnesses. *** Finally, the prosecutor commented in closing argument that if Mr. DePew had taken the stand, the prosecutor would have asked him 'if he's ever been convicted of a criminal offense after the date in question in this case.'"

At page 748, DePew notes, "The Eighth Amendment mitigation requirement also applies to the actions of prosecutors. See Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985) (a prosecutor's comments that led the jury to believe that later an appellate court could mitigate the death sentence violates the Eighth Amendment because it misleads the jury as to its responsibility). When a prosecutor's actions are so egregious

49

that they effectively 'foreclose the jury's consideration of ... mitigating evidence,' the jury is unable to make a fair, individualized determination as required by the Eighth Amendment. Buchanan [v. Angelone], 522 U.S. at 277, 118 S.Ct. 757. As a result, a prosecutor's comments violate the Eighth Amendment when they are so prejudicial as to 'constrain the manner in which the jury was able to give effect' to mitigating evidence."

The decision, at 749, states, "Each of the prosecutor's improper comments, however, was designed to completely undercut the defendant's sole mitigation theory, effectively denying him fair jury consideration."

With respect to Mr. DePew's Fifth Amendment right, the decision at 749 states, "Finally, the prosecutor stated in his closing argument that the defendant failed to take the stand in order to prevent the prosecutor from asking him whether he had a subsequent conviction. This improper statement also undermined defendant's theory that he was a law-abiding citizen, implying that the defendant was instead a recidivist continually engaged in criminal conduct."

The DePew decision, at 749, concludes that, "These statements were purposefully placed before the jury and were not isolated; they clearly misled the jury and prejudiced the defendant; and they undermined the jury's ability to make a fair determination as to whether the defendant's proffered character outweighed the aggravating factors proved against him."