" *** While improper comments of a prosecutor do not generally warrant automatic reversal, the statements in the case at bar require it because they go to the heart of the defendant's sole mitigating theory," at 749.

"The prosecutor's statement concerning the defendant's refusal to testify at sentencing also violated the defendant's Fifth Amendment rights as set forth in Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229 (1965)."

With respect to this Fifth Amendment violation, the DePew decision at 750 states, "Under Ohio's unique statutory scheme, a defendant may present an unsworn statement at sentencing without subjecting himself to cross-examination. Ohio Rev. Code §2929.03(D)(1). We agree with the Ohio Supreme Court that 'to permit the prosecutor to extensively comment on the fact that the defendant's statement is unsworn affects Fifth Amendment rights.'"

The Sixth Circuit DePew's decision concludes at 751 by stating, "Cumulatively, it is clear that these errors are not harmless. As adopted by Justice Stevens in his authoritative concurrence in Brecht v. Abrahamson, 507 U.S. 619, 641, 113 S.Ct. 1710 (1993); *** the applicable standard of harmless error requires that if 'one cannot say, with fair assurance, ... that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected.'"

The DePew decision held there was grave doubt the statements by the prosecutor did not have an effect on the sentencing of the

defendant, and as a result, the defendant was granted a new penalty phase hearing, at 751.

Having stated the law in the Supreme Court, and how it is applied through the Sixth Circuit, the facts of the prosecutorial misconduct in Petitioner Clemons' case need to be detailed.

There are nine separate instances during the course of the trial in which the prosecutor committed misconduct, and under which objections were raised. As noted, all of these were reviewed on the merits by the Ohio Supreme Court.

(1)   In opening statement, the prosecutor stated that Mr. Clemons looked at Mr. Kinney, who was "seated at his desk, sitting down at his desk defenseless, helpless and just sitting there." (J.A. Vol II - 588).

(2)   Also, in opening statement, the prosecutor states the victims were shot in a "cowardly fashion", and then follows with the question, "Could you even imagine the abject terror of those women who have just witnessed it and heard those gunshots?". (J.A. Vol. II - 590).

(3)   The next misconduct occurs at the closing argument in the first phase when the prosecutor states the following, "I know the defense attorneys are just doing their job, but if there is any hope at all that they could produce any type of expert to say this defendant blacked out and could not form the requisite intent of purposely killing these people, you would have heard it." (J.A. Vol. III - 1077-78).

52

(4)   The following comments occurred in the closing argument of the prosecutor at the mitigation hearing: "I issue a challenge to the defense attorneys who in a few minutes are going to come up here. I issue a challenge to them to come up to this podium, stand here, look at each and every one of you in the face, look at each and every one of you in the eye and tell you and convince you that any of the mitigating factors that they tried to present yesterday even begins to come close to being more important than the lives of those three people." (J.A. Vol. III - 1289-90).

(5)   Then the prosecutor tells the jury the defense message is, "to ignore your orders, don't follow the law, do what you want to do." (J.A. Vol. III - 1327-28).

(6)   The prosecutor tells the jurors, "You have been subjected to a whole variety of issues that were simply presented to you for sympathy purposes." (J.A. Vol. III - 1330).

(7)   The prosecutor, in closing, asks the question, "Did you hear at any time during the course of the guilt phase of this trial or the penalty phase of this trial anyone, any expert come before this jury and specifically diagnosis this defendant as being depressed ever? They have subpoena power, they have access to the Court Clinic." (J.A. Vol. III - 1331).

(8)   The next question by the prosecutor at closing asked why the defendant never called any of his former bosses to testify. (J.A. Vol. III - 1338).

(9) The prosecutor also adds that "I suspect I will

53

continually be interrupted throughout this closing argument. It's kind of a tactic defense attorneys are taught." (J.A. Vol. III - 1335).

With respect to the two misconduct comments by the prosecutor in the opening statements, they are significant for several reasons.

First, they establish the pattern of this prosecutor, and in reality, how he wishes to pursue the prosecution in the case.

Secondly, they also demonstrate that the further misconduct on the part of the prosecutor subsequent to the opening statements were not isolated instances that courts often cure because of the fact they did not permeate the trial.

The third factor of importance is they occurred in opening statements, and are opinions of the prosecutor without the first bit of evidence being introduced.

The prosecutor states that Mr. Kinney was defenseless and helpless and was just sitting there. The prosecutor also says that Mr. Kreamelmeyer was shot in a cowardly fashion, and then asks whether anyone can imagine the terror of the women who have witnessed and heard the gunshots.

All of the above, besides being improper opinions of the prosecutor, again occur in the opening, and the sole purpose is to set the stage to influence the passions and prejudices of the jurors.

The last thing of import is also relevant to this case as a

whole, and that is this individual was not an assistant prosecutor. This person was the elected official of Hamilton County. As the prosecutor, he not only represents the people of Hamilton County in this particular trial, but he represents the people of Hamilton County pursuant to his many statutory obligations.

The jurors obviously know this, and hold this individual with a higher degree of respect than they would some assistant prosecutor.

The fact that these type of statements occurred in opening, and also continued throughout, should be considered, with again the fact that this is the Hamilton County prosecutor.

Finally, there is no logical or legal reason for making the comments that this prosecutor made in opening. The sole purpose of it is, again, to influence the passions of the jury before they even hear the first bit of evidence.

The third incident of prosecutorial misconduct under which an objection was lodged occurred at the end of the first phase, i.e. the closing arguments, where the prosecutor again says I know the defense attorneys are just doing their jobs, and if there is any hope at all that they could produce any type of expert, you would have heard it.

This comment is used by the prosecutor to denigrate the defense counsel, and basically says they are just there for no other purpose but to sit next to Mr. Clemons. It implies that they do not want to be there, that they are insincere but pursuing their

responsibilities as defense attorneys, and that the jurors are really required to ignore anything the two of them say.

Thus, as a result of the improper comments in opening statement, and the degrading of the defense attorneys, at the conclusion of the first stage, this prosecutor has attempted to appeal directly to the passions of the jurors improperly, and to make snide comments about defense attorneys attempting "to do their jobs", thereby directly affecting the right to counsel.

The last six instances of misconduct occurred at the mitigation phase, and specifically during closing arguments. They are the most pronounced, they are the most grievous and they demonstrate how far a prosecutor such as this one will go to obtain a death penalty.

The fourth incident (in the trial's sequence) deals with the prosecutor challenging the defense counsel to look at each juror in the face and convince them that mitigation could not outweigh the important lives of these three people.

Obviously, this comment is not only improper, it is also not the law. As this Court knows, the proper instruction at the conclusion of the case is not whether mitigation outweighed the aggravating circumstance, it is whether the aggravating circumstance outweighs the mitigation beyond a reasonable doubt.

In addition, it continues to degrade and denigrate defense counsel by challenging them to "look the jurors in the face." The Ohio Supreme Court, in its decision, stated that this comment was

56

highly "theatrical", but "when viewed in isolation, while improper, it did not materially prejudice defendant", Clemons at 453.

As stated, however, this is not an isolated comment. It is a continuation of this prosecutor performing his misconduct which began at the outset of the case in opening statement.

The fifth incident concerns the comment where the prosecutor says the jurors should just ignore your orders, don't follow the law, do what you want to do, by again referring to the defense counsel's "basic message". The Ohio Supreme Court, at 453, says "This overly embellished comment borders on impropriety, but was neither outcome-determinative or unduly prejudicial."

This comment, with all due respect, not only borders on impropriety, it demonstrates again the attitude of this prosecutor, and his belief that he basically can say what he wants to say, because of his position as county prosecutor, and because it appears he believes this is necessary to win these type of cases.

One of the most important parts of any jury trial consists of the instructions that the trial judge gives to the jurors. Just before this event occurs, this prosecutor is saying that the basic message of the defense is to ignore the law, and do not follow the instructions.

In addition to being unethical, what this does is it tells the jurors to disregard anything counsel may say on behalf of Gerald Clemons. The jurors are faced with the dilemma of refusing to even listen to what the defense presents because of this comment by the

prosecutor and the respect his office holds to the panel.

The sixth incident regards the prosecutor stating you have been subjected to a whole variety of issues by the defense because they were presented for sympathy purposes.

As this Court is aware, the trial court, in its instructions, informs the jurors that sympathy should play no role in their decision. (J.A. Vol. III - 1364). The prosecutor "covers this" issue by saying the defense in its mitigation presentation, was only bringing it in front of the jury for sympathy purposes - which by law is not part of any mitigation hearing; and not for the jury's consideration.

This again constitutes improper opinions by this prosecutor, improper degrading of the defense counsel, and just as important, an improper statement analysis of the mitigation presented.

The seventh incident deals with the commenting on the failure of defense counsel to call an expert to testify that Mr. Clemons suffered from depression, or had other psychological deficiencies.

The record in this case demonstrates that the prosecutor successfully moved to keep any type of expert testimony out with respect to Gerald Clemons' mental status. The prosecutor was successful both in the first phase, and also in the second phase. However, as again the record demonstrates, the prosecutor and his comments in closing then uses this to imply that an expert should have been called by the defense. (J.A. Vol. II - 864-79).

This gives the jurors the impression that, because an expert

58

was not called by the defense, the mitigation that was presented was worthless.

The eighth incident concerns the further compounding of the above by the prosecutor making the comment that the "defendant never called any of his former bosses to testify."

This comment gives the jurors the impression that this prosecutor had investigated and interviewed his former bosses, and was aware of their opinions of Mr. Clemons before he was employed by Trans-Continental. It directly effects the background and character of Mr. Clemons, and presents prejudicial information that was not made part of the trial, both in the initial stage and in the mitigation stage.

This is simply a continuation of the misconduct of the prosecutor, and demonstrates that his theme throughout this was to freely comment and basically say whatever he desired to say, in order to obtain a conviction and a death sentence.

Finally, the ninth incident concerns the prosecutor saying I am going to be continually interrupted throughout closing argument, because it is a tactic defense attorneys are taught.

The Ohio Supreme Court, at 453-54, stated, "This comment improperly denigrated defense counsel and has no place in a trial. In our view, such prosecutorial comments potentially infringe on the defendant's right to counsel and penalize him for attempting to enforce procedural rights."

In summary, these actions, as in the DePew case, involve the

59

county prosecutor.

The United States Supreme Court, and the Sixth Circuit, have emphasized that, even when a prosecutor commits misconduct, the misconduct itself has to influence the actual fairness of the trial, for an unconstitutional result.

Again, as is pointed out by the Supreme Court, there has to be a pattern; the incidents cannot be isolated; the misconduct has to directly go to the heart of the trial; and obviously, the defense.

All of the above comments, considered separately, may not be sufficient to overcome the standard that has been used in reversal, but when considered together, and when it is evident that the prosecutor is conducting the entire trial in this fashion, the result is prejudicial to Mr. Clemons. This is of particular importance in the mitigation phase, where a significant amount of the misconduct occurred.

The Ohio Supreme Court, at page 454, ruled the above comments were harmless, and not outcome-determinative. It concluded by saying, "Nevertheless, prosecutors should be on notice to avoid the comments highlighted here."

In the Return of Writ, after a detailed discussion of United States Supreme Court law, and the misconduct by the county prosecutor, the Respondent, at page 84, states the prosecutor's comments either were reasonable arguments based on the facts or they were improper but did not deprive Clemons of a fair trial due to the overwhelming evidence that Clemons murdered Mr.

Kreamelmeyer, Mr. Kinney and Ms. Teetzel with prior calculation and
design.

It is respectfully asserted that the Respondent's statement
above is incorrect.

The Clemons decision is contrary both the established Supreme
Court precedent found in Darden and Caldwell, supra.

Darden emphasizes the factors to be viewed are (1) whether in
isolation, (2) a pattern, (3) misstatement of evidence and (4)
implication of constitutional rights. All have been established
here, by the county prosecutor's misconduct.

In addition, the prosecutor's actions shut down the mitigation
presented, thus implementing the Caldwell holding noted in the
DePew decision of the Sixth Circuit.

It is respectfully asserted that this misconduct was such that
the penalty phase of the trial was constitutionally tainted, and
that this Court should grant relief with respect to this claim,
minimally with respect to the sentence of death.

> FIFTH GROUND FOR RELIEF: THE TRIAL COURT ERRED
> IN SENTENCING WHEN IMPROPERLY CONSIDERING THE
> NATURE AND CIRCUMSTANCES OF THE OFFENSE AS AN
> AGGRAVATING CIRCUMSTANCE IN IMPOSING THE DEATH
> SENTENCE ON PETITIONER CLEMONS, THE RESULT
> BEING CONTRA THE EIGHTH AND FOURTEENTH
> AMENDMENTS TO THE CONSTITUTION.

On November 4, 1996, the trial court filed its opinion
affirming the death sentence. (JA - Vol. V - 442).

In this sixteen page decision, the trial court
constitutionally erred in using the "nature and circumstances of

61

the offense" as an aggravated factor. In addition, the trial court improperly weighed this factor against the mitigating circumstances, thus creating an unreliable sentence, contra the Eighth Amendment.

At page 447, the opinion states, the "court placed itself in the same position as if it were one of the members of the jury panel."

Then, at page 449, the trial court states that these murders "were completely unnecessary, and cold-blooded acts of violence. These killings evidenced the particularly cruel, calculating, and malicious outlook of the defendant."

The opinion then, beginning at page 451, details the nature and circumstances of the offense, not as mitigation, but again improperly as aggravating circumstances.

For example, at page 455, the opinion states that the "proven facts of the aggravating circumstances reveal a calculating cruel willful and cold-blooded disregard for human life and values."

Then, at page 456, the trial court states that the sole issue before the court is that the state prove the above.

The above demonstrates the trial court structured its sentence on improper aggravating circumstances. It also shows that, by saying he was placing himself as one of the jurors, there was no independent evaluation so needed in these type of cases.

In State v. Davis (1988) 38 Ohio St. 3d 361, the Ohio Supreme Court reversed a death sentence, relying on two United States

Supreme Court cases, dealing with this instant issue. The two cases are <u>Zant v. Stephens</u> (1983) 462 U.S. 862, 103 S. Ct. 2733 and <u>Barclay v. Florida</u> (1983) 463 U.S. 939.

At pages 369-70 of the <u>Davis</u> decision, the Ohio Supreme Court, in reviewing <u>Zant</u> and <u>Barclay</u>, stated, "In each case, the sentencing court considered an improper aggravating circumstance which the state's highest courts held did not require vacation of the death penalty. The United States Supreme Court held that the improper consideration of an aggravating circumstance by the sentencer did not necessarily invalidate the imposition of a sentence of death. ***

Florida's statutory framework for imposition of capital punishment is similar to Ohio's. *** Both states require the sentencing authority to weigh the aggravating circumstances and the mitigating factors. ***

In Florida, when trial courts erroneously consider improper aggravating factors and also find some mitigating factors to exist, the case will generally be remanded for resentencing."

Further on in <u>Davis</u>, at 370-71, the decision emphasizes that "*** we must guard against any unauthorized aggravating factor going into the equation which might tip the scales of the weighing process in favor of death."

In concluding, in <u>Davis</u> at 372, the decision holds, "The trial court essentially made 'prior calculation and design' an aggravating circumstance. It is an element of aggravated murder,

but it is not an aggravating circumstance listed in R.C.
2929.04(A). We find that the trial court improperly weighed non-
statutory aggravating circumstances against the mitigating factors
it found to be present herein."

What was done in the Davis case is precisely what occurred in
Mr. Clemons' case. As noted earlier, the trial court, in its
decision, structures its bases of death on the fact that the
actions were cold, calculated and cruel, i.e. reflective of prior
calculation and design.

The Davis decision states at 372 that, "We cannot accept
independent review as a cure in this particular action because we
cannot know if the result of the weighing process by the three-
judge panel would have been different had the impermissible
aggravating circumstances not been present."

The trial court, in the present case, through its opinion,
also brought in impermissible aggravating circumstances that are
vague, and thus contra the Eighth Amendment narrowing command.

The specific statements of the trial court's opinion involve
the conduct of Petitioner Clemons which he calls a "calculated,
cruel, willful, and cold-blooded disregard for human life and
values."

In Arave v. Creech (1993) 507 U.S. 463, the narrowing
criteria, and whether it is unconstitutionally vague was discussed
in detail.

In the syllabus of Arave, the Supreme Court states that, "***

64

a State's capital sentencing scheme [must] 'genuinely narrow the class of persons eligible for the death penalty.' <u>Zant v. Stephens</u>, 462 U.S. 862, 877."

In the <u>Arave</u> decision itself, at 470, the Court cites <u>Lewis v. Jeffers</u> 497 U.S. 764 (1990): "In <u>Jeffers</u>, we reaffirmed the fundamental principle that, to satisfy the Eighth and Fourteenth Amendments, a capital sentencing scheme must 'suitably direct[t] and limi[t]' the sentencer's discretion 'so as to minimize the risk of wholly arbitrary and capricious action.' <u>Id</u>. at 774 (quoting <u>Gregg v. Georgia</u>, 428 U.S. 153, 189 (1976)."

The <u>Arave</u> decision upholds the State Supreme Court's decision [Idaho Supreme Court], but only because that State Supreme Court had previously narrowed the definition of cold-blooded and calculating.

At pages 475-76, the <u>Arave</u> decision states, "We acknowledge that, even within these broad categories, the word 'pitiless,' standing alone, might not narrow the class of defendants eligible for the death penalty. A sentencing judge might conclude that every first-degree murderer is 'pitiless,' because it is difficult to imagine how a person with any mercy or compassion could kill another human being without justification. Given the statutory scheme, however, we believe that a sentencing judge reasonably could find that not all Idaho capital defendants are 'cold-blooded.' *** Idaho similarly has identified the subclass of defendants who kill without feeling or sympathy as more deserving

65

of death. By doing so, it has narrowed in a meaningful way the category of defendants upon whom capital punishment may be imposed."

In the present case, it is important to stress here that the aggravating circumstance was the "course of conduct" specification. The judge, by interjecting prior calculation and design; and the cold-blooded nature of the conduct, in his own reasoning, has structured a death penalty case not on the appropriate aggravating circumstance.

When this occurs, the death sentence is constitutionally unreliable, it is arbitrary, and it is capricious. The judge's opinion is the very reason why the Ohio statutory scheme insists on (1) narrowing, and (2) independent review so that a death sentence, if affirmed, is constitutionally valid.

In this case, the judge stressed, in its opinion, as the most significant reasons he affirmed the death penalty as factors which are specifically prohibited by the United States Supreme Court decisions, and the Ohio statutes implementing those decisions.

The Ohio Supreme Court, in rejecting this claim, at page 447 states, "Moreover, even assuming that the Defendant's argument has any legitimacy, our independent review will readily cure any such error."

In their independent review, the Court at 454 begins by saying, "After independent assessment, we find that the evidence supports beyond a reasonable doubt the aggravating circumstance

66

that Defendant murdered Kreamelmayer, Kinney and Teetzel as 'part
of a course of conduct involving the purposeful killing of two or
more persons.' R.C. 2929.04(A)(5)."

After detailing the facts, the Court however bases its
weighing decision on the murders themselves, not on the "course of
conduct" requirement: "Nevertheless, after independent weighing in
each of the three murders, we conclude that the aggravating
circumstances in each murder outweighs the mitigating factors
beyond a reasonable doubt. Defendant deliberately sought out and
murdered each victim without provocation," Clemons at 456.

Thus, both the trial court and the Ohio Supreme Court injected
non-statutory aggravators into its weighing, and it is contra the
principles of Zant and Barclay.

For the above reasons, it is respectfully requested that this
claim be found meritorious.

> SIXTH GROUND FOR RELIEF: THE TRIAL COURT ERRED
> TO THE PREJUDICE OF PETITIONER CLEMONS WHEN IT
> DENIED THE PRE-TRIAL MOTION FOR TWELVE
> PERMPTORY JURY CHALLENGES CONTRA THE SIXTH,
> EIGHTH AND FOURTEENTH AMENDMENTS TO THE
> CONSTITUTION.

Petitioner Clemons is constitutionally entitled to twelve
peremptory challenges at voir dire.

Petitioner Clemons was allowed only six peremptory challenges
at voir dire after the trial court denied the defense's motion to
increase the number of peremptories. (J.A. Vol. I - 55).

Ohio's statutory scheme had specifically allowed for twelve

peremptory challenges under R.C. 2945.21(A)(2). Crim. R. 24, enacted subsequent to the Ohio statute, procedurally implementing Ohio's criminal judicial process, calls for six peremptories.

In 1988, the Ohio Supreme Court held under State v. Greer (1988) 39 Ohio St. 3d 236; 530 N.E. 2d 382, that Crim. R. 24 superseded the statute and therefore, in capital litigation, the defense was precluded from exercising twelve peremptory challenges.

It is Petitioner Clemons' assertion that the Ohio Supreme Court case, State v. Greer, is contrary to the United States Supreme Court's previous decisions regarding peremptory challenges, and the result prejudicially affected Mr. Clemons in his jury trial.

In the Greer decision, at 245, the Ohio Supreme Court stated erroneously that the number was procedural in nature and therefore Ohio Crim. R. 24, stating six peremptories, controlled over the statute calling for twelve.

In affirming this issue, the Greer decision, at 245, notes, "It is evident upon the face of the [Ohio] Constitution that the Rules of Criminal Procedure as propounded by this court prevail over conflicting state statutes so long as the subject of regulation is procedural. There is, of course, no federal or state constitutional requirement that peremptory challenges be provided within a trial. Stilson v. United States (1919), 250 U.S. 583. However, such right, once provided by a state's legislature, is a valuable statutory incident to the right of trial by jury. *** When

68

utilized in conjunction with the challenge for cause, the peremptory challenge aids in the provision of an impartial jury. Stilson, supra; Swain v. Alabama (1965) 380 U.S. 202. Thus, once provided by the General Assembly, the peremptory challenge has become a crucial substantive right. See, e.g., Swain v. Alabama, supra, at 219."

The Greer decision then concludes that the total of six peremptories in capital cases is not improper: "The present case presents a classic example of an underlying substantive right, the right to peremptorily challenge jurors during voir dire, which application is regulated by a Rule of Criminal Procedure which sets forth the time and manner as well as the number of times such right may be exercised. The number of allowable peremptory challenges has, with near unanimity, been declared a matter of procedure, 'subject to *** discretion *** and var[ying] from jurisdiction to jurisdiction.'", at 245-46.

This decision, Greer, is contrary established United States Supreme Court precedent, i.e. Swain v. Alabama (1965) 380 U.S. 202.

Swain traced the historical development of the constitutional right to peremptory challenges in our criminal jury system.

In Swain, the review focused on the Alabama system of "striking". In that system, "*** the venire in a capital case is reduced to about 75. The jury is then 'struck' - the defense striking two veniremen and the prosecution one in alternating turns, until only 12 jurors remain. *** This essentially is the

69

Alabama struck-jury system, applicable in all criminal cases and available in civil cases."

Thus, in the Alabama system, there were numerous peremptory strikes that occurred before the jury reached the composition of twelve. In Ohio, in contrast, the defense is allowed only six peremptories.

In Swain, further at 211-12, the decision states, "In providing for jury trial in criminal cases, Alabama adheres to the common-law system of trial by an impartial jury of 12 men who must unanimously agree on a verdict, the system followed in the federal courts by virtue of the Sixth Amendment. As part of this system it provides for challenges for cause and substitutes a system of strikes for the common-law method of peremptory challenge. ***

The peremptory challenge has very old credentials. In all trials for felonies at common law, the defendant was allowed to challenge peremptorily 35 jurors."

The Swain decision then traces the development of the peremptory challenge in American trials, and emphasizes at 218-19, "The voir dire in American trials tends to be extensive and probing, operating as a predicate for the exercise of peremptories, and the process of selecting a jury protracted. The persistence of peremptories and their extensive use demonstrate the long and widely held belief that peremptory challenge is a necessary part of trial by jury. See Lewis v. United States 146 U.S. 370, 376. Although '[t]here is nothing in the Constitution of the United

States which requires the Congress [or the States] to grant peremptory challenges,' <u>Stilson v. United States</u> 250 U.S. 583, 586, nonetheless the challenge is 'one of the most important of the rights secured to the accused,' <u>Pointer v. United States</u> 151 U.S. 396, 408. The denial or impairment of the right is reversible error without a showing of prejudice, <u>Lewis v. United States</u>, <u>supra</u>; <u>Harrison v. United States 163 U.S. 140</u>. *** 'For it is, as Blackstone says, an arbitrary and capricious right; and it must be exercised with full freedom, or it fails of its full purpose.' <u>Lewis v. United States</u>, <u>supra</u>, at 378.

The function of the challenge is not only to eliminate extremes of partiality on both sides, but to assure the parties that the jurors before whom they try the case will decide on the basis of the evidence placed before them, and not otherwise. In this way the peremptory satisfies the rule that "to perform its high function in the best way 'justice must satisfy the appearance of justice.'" <u>In re Murchison</u> 349 U.S. 133, 136. Indeed the very availability of peremptories allows counsel to ascertain the possibility of bias through probing questions on the voir dire and facilitates the exercise of challenges for cause by removing the fear of incurring a juror's hostility through examination and challenge for cause", <u>Swain</u> at 220.

In summary, <u>Swain</u> holds that the use of peremptory challenges has been constitutionally supported essentially since the beginning of the American jury trial system.

The <u>State v. Greer</u> decision ruled against this right by reducing the constitutional allotment of twelve peremptories in a capital case, down to six, and its decision was contrary, again, to established United States Supreme Court precedent, in <u>Swain</u>.

No prejudice need be shown.

The Ohio Supreme Court decision summarily rejected this argument at 442-43, citing its decision in <u>Greer</u>.

As a result, it is respectfully requested that this claim is meritorious, and this Court order a new trial.

> SEVENTH GROUND FOR RELIEF: THE DEATH PENALTY STATUTE IN OHIO IS UNCONSTITUTIONAL UNDER THE FOURTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION IN THAT IT FAILS TO REQUIRE THE APPROPRIATE MENTAL STATE AND, AS A RESULT, ALLOWS THE JURY TO CONVICT ON A LESS THAN ADEQUATE SHOWING OF CULPABILITY.

Ohio's death penalty statutes allow the imposition of the death penalty on a less than adequate showing of culpability. The mental state, which is sufficient to convict in Ohio, fails to require the conscious desire to kill through adequate deliberation.

In <u>Enmund v. Florida</u> (1982) 458 U.S. 872, 102 S.Ct. 3368, the United States Supreme Court held that the Eighth and Fourteenth Amendments to the Constitution preclude the imposition of the death penalty upon a person who did not kill, attempt to kill or <u>intend to kill</u>.

The Ohio General Assembly, in attempting to meet this constitutional standard, enacted R.C. 2903.01(D) which states that

no person shall be convicted of aggravated murder unless he has specifically been found to have intended to cause the death of another. [H.B. 5 has since deleted this portion of Ohio's death penalty statutes].

The Ohio Supreme Court has continuously misconstrued perhaps the most important element of the aggravated murder statute by holding that a finding by a jury that an accused unlawfully and purposely caused the death of another is sufficient to withstand a challenge under Enmund v. Florida. The logic the Ohio Supreme Court uses is that R.C. 2903.01(D) requires a finding that the accused intentionally caused the death of another for a conviction of aggravated murder. State v. Mapes (1985) 19 Ohio St. 3d 108, 484 N.E.2d 140.

In reviewing the Enmund v. Florida case, the Ohio Supreme Court in Mapes, at page 114, states, "The Supreme Court stated that an accused's culpability must be examined individually and that the death penalty may not be imposed on one 'who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed.' Id. at 797. More specifically, the court variously described this evaluation of an accused's culpability as an examination of his 'intentions, expectations, and actions,' id. at 800, 'of whether *** [he] intended or contemplated that life would be taken,' id. at 801, and whether he had an 'intention or purpose that life will be taken. [Id. at 799].' ***

Appellant's [Mapes] argument that Ohio's death penalty statute

does not satisfy Enmund also lacks merit. R.C. 2903.01(D) provides that, '[n]o person shall be convicted of aggravated murder unless he is specifically found to have intended to cause the death of another. ***' Thus, an accused cannot be found guilty of aggravated murder unless he is found to have intentionally caused the death of another.    This    intent    standard    falls    squarely    within    the requirements of Enmund. Therefore, the Ohio death penalty statutes satisfy Enmund v. Florida because, for a conviction of aggravated murder, R.C. 2903.01(D) requires a finding that the accused intentionally caused the death of another."

In Petitioner Clemons' case, the jury made no finding with respect to the specific intent of element.

The importance of this has been emphasized in a recent United States Supreme Court decision: Sattazahn v. Pennsylvania 537 U.S. 101, 123 S.Ct. 732 (2003).

In that case, the decision holds that in capital murder cases, the jury has to make the specific finding before the trial court can implement a sentence of death.

Specifically, at page 111, the    Sattazahn decision states, "Recent developments, however, have illuminated this part of our jurisprudence. Our decision in Apprendi v. New Jersey 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), clarified what constitutes an 'element' of an offense for purposes of the Sixth Amendment's jury-trial guarantee. Put simply, if the existence of any fact (other than a prior conviction) increases the maximum punishment

74

that may be imposed on a defendant, that fact - no matter how the State labels it - constitutes an element, and must be found by a jury beyond a reasonable doubt. Id. at 482-484, 490, 120 S.Ct. 2348.

Just last Term we recognized the import of Apprendi in the context of capital-sentencing proceedings. In Ring v. Arizona 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), we held that aggravating circumstances that make a defendant eligible for the death penalty "operate as 'the functional equivalent of an element of a greater offense.'" Id. at 609, 122 S.Ct. 2428 (emphasis added). That is to say, for purposes of the Sixth Amendment's jury-trial guarantee, the underlying offense of 'murder' is a distinct, lesser included offense of 'murder plus one or more aggravating circumstances': Whereas the former exposes a defendant to a maximum penalty of life imprisonment, the latter increases the maximum permissible sentence to death. Accordingly, we held that the Sixth Amendment requires that a jury, and not a judge, find the existence of any aggravating circumstances, and that they be found, not by a mere preponderance of the evidence, but beyond a reasonable doubt. Id. at 608-609, 122 S.Ct. 2428."

Thus, just as in Sattazahn, the opinion focuses on the aggravating element as a key in which the jury must make a determination, in the present case, the Clemons jury never made any specific finding as to the element of intent, under the previous Ohio statute, R.C. 2901.05(D).

75