In conclusion, as the <u>Sattazahn</u> states, it "illuminates" the previous jurisprudence in the United States Supreme Court.

As a result, because the jury did not make this specific finding on record, this issue is meritorious, and must be remanded for resentencing.

> <u>EIGHTH GROUND FOR RELIEF</u>: PETITIONER CLEMONS WAS IMPROPERLY CONVICTED AND SENTENCED BECAUSE THE OHIO BEYOND A REASONABLE DOUBT STANDARD FAILS TO MEET THE REQUIREMENT OF A HIGHER RELIABILITY FOR GUILT DETERMINATION IN A CAPITAL CASE CONTRA THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION.

Ohio's death penalty statute under R.C. 2903.01 is constitutionally flawed in that it fails to require proof beyond all doubt as to guilt in the trial phase, and significantly in the mitigation phase of the proceedings.

R.C. 2901.05 gives the definition of proof beyond a reasonable doubt. In <u>State v. Jenkins</u> (1984) 15 Ohio St. 3d 164, 473 N.E.2d 764, the Ohio Supreme Court held that the standard of proof in any capital prosecution is proof beyond a reasonable doubt as so defined in the statute found under R.C. 2901.05.

This standard of proof is constitutionally unreliable in Ohio capital cases for several reasons. The first is that in December, 1995, at the time of the offense in this case, Ohio recognized a standard of proof, especially in the mitigation phase, which was inconsistent with the instruction the trial court gave to the jury. The second reason relates to United States Supreme Court precedent.

In <u>State v. Watson</u> 61 Ohio St. 3d 1; 572 N.E.2d 97 (1991), the

Ohio Supreme Court recognized the doctrine of residual doubt as a proper consideration in the mitigation phase: "Residual doubt of a capital defendant's guilt may properly be considered in mitigation. Lockhart v. McCree (1986), 476 U.S. 162, 181, 106 S.Ct. 1758, 1769."

Thus, at the time of the offense, December 15, 1995, the Watson decision controlled. Significantly, an integral part of the mitigation phase of any case included the concept of residual doubt the jurors were required to hear.

In Lockhart, the United States Supreme Court, at 181, states: "Another interest identified by the State in support of its system of unitary juries is the possibility that, in at least some capital cases, the defendant might benefit at the sentencing phase of the trial from the jury's 'residual doubts' about the evidence presented at the guilt phase. The dissenting opinion in the Court of Appeals also adverted to this interest:

'[A]s several courts have observed, jurors who decide both guilt and penalty are likely to form residual doubts or 'whimsical' doubts ... about the evidence so as to bend them to decide against the death penalty. Such residual doubt has been recognized as an extremely effective argument for defendants in capital cases. To divide the responsibility ... to some degree would eliminate the influence of such doubts.'"

The United States Supreme Court expanded on the above in Franklin v. Lynaugh 487 U.S. 164; 108 S.Ct. 2320 (1988), at 172-73:

77

"At the outset, we note that this Court has never held that a
capital defendant has a constitutional right to an instruction
telling the jury to revisit the question of his identity as the
murderer as a basis for mitigation. Petitioner suggests that our
discussion of the 'residual doubt' question in Lockhart v. McCree,
476 U.S. 162, 180-182, 106 S.Ct. 1758, 1768-1770, 90 L.Ed.2d 137
(1986), supports his position that he has such an entitlement. ***
But all that this aspect of the Lockhart opinion stands for is the
simple truism that where 'States are willing to go to allow
defendants to capitalize on "residual doubts"', such doubts will
inure to the defendant's benefit."

As noted earlier, the Ohio Supreme Court established in the
Watson decision, as an integral constitutional process, the concept
of residual doubt, especially in the mitigation phase of Ohio
capital trials.

This was the law at the time of the offense, and at the time
of Petitioner Clemons' trial the next year, i.e. in 1996.

There thus was a heightened standard with respect to
reasonable doubt in the capital sentencing process. This should
have been part of the process both in the jurors decision at the
mitigation phase, and also the trial court's opinion. It is evident
that this standard was not implemented, and as a result, the
penalty is constitutionally flawed.

A constitutional example of an improper reasonable doubt
instruction, and the reversal of the death penalty is found in Cage

v. Louisiana (1990) 498 U.S. 39; 111 S.Ct. 328.

In Cage, the petitioner argued that the reasonable doubt instruction used in his trial was constitutionally defective.

There were certain phrases used in the trial court's instruction, which resulted in a constitutional violation of reasonable doubt.

The syllabus held that "The Due Process Clause of the Fourteenth Amendment 'protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.' In re Winship, 397 U.S. 358, 364, 25 L.Ed.2d 368, 90 S.Ct. 1068. ***

The instruction was contrary to the 'beyond a reasonable doubt' requirement articulated in Winship. The words 'substantial' and 'grave' suggest a higher degree of doubt than is required for acquittal under the reasonable-doubt standard. When those statements are then considered with the reference to 'moral,' rather than evidentiary certainty, a reasonable juror, taking the charge as a whole, could have interpreted the instruction to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause."

Just as the Cage decision requires reversal where an improper reasonable doubt instruction was given to the jury, in the instant matter, Petitioner Clemons' sentence is flawed, because of a constitutionally defective instruction at mitigation. No prejudice need be shown.

In addition, the jurors, in the trial court's opinion, did not have the benefit of the doctrine of residual doubt, which, again, at the time was part of the capital sentencing process.

For the above reasons, it is respectfully asserted that this claim is meritorious, and that Petitioner Clemons' death sentence must be vacated.

> NINTH GROUND FOR RELIEF: THE AMENDED OHIO REVIEW PROCESS IS UNCONSTITUTIONAL IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION IN THAT IT REMOVES COURT OF APPEALS JURISDICTION FROM THE DIRECT APPEAL PROCESS.

Effective January 1, 1995, the Ohio Constitution was amended to jurisdictionally alter the appellate review process in capital litigation.

After the above date, an individual sentenced to death was not entitled to a review by the appropriate court of appeals. Henceforth, the accused was only entitled to State review as a matter of right to the Ohio Supreme Court. Previous to the above date, the review process, as a matter of right, included the appropriate court of appeals in Ohio.

The Ohio Supreme Court, in State v. Smith (1997) 80 Ohio St. 3d 89, 684 N.E.2d 668, found this amendment to the Ohio Constitution, and the implementing statute, R.C. 2953.02, constitutional.

Pursuant to the Smith decision, the Court of Appeals of the appropriate district was ordered to not accept jurisdiction of any

case in which the sentence of death had been imposed for an offense committed on or after January 1, 1995. Petitioner Clemons became directly affected by this Ohio Constitutional Amendment, since the events in question here occurred on December 15, 1995.

Before this Ohio constitutional amendment, the appellate review process in capital litigation, i.e. from October 19, 1981 until January 1, 1995, included a two step direct appeal process: the appropriate Ohio court of appeals, and also direct review by the Ohio Supreme Court, as a matter of right.

The Ohio capital statutory scheme adopted, effective October 19, 1981, complied with the United States Supreme Court decisions in <u>Furman v. Georgia</u> (1972) 408 U.S. 238; 92 S.Ct. 2726 and <u>Gregg v. Georgia</u> (1976) 428 U.S. 153; 96 S.Ct. 2909.

This two-step direct review process, was enacted in 1981 to constitutionally ensure adequate capital appellate review. A state's capital appellate review process is an important and integral link that was emphasized in the upholding of the death penalty litigation process in Georgia, as stated in the <u>Gregg v. Georgia</u> decision.

When an important facet in the capital review process is taken out, like it was in Ohio, then a crucial stage that the United States Supreme Court insists upon, is altered, and capital review becomes flawed.

For example, in the <u>Gregg</u> decision, at 204, the Supreme Court states: "Finally, the Georgia statute has an additional provision

81

designed to assure that the death penalty will not be imposed on a capriciously selected group of convicted defendants. The new sentencing procedures require that the State Supreme Court review every death sentence to determine whether it was imposed under the influence of passion, prejudice, or any other arbitrary factor, whether the evidence supports the findings of a statutory aggravating circumstance, and [w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."

Then, at 206, the decision notes, "The provision for appellate review in the Georgia capital sentencing system serves as a check against the random or arbitrary imposition of the death penalty. In particular, the proportionality review substantially eliminates the possibility that a person will be sentenced to die by the action of an aberrant jury. If a time comes when juries generally do not impose the death sentence in a certain kind of murder case, the appellate review procedures assure that no defendant convicted under such circumstances will suffer a sentence of death."

Then, in the concurring opinion, specifically at pages 211-12, the decision states, "An important aspect of the new Georgia legislative scheme, however, is its provision for appellate review. Prompt review by the Georgia Supreme Court is provided for in every case in which the death penalty is imposed. To assist it in deciding whether to sustain the death penalty, the Georgia Supreme Court is supplied, in every case, with a report from the trial

judge in the form of a standard questionnaire. *** The questionnaire contains, inter alia, six questions designed to disclose whether race played a role in the case, and one question asking the trial judge whether the evidence forecloses 'all doubt respecting the defendant's guilt.' In deciding whether the death penalty is to be sustained in any given case, the court shall determine:

(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary, and ***

(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant....

In order that information regarding 'similar cases' may be before the court, the post of Assistant to the Supreme Court was created."

The above was provided in detail because it demonstrates that in each state there have developed an intricate statutory process where the death penalty is imposed.

Again, when the Ohio statutory scheme was altered, there was no other provision which supplemented this most important constitutional process, i.e. the particular Ohio court of appeals reviewing on direct appeal, the conviction and sentence of Gerald Clemons.

In addition to the above, the Ohio Supreme Court decision of

83

State v. Smith upholding this changed Ohio constitutional provision
is based on flawed logic.

As noted earlier, one of the principal reasons the United
States Supreme Court has found death penalty schemes
unconstitutional is because they are often times based on an
arbitrary decision, and also are influenced by passion and the
public outcry for the death penalty.

The entire Smith decision is based on the above.

The Smith decision, after reviewing the two step process at
issue here, states at pages 95-96, "When Ohio revised its death
penalty statute in 1981 pursuant to the United States Supreme Court
ruling in Gregg v. Georgia *** the two-tiered system was retained.

However, the general public, both in Ohio and across the
nation, has been increasingly dissatisfied with inordinate delays
that pervade the death penalty system. Since the enactment of
Ohio's present death penalty statute in 1981, following Gregg, as
of July 1997, over one-hundred-seventy people have been sentenced
to death. None of these is yet close to execution. Ohio's last
execution was carried out in 1963. The public's frustration is
clearly understandable.

The Supreme Court of Ohio recognized the public's frustration
in State v. Steffen (1994), 70 Ohio St.3d 399, 639 N.E.2d 67, when
the court ruled that lower courts could not stay an execution date
set by the Supreme Court of Ohio. Judge Moyer's pronouncement at
that time bears repeating:

84

'The constitutions and courts of our country have established procedural safeguards reflecting our society's concern for the rights of citizens accused of committing crimes. When those safeguards are used to thwart judgments rendered pursuant to the procedures, it is predictable that citizens will lose confidence in the ability of the criminal justice system to enforce the judgments.' ***

Against this backdrop of extraordinary delay and loss of public confidence in the integrity of the death penalty system, the citizens of the state of Ohio have spoken through constitutional amendment. In November 1994, the Ohio citizens passed amendments to the Ohio Constitution allowing for direct appeal of cases from the trial court to the Supreme Court of Ohio. The first of the two amendments establishes a direct right of appeal from the trial court to the Supreme Court of Ohio, and the second amendment removes such right of appeal from the intermediate appellate courts."

Then, at page 100 of the Smith decision, the Ohio Supreme Court summarizes: "Capital defendants, on the other hand, while seeking to overturn their convictions, also seek to prolong the appeal process as long as possible, using every conceivable avenue of attack, and the statistics show they have been extremely successful in Ohio."

The Ohio Supreme Court, thus, pursuant to its Steffen and Smith decisions, as a matter of public policy, has not only stated

85

that the voters' outcry precipitated the constitutional amendments to the Ohio capital process, but have made this an integral part of the Ohio Supreme Court doctrine.

Where it is evident the only nexus between the amendment and the implementation of it is the "public frustration" bases, then the process is obviously flawed.

This, coupled with the fact that no alternative process was used to supplement the deletion of this direct appeal process, has resulted in an unconstitutional death penalty statutory scheme in Ohio.

As a result of the above, it is respectfully asserted that the new Ohio constitutional capital scheme is arbitrary, and the law was enacted as a result of an improper public policy bases, and the death sentence of Gerald Clemons must be vacated.

> TENTH GROUND FOR RELIEF: THE OHIO DEATH PENALTY STATUTES ARE UNCONSTITUTIONAL IN THAT THEY VIOLATE THE EIGHTH AMENDMENT PROSCRIPTION OF CRUEL AND UNUSUAL PUNISHMENT AND THE FOURTEENTH AMENDMENT TO THE CONSTITUTION WHICH GUARANTEES DUE PROCESS OF LAW AND EQUAL PROTECTION OF THE LAWS.

There is no rational state interest served by the implementation of Ohio's capital statutory scheme.

Under a factor used for capital punishment, incapacitation of the offender can be satisfied by punishment less severe than death.

Petitioner Clemons did not have the opportunity for the jury to decide the "life without parole" alternative. Current Ohio law did not provide, under the statutes, for life without parole at the

86

time of Petitioner Clemons' offense and trial. As a result, even
though defense counsel requested it at a pre-trial motion hearing,
the trial court denied such an instruction be given to the jury.
(J.A. Vol. III - 1145).

The failure on the part of the trial court to include this
instruction as an integral part of the mitigation instructions,
plus the fact that "future dangerousness" was introduced in
testimony at Petitioner Clemons' trial, plus at the mitigation
hearing, resulted in a death sentence which was constitutionally
unreliable.

The case law is clear that, especially when future
dangerousness is brought forth for the jurors determination, an
explicit instruction has to be constitutionally given so that the
jurors fully understand a life sentence means just what it says,
i.e. a life sentence.

It is agreed that the Ohio Supreme Court in its previous
decision on this issue has held that consideration of parole, and
consecutive or concurrent sentences, should not be involved in the
jury's deliberations. See Smith v. Mills (1992) 62 Ohio St. 3d 357,
374, 582 N.E. 2d 972, 987; State v. Goff (1998) 82 Ohio St. 3d 123,
at 132.

However, the United States Supreme Court has held, in Kelly v.
South Carolina (2002) 534 U.S. 246, 122 S.Ct. 726, that in specific
fact situations like the present case, it is constitutional and
prejudicial error to refuse a jury instruction like that which was

87

requested by defense counsel. The beginning of the syllabus in Kelly holds that "Kelly was entitled to a jury instruction that he would be ineligible for parole under a life sentence." Further on in the syllabus, it states, "A jury hearing evidence of a defendant's propensity for violence reasonably will conclude that he presents a risk of violent behavior, whether locked up or free, and whether free as a fugitive or as a parolee. Evidence of future dangerousness under Simmons v. South Carolina [(1994) 512 U.S. 154, 114 S.Ct. 2187] is evidence with a tendency to prove dangerousness in the future; its relevance to that point does not disappear merely because it might support other inferences or be described in other terms. The prosecutor accentuated the clear inference of future dangerousness raised by the evidence and placed the case within the four corners of Simmons. Although his characterizations of butchery went to retribution, that did not make them any the less arguments that Kelly would be dangerous down the road."

In the present case, there is no question that future dangerousness was introduced to the jury by the prosecutor, and at the mitigation hearing. In his opening statement at the trial phase, he states, "He would have killed more." (J.A. Vol. II - 594).

In his opening at mitigation, he tried to explain that (at Petitioner Clemons present age), even a 30 year sentence would be equivalent to life. The prosecutor objected and stated, "That's just false." (J.A. Vol. III - 1153-54).

Then after the evidence, and during the prosecutor's closing argument, he talked about release: "How much time Clemons may spend in jail, or if the Governor is going to pardon him." There was an objection, but no cure of this statement.

Future dangerousness was an integral part of the prosecutor's case.

Simmons, and the cases preceding it, identify historically the reasons for an instruction ensuring that jurors are properly informed of what indeed would occur in the future – if they recommend a life sentence.

The factors to consider in favoring giving a parole eligibility instruction, begin with how the Supreme Court decided Kelly.

At the jury trial in Kelly's case, "The judge explained 'that the terms 'life imprisonment' and 'death sentence' are to be understood in this ordinary and plain meaning.' *** But, in accordance with the earlier ruling, the court did not say that under South Carolina law, a convicted murderer sentenced to life imprisonment was ineligible for parole ***", at 730.

In responding to this, the United States Supreme Court, at 730-31, noted the following: "The state court said that 'Simmons is inapplicable under [South Carolina's] new sentencing scheme because life without the possibility of parole is not the only legally available sentence alternative to death.' *** That statement mistakes the relationship of Simmons to the state sentencing

scheme. It is true that a defendant charged with murder carrying the possibility of a death sentence can, under some circumstances, receive a sentence less than life imprisonment. But, as we explained in <u>Shafer</u>, under the South Carolina sentencing scheme a jury now makes a sentencing recommendation only if the jurors find the existence of an aggravating circumstance. When they do make a recommendation, their only alternatives are death or life without parole. \*\*\* We therefore hold, as we did in <u>Shafer</u>, that the state court's reasoning is not to the point."

<u>Shafer</u>, then, is a further extension of <u>Simmons</u>. The Supreme Court is saying, with these cases, that jurors are to be truthfully told about parole ineligibility. Even when there are legal nuances that can be brought up by a state supreme court (in this case, South Carolina), the United States Supreme Court will cut through this, and determine whether an appropriate <u>Simmons</u> instruction is constitutionally required.

<u>Kelly</u> also notes: "Perhaps because this is so undeniable, the State in its argument before us takes a tack never pursued by the state court, in claiming there was no need for instruction on parole ineligibility, because 'there is nothing whatsoever to indicate that the jurors were concerned at all with the possibility of <u>Kelly's</u> future release when they decided death was appropriate.' But it cannot matter that <u>Kelly's</u> jury did not ask the judge for further instruction on parole eligibility, whereas the <u>Simmons</u> and <u>Shafer</u> juries did. See <u>Shafer</u>, 532 U.S. at 44; <u>Simmons</u>, <u>supra</u>, at

160. A trial judge's duty is to give instructions sufficient to
explain the law, an obligation that exists independently of any
question from the jurors or any other indication of perplexity on
their part. Cf. C. Wright, Federal Practice and Procedure §485, p.
375 (3d ed. 2000) ('It is the duty of the trial judge to charge the
jury on all essential questions of law, whether requested or not').
Time after time appellate courts have found jury instructions to be
insufficiently clear without any record that the jury manifested
its confusion ***. While the jurors' questions in  Simmons and
Shafer confirmed the inadequacy of the charges in those cases, in
each case it was independently significant that 'displacement of
'the longstanding practice of parole availability' remains a
relatively recent development [in South Carolina], and 'common
sense tells us that many jurors might not know whether a life
sentence carries with it the possibility of parole.'", Kelly at
733.

Jurors obviously do not leave their pasts when they enter the
deliberation room. The Supreme Court is saying here that jurors
know about parole, have opinions, and are naturally inquisitive
over it if it applies in their deliberations.

Another salient point found in Kelly is how the Court views
the concept of future dangerousness.

As noted earlier, the Kelly decision emphasizes that future
dangerousness is an issue separate and apart from other relevant
issues in a capital trial.

91

It is inherent, and part and parcel of any capital jury trial.

The Ohio Supreme Court has not discussed this issue at length, but when they do, they often claim that it is not a relevant issue.

In <u>State v. Loza</u> (1994) 71 Ohio St. 3d 61, the court, at page 81, addressed the issue when Mr. Loza claimed that future dangerousness had entered the sentencing proceedings: "During the sentencing phase, the prosecution asked defense psychologist Dr. Fisher if Loza regretted the offense and if Loza would do it again under the same circumstances. Fisher responded that Loza did not express any regrets over the deaths and that he would commit the offenses again under the same circumstances."

"The <u>Loza</u> decision responds at page 82 by stating, "Our review of the record indicates that these comments were not to be interpreted as non-statutory aggravating circumstances, but rather, were related to Loza's 'history, character, and background' as specified in R.C. 2929.04(B). The trial court instructed the jury on statutory aggravating circumstances and mitigating factors only. Appellant's contention is without merit."

Although it is true that testimony like the above is indeed part of the background of an individual, as has been stated throughout, <u>Kelly</u> emphasizes that future dangerousness exists in and of itself as a significant issue, and needs to be addressed, if raised, in a capital jury trial.

At page 731 of <u>Kelly</u>, "The State Supreme Court's first ground, that Kelly's future dangerousness was not 'at issue,' is

unsupportable on the record before us." *** "The court acknowledged the prosecutor's 'evidence that Kelly took part in escape attempts and carried a shank,' *** and that 'he had been caught carrying a weapon and planning or participating in escape attempts,' ibid. The court concluded, however, that this evidence was not the sort contemplated by Simmons, that is, evidence demonstrating future danger 'if released from prison.' *** The court saw the evidence as going only to Kelly's likely behavior in prison, or to his proclivity to escape from it; the state court said that Kelly was allowed to rebut this evidence of his inability to adapt to prison life, but that explaining parole ineligibility would do nothing to rebut evidence that Kelly was an escape risk.

Even if we confine the evidentiary consideration to the evidenced discussed by the State Supreme Court, the court's conclusion cannot be accepted. To the extent that it thought that 'evidence that Kelly took part in escape attempts and carried a shank ... is not the type of future dangerousness evidence contemplated by Simmons,' it overlooked that evidence of violent behavior in prison can raise a strong implication of 'generalized ... future dangerousness.' *** (And, of course, the state court's reasoning says nothing about the evidence of the crime, or of Kelly's sadism generally, and his mercurial thirst for vengeance.) A jury hearing evidence of a defendant's demonstrated propensity for violence reasonably will conclude that he presents a risk of violent behavior, whether locked up or free, and whether free as a

93

fugitive or as a parolee."

In essence, the United States Supreme Court is saying it is very difficult to separate and preclude from a jury that future dangerousness is not an integral part of any capital sentencing procedure.

The constitutional foundation for the above is, of course, found in Simmons v. South Carolina 512 U.S. 154, 114 S.Ct. 2187.

The applicable law is found in paragraphs 1 and 2 of the syllabus, which states the following, "1. Where a defendant's future dangerousness is at issue, and state law prohibits his release on parole, due process requires that the sentencing jury be informed that the defendant is parole ineligible. An individual cannot be executed on the basis of information which he had no opportunity to deny or explain. Gardner v. Florida 430 U.S. 349, 362. Petitioner's jury reasonably may have believed that he could be released on parole if he were not executed. To the extent that this misunderstanding pervaded its deliberations, it had the effect of creating a false choice between sentencing him to death and sentencing him to a limited period of incarceration. The trial court's refusal to apprise the jury of information so crucial to its determination, particularly when the State alluded to the defendant's future dangerousness in its argument, cannot be reconciled with this Court's well established precedents interpreting the Due Process Clause. See, e.g. Skipper v. South Carolina 476 U.S. 1, pp. 161-169.

94

2.    The trial court's instruction that life imprisonment was to be understood in its plain and ordinary meaning did not satisfy petitioner's request for a parole ineligibility charge, since it did nothing to dispel the misunderstanding reasonable jurors may have about the way in which any particular State defines 'life imprisonment.' Pp. 169-171."

In Petitioner Clemons' case, he was fifty-four years old at the time of the jury trial.

Even considering the Ohio statutory alternatives, he would have been well into his mid-eighties if the jury had given him a life sentence of thirty.

The trial court refusing to instruct on life without parole, weakened significantly this important aspect of the capital sentencing process in Ohio.

Separate from this, as noted earlier, and in another claim, the Hamilton County prosecutor spent a great deal of time talking about Petitioner Clemons' future dangerousness.

This was an integral theme of the prosecution.

As the United States Supreme Court has continuously ruled, when future dangerousness is introduced, and the jury is not instructed that the accused can spend the rest of his life in prison through the jurors verdict, the result is an arbitrary and capricious sentence. The result is a constitutional violation, is contra established Supreme Court precedent in Simmons and it is respectfully asserted that this claim has merit and that Petitioner

95

Clemons' death sentence cannot stand.

> ELEVENTH GROUND FOR RELIEF: THE REQUIREMENT
> THAT A JURY MUST RECOMMEND DEATH UPON PROOF
> BEYOND A REASONABLE DOUBT THAT THE AGGRAVATING
> CIRCUMSTANCES OUTWEIGH ONLY TO THE SLIGHTEST
> DEGREE THE MITIGATING CIRCUMSTANCES GIVES THE
> OHIO CAPITAL STATUTES A MANDATORY NATURE, THUS
> PERMITTING THE EXECUTION OF AN ACCUSED EVEN
> THOUGH THE MITIGATING EVIDENCE FALLS JUST
> SHORT OF EQUIPOISE WITH THE AGGRAVATING
> FACTORS. THE RESULT IS THE OHIO STATUTE
> RENDERS THE CAPITAL PROCESS ARBITRARY AND
> CAPRICIOUS CONTRA THE SIXTH, EIGHTH AND
> FOURTEENTH TO THE CONSTITUTION.

Ohio's death penalty statutory scheme, as implemented in Petitioner Clemons' case, is quasi-mandatory in nature and therefore arbitrary and capricious.

Under Ohio's death penalty, specifically R.C. 2929.03(D), the statute instructs the jury to establish beyond a reasonable doubt that the statutory aggravating factors outweigh the mitigating circumstances.

Under Ohio's scheme, however, the aggravating circumstances only have to outweigh the mitigating factors by just a slight amount. The jury then has no choice but to recommend a sentence of death even though it is just short of equipoise.

In order to comport with the Eighth Amendment to the United States Constitution in Ohio, constitutionally the jury must be instructed that the aggravating circumstances substantially outweigh the mitigating factors.

In Petitioner Clemons' case, there was one specification which is called the "course of conduct" specification in which the

allegation is a purposeful killing or attempt to kill two or more individuals.

The record reveals the jury, at the mitigation hearing, deliberated an extended period of time. They asked the judge if they could hear Dr. Day's (Petitioner Clemons' physician) testimony and review his notes. Both were denied. (J.A. Vol. III - 1372).

In Roberts v. Louisiana (1976) 428 U.S. 325, the United States Supreme Court reversed a death sentence when it was determined the Louisiana capital statutory scheme was mandatory in nature.

The Roberts decision states the mandatory death penalty violated the Eighth and Fourteenth Amendments.

Specifically, at pages 333-34 of Roberts, the Court states, "The constitutional vice of mandatory death sentence statutes - lack of focus on the circumstances of the particular offense and the character and propensities of the offender - is not resolved by Louisiana's limitation of first-degree murder to various categories of killings. The diversity of circumstances presented in cases falling within the single category of killings during the commission of a specified felony, as well as the variety of possible offenders involved in such crimes, underscores the rigidity of Louisiana's enactment and its similarity to the North Carolina statute. Even the other more narrowly drawn categories of first-degree murder in the Louisiana law afford no meaningful opportunity for consideration of mitigating factors presented by the circumstances of the particular crime or by the attributes of

97

the individual offender. (fn9)

Louisiana's mandatory death sentence statute also fails to comply with Furman's requirement that standardless jury discretion be replaced by procedures that safeguard against the arbitrary and capricious imposition of death sentences."

In Blystone v. Pennsylvania (1990) 494 U.S. 299, 110 S.Ct. 1078, the issue also concerned the mandatory nature of the Pennsylvania capital statute.

In upholding this death penalty scheme, the Blystone court, at 304, stated, "We think that the Pennsylvania death penalty statute satisfies the requirement that a capital sentencing jury be allowed to consider and give effect to all relevant mitigating evidence. *** Death is not automatically imposed upon conviction for certain types of murder. It is imposed only after a determination that the aggravating circumstances outweigh the mitigating circumstances present in the particular crime committed by the particular defendant, or that there are no such mitigating circumstances."

The difficulty with Ohio's capital statutory scheme, with respect to mandatory sentencing, is that the trial c, in its written opinion, interpreted the "course of conduct" aggravating circumstance improperly, calling it a cold-blooded, cruel willful act. [See Claim V].

Thus, by its own analysis, the trial judge altered the findings that it was required to make, as a reviewing court, with respect to the death penalty course of conduct specification.

98

By doing this, the judge took findings of fact, required by the jury, and changed them to an extent that the result is an arbitrary and capricious appellate review process.

Put another way, the jury makes one factual determination with respect to the aggravating circumstance of course of conduct, while the trial judge reviews on another standard.

In <u>Ring v. Arizona</u> (2002) 536 U.S. 584, Petitioner Ring argued that Arizona's capital sentencing scheme violates the Sixth Amendment's jury trial guarantee by entrusting to a judge the finding of a fact raising the defendant's maximum penalty.

The syllabus in <u>Ring</u> held that due to the fact that Arizona's enumerated aggravating factors operate as a functional equivalent of an element of a greater offense, the Sixth Amendment requires that they be found by a jury.

Further on in the syllabus, the <u>Ring</u> decision holds that a defendant may not be exposed to a penalty exceeding the maximum he would receive if punished according to the facts reflected in the jury verdict alone.

In the present case, the fact that the trial judge in its opinion found that the course of conduct specification was "cold-blooded", "cruel" and so forth, means that Petitioner Clemons did not get a proper weighing from the trial judge when it reviewed the aggravating circumstance and the mitigating factors.

Again, put another way, the trial judge made specific findings under Ohio's capital statutory scheme, at the conclusion of the

trial process. The fact that it made findings of the heightened nature, when it comes to course of conduct, means that the trial judge changed Ohio's scheme to one quasi-mandatory in nature.

As a result of the above, it is respectfully asserted that because Petitioner Clemons' sentence was the result of a mandatory death penalty scheme, it is contra the Sixth, Eighth and Fourteenth Amendments and, as a result, Gerald Clemons' death penalty sentence must be reversed.

> TWELFTH GROUND FOR RELIEF: THE PROVISIONS OF OHIO CRIM. R. 11(c)(3), PERMITTING THE TRIAL COURT TO DISMISS SPECIFICATIONS UPON A GUILTY PLEA UNDER THE CONCEPT OF "IN THE INTEREST OF JUSTICE" NEEDLESSLY ENCOURAGES GUILTY PLEAS, THUS RE-INTRODUCING THE POSSIBILITY THAT THE DEATH SENTENCE WILL BE IMPOSED ARBITRARILY AND CAPRICIOUSLY CONTRA THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION.

The Ohio death penalty statute, as enacted, is arbitrary and capricious in that it encourages guilty pleas, thereby precluding the accused to his right to a jury trial.

Under Ohio Crim. R. 11(c)(3), a trial court, "in the interest of justice", is allowed to dismiss death specifications.

Thus, by permitting an accused, who is capitally indicted, to escape the death penalty by pleading guilty, under these circumstances, the trial court can then dismiss the specifications.

The "interest of justice" standard in and of itself is arbitrary in that there are no guidelines under which the particular judge can make a determination on whether the specifications should be dismissed.

100