IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION


GERALD L. CLEMONS,                    :

    Petitioner,                        :

vs.                                   :    Case No. C-1-00-722

BETTY MITCHELL, WARDEN,               :    JUDGE GEORGE C. SMITH

    Respondent.                        :    MAGISTRATE JUDGE KING


---

GERALD CLEMONS' MERIT BRIEF
VOL. II

---


CHARLES L. WILLE (0056444)
Capital Crimes Section
30 East Broad Street, 23rd Floor
Columbus, Ohio 43215
(614) 728-7055

RICHARD S. KETCHAM (0023380)
755 South High Street
Columbus, Ohio 43206
(614) 444-3900

DAVID J. GRAEFF (0020647)
P.O. Box 1948
Westerville, Ohio 43086
(624) 226-5991

COUNSEL FOR RESPONDENT
STATE OF OHIO

COUNSEL FOR PETITIONER
GERALD CLEMONS

TABLE OF CONTENTS

Page

Table of Authorities.....................................   i

Eighteenth Ground for Relief.............................   1

>       GERALD CLEMONS' CONVICTIONS AND SENTENCES ARE
>       CONSTITUTIONALLY INFIRM BECAUSE TRIAL COUNSEL
>       FAILED   TO   PROVIDE   HIM   WITH   REASONABLE
>       EFFECTIVE ASSISTANCE OF COUNSEL DURING THE
>       TRIAL PHASE.

Nineteenth Ground for Relief.............................   7

>       GERALD CLEMONS' CONVICTIONS AND SENTENCES ARE
>       CONSTITUTIONALLY INFIRM BECAUSE TRIAL COUNSEL
>       FAILED   TO   PROVIDE   HIM   WITH   REASONABLY
>       EFFECTIVE ASSISTANCE DURING THE MITIGATION
>       PHASE.

Twenty-Third Ground for Relief...........................  40

>       PETITIONER  CLEMONS'  SENTENCE  OF  DEATH  IS
>       CONSTITUTIONALLY  INFIRM  BECAUSE  THE  TRIAL
>       COURT ERRONEOUSLY INSTRUCTED THE JURY THAT
>       THEY   MUST   UNANIMOUSLY   FIND   THAT   THE
>       AGGRAVATING CIRCUMSTANCES DO NOT OUTWEIGH THE
>       MITIGATING CIRCUMSTANCES IN ORDER TO RECOMMEND
>       A LIFE SENTENCE.

Twenty-Fourth Ground for Relief..........................  53

>       TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO
>       OBJECT TO THE IMPROPER INSTRUCTION THAT THE
>       JURY MUST BE UNANIMOUS IN THEIR RECOMMENDATION
>       OF A LIFE SENTENCE.

Conclusion...............................................  55

Proof of Service.........................................  56

## TABLE OF AUTHORITIES

Page

Ake v. Oklahoma 470 U.S. 68, 105 S.Ct. 1087 (1985)........    31

Andres v. United States 333 U.S. 740, 92 L. Ed. 1055,
68 S. Ct. 880 (1948)......................................    51

Apprendi v. New Jersey 530 U.S. 466 (2000)...............    52

Barclay v. Florida 463 U.S. 939 (1983)...................    34

State v. Brooks 75 Ohio St. 3d 160 (1996)................    41

Bullington v. Missouri 451 U.S. 430 (1981)...............    34

United States v. Byers 740 F.2d 1104 (D.C. Cir. 1984).....    37

State v. Clemons (1998) 82 Ohio St. 3d 438...............    17

Collins v. Lockhart 754 F.2d 258 cert. denied,
474 U.S. 1013, 88 L. Ed. 2d 475, 106 S. Ct. 546 (1985)....    55

Combs v. Coyle 205 F.3d 269 (6th Cir. 2000)..............    3

Cone v. Bell 359 F.3d 785 (6th Cir. 2004).................    24

Davis v. Mitchell 318 F.3d 682 (6th Cir. 2003)............    42

Furman v. Georgia 408 U.S. 238, 33 L. Ed. 2d 346,
92 S. Ct. 2726 (1972)....................................    43

Glenn v. Tate 71 F.3d 1204 (6th Cir. 1995)...............    25

State v. Goff 82 Ohio St. 3d 123 (1998)..................    40

Gregg v. Georgia 428 U.S. 153, 49 L. Ed. 2d 859,
96 S. Ct. 2909 & nn. 44 (1976)...........................    44

Hamblin v. Mitchell 354 F.3d 482 (6th Cir. 2003)...........    23

Harris v. New York 401 U.S. 222, 91 S.Ct. 643 (1971)......    6

Lockett v. Ohio 438 U.S. at 605..........................    51

Lockhart v. Fretwell 506 U.S. 364, 113 S.Ct. 838.......... 6

McClesky v. Kemp 481 U.S. 279, 95 L. Ed. 2d 262,
107 S. Ct. 1756 (1987)................................... 47

McKoy v. North Carolina 494 U.S. 433, 108 L. Ed. 2d 369,
110 S. Ct. 1227 (1990)................................... 45

Mills v. Maryland 486 U.S. 367, 100 L.Ed. 2d 384,
108 S. Ct. 1860 (1968)................................... 45

State v. Otte (1996) 74 Ohio St. 3d 555.................. 1

Powell v. Collins 332 F.3d 376 (6th Cir. 2003)............. 11

Richardson v. United States 526 U.S. 813, 119 S. Ct.
1707, 143 L. Ed. 2d 985 (1999)........................... 46

Ring v. Arizona 536 U.S. 584, 122 S. Ct. 2428,
153 L. Ed. 2d 556 (2002)................................. 46

Sattazahn v. Pennsylvania 537 U.S. 101; 123 S.Ct. 732
(2003)................................................... 51

United States v. Sloan 776 F.2d 926 (10th Cir. 1985)....... 37

Smith v. McCormick 914 F.2d 1153 (9th Cir. 1990)........... 37

Starr v. A.L. Lockhart 23 F.3d 1280 (8th Cir. 1994)........ 36

Strickland v. Washington 466 U.S. 668,
104 S.Ct. 2052 (1984).................................... 2

State v. Taylor 78 Ohio St. 3d 15 (1997)................. 40

Wiggins v. Smith 539 U.S. 510, 123 S.Ct. 2527 (2003)...... 20

Williams v. Taylor 529 U.S. 362, 120 S.Ct. 1495 (2000).... 19

EIGHTEENTH GROUND FOR RELIEF: GERALD CLEMONS'
CONVICTIONS AND SENTENCES ARE CONSTITUTIONALLY
INFIRM BECAUSE TRIAL COUNSEL FAILED TO PROVIDE
HIM WITH REASONABLE EFFECTIVE ASSISTANCE OF
COUNSEL DURING THE TRIAL PHASE.

At the outset of this case, counsel were aware that Petitioner
Clemons had been taking Prozac and indicated that they were
considering that as a line of defense. (J.A. Vol. I - 22). As there
was no question that petitioner fired the shots, the only defense
available would have to do with his mental state.

At the time of petitioner's trial, evidence of voluntary
intoxication could be considered in determining whether an act was
done intentionally or with deliberation and premeditation. Ohio v.
Fox (1981) 68 Ohio St. 2d 53. "Voluntary intoxication is not a
defense, but where specific intent is a necessary element of the
crime charged, the fact of intoxication may be shown to negate this
element if the intoxication is such to preclude the formation of
such intent." State v. Otte (1996) 74 Ohio St. 3d 555, 563.

Counsel, in fact, attempted to present this defense in his
opening statement: "I expect the evidence to show that he was under
treatment and prescribed the medicine Prozac. He had great fits of
depression and other problems that bothered him in his life and
that he was under this prescription." (J.A. Vol. II - 595). "All we
are asking is to show that he was under that treatment and whether
or not that had anything to do with some of the elements of the
crime as charged by the prosecuting attorney of first degree murder
as to the prior calculation and design. (J.A. Vol. II - 596).

1

Given that opening statement, and the fact that counsel talked about Prozac on voir dire, any reasonable juror would expect to hear something about the effect of Prozac. Counsel, however, failed to follow up on this and presented nothing at all on this subject. The only other references to Prozac were in brief portions of testimony: Petitioner Clemons testified that he believed the blackouts were caused by Prozac, (J.A. Vol. II - 984), and petitioner's mother testified that after her son began taking Prozac he was "different". (J.A. Vol. II - 1201).

They were unable to put on an intoxication case because they utterly failed to investigate the possible effects of the drug Prozac. After unreasonably choosing not to investigate the drug, they unreasonably chose not to seek an expert to assist them. Counsel's failure to investigate and obtain an expert are explained in detail in the nineteenth ground for relief, infra.

Counsel's choice not to present an intoxication defense cannot be dismissed as trial strategy, because it was not based on an adequate investigation.

"Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Strickland v. Washington 466 U.S. 668, 690-91.

The only feeble attempt to present some evidence of Prozac was

2

counsel's attempt to call Dr. James Day, petitioner's physician who prescribed Prozac. The court refused to allow him to testify in front of the jury, so the defense proffered his testimony. (J.A. Vol. II - 865).

Even if Dr. Day had testified before the jury, it would have probably hurt more than helped. He said that petitioner was depressed, was impotent and had venereal warts. If this was intended to bolster some sort of intoxication defense, it failed miserably.

In fact, his testimony would have been very damaging, as he said that one does not have any hallucinations because of Prozac and that it is not a mind altering kind of thing. (J.A. Vol. II - 871).

In Combs v. Coyle 205 F.3d 269 (6th Cir. 2000), the defendant, in his capital murder trial, had attempted to use intoxication to negate intent, as was allowed under Ohio law. His counsel presented a psychologist, Dr. Fisher, to bolster that defense. However, Dr. Fisher testified that, in his opinion, although Combs was intoxicated, he acted purposefully and intentionally, thus destroying Comb's defense.

The Sixth Circuit found that, "Although Comb's counsel's decision to present Dr. Fisher's testimony may be considered a strategic one, it was a decision made without undertaking a full investigation." Id. at 288. The court called counsel's failure to question Fisher in this regard prior to trial inexcusable and found

3

counsel's performance to be deficient.

It is obvious from the transcript that petitioner's counsel also did not prepare Dr. Day to testify. Rather than help the defense, he would have hurt it, as in Combs, supra. Such failure to prepare, coupled with the failure to investigate falls below acceptable standards for competent defense counsel. As previously stated, counsel's failure to investigate will be more fully explained in the nineteenth ground for relief, infra.

In subpart D of the eighteen ground for relief, petitioner says that counsel did not have a strategy for a defense and did not prepare him to testify. Although counsel apparently realized that a defense concerning petitioner's state of mind was the only one available, they did nothing to implement it, as has been argued already.

The decision to put petitioner on the stand was not made until well into the trial phase. Counsel did not tell petitioner that he was going to testify until the day before and they did not prepare him to testify by talking to him about what he would say (Affidavit of petitioner, J.A. Vol. VIII - 2).

Counsel obviously did not prepare petitioner for cross-examination, especially for questions regarding his prior statement to the police.

A review of the transcript confirms this, regardless of what counsel now says.

For example, one key point of petitioner's defense that this

4

was not planned was that he always carried a gun and sometimes two guns for self protection. (J.A. Vol. II - 901).

He previously had given a statement to police in which he said, among other things, that it was highly unusual for him to carry a gun. That statement had been suppressed, by agreement, due to a Miranda violation. After petitioner testified on direct, the prosecutor used it very effectively on cross to impeach him. (J.A. Vol. III - 939-40).

Counsel for petitioner were obviously taken aback and surprised at this:

Mr. Deters: I think the record should be clear. Although we can't use this statement it could be used to impeach the witness

. . . .

Mr. Schmidt: If Your Honor please, that statement has been ruled out. (J.A. Vol. II - 940-41).

After petitioner testified, the prosecution call Officer Gadzala in rebuttal, who testified, among other things, that petitioner told him it was highly, highly unusual for him to carry a gun to work and that petitioner did not tell him that Dave Kreamelmeyer charged him, as petitioner had testified. (J.A. Vol. III - 985).

Before Gadzala testified, counsel put the following on the record:

Mr. Schmidt: If they are going to call Gadzala back to the stand - and for the record anything that was said to him at the Evendale Police Department I would object to because of the ruling of the Court in the suppression motion and by agreement that any statements made would be suppressed. (J.A. Vol. III - 973).

5

After this devastating testimony, counsel put the following on

the record:

> Mr. Schmidt: If your Honor please, in the video statement
> taken of Gerald Clemons on 12/15/95 from the Evendale
> Police Department at approximately 9:10 a.m., Lieutenant
> Oakes read the rights to Mr. Clemons, "You have a right
> to remain silent and anything you say could be used in a
> court and you have a right to have an attorney before we
> ask you any questions and you have the right to stop
> during questioning. If you cannot afford a lawyer one
> will be appointed for you. Any questions that you decide
> to answer now without a lawyer present, you would still
> have the right to stop answering at any time. You also
> have the right to stop answering at any time until you
> talk to a lawyer. Do you understand the those? Yes.
> Lieutenant: Okay, do you want to answer questions for us?
> Mr. Clemons: No, I don't.

> At that point, Your Honor, we feel that anything that was
> taken from that point on for any reason whatsoever and we
> would ask that either the jury be instructed to disregard
> that or have a mistrial be declared. (J.A. Vol. III –
> 987-88).

What this demonstrates is counsel's ignorance of the law on

this subject. The United States Supreme Court case, Harris v. New

York 401 U.S. 222, 91 S.Ct. 643 (1971), among others, clearly says

this is permissible impeachment.

Effective counsel need to know the applicable law when trying

a case.

In Lockhart v. Fretwell 506 U.S. 364, 113 S.Ct. 838, the

Supreme Court was faced with a situation in which the defendant's

trial counsel did not make an objection to a jury instruction – an

objection that would have been supported by a significant decision

at the time, during the trial, which resulted in his receiving a

sentence of death. The Supreme Court did deny his habeas on the

6

grounds that he suffered no prejudice because the decision that supported his objection at the trial had since been overruled. In doing so, however, the court noted that counsel's failing to make the objection apparently because he was unaware of the decision was deficient performance. The government even conceded that counsel's performance was deficient. Id. at 369, footnote 1.

Since petitioner's counsel were apparently unaware of the applicable law regarding the use of a suppressed statement for impeachment, they obviously never prepared petitioner for this and were thus ineffective.

> NINETEENTH GROUND FOR RELIEF: GERALD CLEMONS'
> CONVICTIONS AND SENTENCES ARE CONSTITUTIONALLY
> INFIRM BECAUSE TRIAL COUNSEL FAILED TO PROVIDE
> HIM  WITH  REASONABLY  EFFECTIVE  ASSISTANCE
> DURING THE MITIGATION PHASE.

It is axiomatic that "[s]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgements support the limitations of the investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgements." Strickland v. Washington 466 U.S. 668, 690-91, 104 S.Ct. 2052 (1984).

7

In this case, counsel utterly failed in their ethical duty to conduct a thorough investigation to present a mitigation case. Their lack of investigation was unreasonably deficient in two respects: they did not conduct a thorough investigation of Gerald Clemons' history, character and background and they did not conduct a thorough investigation into the effects of Prozac, which they maintained from the outset may be a line of defense. (J.A. Vol. I - 22). Sub-claims A and C of Nineteenth Ground for Relief.

At the mitigation hearing, the defense presented only two witnesses, Dr. David Day, who was a treating physician of Petitioner Clemons, and Alice McMichen, Gerald's mother, along with the unsworn statement of Petitioner Clemons himself. The evidence of his upbringing, employment history, family, substance abuse and medical history was not comprehensively presented in a logical, believable fashion.

The prosecution used this lack of preparation very effectively in rebuttal closing argument at the mitigation phase. "Finally, they only put on three witnesses. This is the sum total of the mitigation." (J.A. Vol. III - 1338). "If you were defending Mr. Clemons and you wanted to argue what a wonderful life he had, where are the people? Where are they? Well, they have only three witnesses in mitigation." (J.A. Vol. III - 1339).

In fact, there were several witnesses available to testify about petitioner's background, but they were not even interviewed by the defense.

8

Evelyn Gerdes, petitioner's maternal aunt, could have testified about petitioner's substance abuse, good things about his personality and relationships that affected him, but she was never contacted by the defense attorneys. (J.A. Vol. X - 156).

Similarly, Holly Haven Morgan, the daughter of petitioner's deceased sister, could have shed light on family dynamics, including how petitioner's step-father considered him a bastard and petitioner never got anything. She was also not contacted by the attorneys. (J.A. Vol. X - 201).

Petitioner's ex-girlfriend, Michael "Mickey" Lynch, knew petitioner very well and could have explained several aspects of petitioner's personality that would have been consistent with the initial theme of substance abuse affecting his state of mind. She was also never contacted. (J.A. Vol. X - 203).

Michael "Mick" Haven, who was married to petitioner's deceased sister, was talked to briefly (2 to 3 hours) by the trial attorneys before the mitigation hearing, but was never called to testify. He could have enlightened the jury as to several issues, including petitioner's substance abuse, his mounting desperation before the crime and the fact that petitioner always carried guns in his truck. (J.A. Vol. X - 158).

Finally, the affidavit of petitioner's mother, Alice McMichen, says that she only met with petitioner's attorneys for two to three hours before the mitigation hearing. She says she was not adequately prepared for the mitigation hearing. (J.A. Vol. X -

9

155). Although counsel, Dale Schmidt, says he spoke to her "many times", (Schmidt at 30), there is a difference between just speaking to her in the course of representing her son and preparing her to testify.

Finally, counsel did not even prepare Petitioner Clemons to testify. (Affidavit of Gerald Clemons, J.A. Vol. VIII - 2). This had devastating results which carried over into the mitigation phase because his credibility was pretty much destroyed.

What is really ironic is that the Cincinnati newspapers did a better job of investigating petitioner's background than counsel did. In an article headlined "The Clemons some knew", (J.A. Vol. X 496, 501), the reporter talked to people that knew petitioner in high school as a quick-witted, ad-libbing saxophonist who taught clumsier guys the jitterbug and avoided fights. The reporter also spoke with a 54 year old Price Hill man who had known petitioner since boyhood and had good things to say about him. Likewise, with Ed Garrett, another boyhood friend, and Patricia Carota, a former upstairs neighbor.

That a newspaper reporter would go to such lengths to investigate petitioner's background and uncover all this potentially mitigating evidence and defense counsel does not follow up on it, even after it is published in the newspaper, is simply incomprehensible.

As a result of counsel's lack of diligence, petitioner's background was conveyed solely through his mother and himself.

10

In <u>Powell v. Collins</u> 332 F.3d 376 (6th Cir. 2003), the defense presented the defendant's background evidence through a court clinic psychologist, Dr. Nancy Schmidtgoessling, who coincidentally was also appointed by the Court to do petitioner's mitigation herein, which will be addressed <u>infra</u>. In <u>Powell</u>, the government argued that the background evidence that the defendant would have received had his counsel made a proper investigation was cumulative of the information provided by Dr. Schmidtgoessling. The Sixth Circuit disagreed, saying, "But if counsel had actually conducted an investigation and produced pertinent witnesses, jurors would have heard first-hand accounts from those who knew petitioner best. We believe such personal testimony would have been of significant benefit during the penalty phase." <u>Id</u>. at 400.

Equally egregious is defense counsel's total failure to investigate the effects of the mood altering drug Prozac and present it to the jury.

As previously stated, counsel had intended to mount a Prozac defense. In fact, the newspapers carried several articles referring to a Prozac defense. "Prozac to figure in trial" headline (J.A. Vol. V - 485); "Prozac may be defense in trial" headline (J.A. Vol. V - 496); "Prozac defense possible" headline (J.A. Vol. V - 497); "Prozac can cause aggressive behavior: defense lawyer Mark Krumbein said" newspaper article (J.A. Vol. V - 483).

On top of this, counsel voir dired several jurors regarding their knowledge of Prozac (J.A. Vol. I - 186, 194, 243-44, 366,

11

367-68), Petitioner Clemons testified that he believed the blackouts were caused by Prozac (J.A. Vol. II - 948), petitioner's mother testified that after her son began taking Prozac he was "different" (J.A. Vol. II - 1201), and counsel alluded to it in opening statements. "I expect the evidence to show that he was under treatment and prescribed the medicine Prozac. He had great fits of depression and other problems that bothered him in his life and that he was under this prescription." (J.A. Vol. II - 595). "All we are asking is to show that he was under that treatment and whether or not that had anything to do with some of the elements of the crime as charged by the prosecuting attorney of first degree murder as to the prior calculation and design." (J.A. Vol. II - 596).

After hearing all this, a juror would naturally expect to hear something about the effects of Prozac, at least in the mitigation hearing, yet none was offered by the defense. In contrast, the prosecution offered devastating expert testimony from Dr. Paul Keck, who had testified for Eli Lilley, the manufacturer of Prozac, before. (J.A. Vol. III - 1215).

The record reveals that counsel's investigation into Prozac was cursory at best. Counsel Schmidt testified at deposition about his investigation into Prozac:

Q.   When you were preparing the case for trial you knew Prozac would be an issue, apparently, correct, of some kind?

A.   I assume so, I knew about Prozac.

12

Q.  Did you undertake any investigation to find out more about Prozac and the effects it has on people?

A.  I talked to the people from Lilley, yes.

Q.  Lilley is the manufacturer of Prozac, correct?

A.  That's correct.

Q.  Do you remember who you talked to?

A.  No.

Q.  I know at trial at some point they had a Dr. Keck, who I believe testified for Lilley in other cases. Did you talk to him?

A.  At one point, I did, yes.

Q.  At one point, prior to trial?

A.  Yes.

Q.  Did you check out his credentials?

A.  Did I check them out?

Q.  Right.

A.  I don't remember.

(Schmidt at 10-11).

That is the total investigation Schmidt did on Prozac, consulting with the manufacturer's representative, who of course is not going to say anything bad about Prozac. Kind of like the fox guarding the henhouse.

On the other hand, attorney Krumbein claimed that he had researched Prozac and determined that it had been used as a defense in 85-odd cases across the country and never been successful. (Krumbein at 20). That in itself is not accurate. In 1991, a woman

13

in California, Mildred Johnson, received probation for killing her husband basically because of the effects of Prozac. (J.A. Vol. VII - 185-86). Also, in 1991, a judge in Illinois gave a man probation for killing his father who was engaged in a drug induced attack (Prozac) against him. (J.A. Vol. VII - 232).

Had attorney Krumbein really investigated Prozac, he would have found a plethora of information detailing its possible negative side effects. The joint appendix contains numerous articles about Prozac, including articles from such prestigious publications as the Wall Street Journal (J.A. Vol. VII - 241); U.S. News and World Report (J.A. Vol. VII - 205) and Time magazine (J.A. Vol. VII - 243).

He could easily have found that there is a Prozac survivor's support group. (J.A. Vol. VII - 293).

Defense counsel Krumbein acknowledged at deposition that he had come across some material that indicated opinions contrary to that of Dr. Keck in that Prozac could induce mania and have an effect on people (Krumbein at 7). Yet, in spite of that admission, he delved no further into it.

The report of Peter Breggin, M.D. notes, among other things, that Prozac "frequently causes agitation, anxiety, jitteriness, insomnia, and other stimulation effects that are known to cause or exacerbate suicidal and/or violent behavior." (J.A. Vol. VII - 42).

He also notes that "Prozac can cause manic psychosis which can result in grandiosity, paranoia, and acts of aggression, against

14

self and others." (J.A. Vol. VII - 42).

Counsel for respondent claims that all this is meritless because the level of Prozac in petitioner's system was very low as he had not taken any that morning. Had counsel done his research he could have countered that argument with expert testimony. Dr. Breggin states in his report: "Adverse behavioral reactions to Prozac frequently occur when the individual begins to take the medication irregularly or shortly after the individual stops taking the medication. The brain, having compensated for the presence of Prozac, goes through a withdrawal response that can cause abnormal mental and behavioral reactions. (J.A. Vol. VII - 44).

Attorney Krumbein also indicated in deposition that he consulted Dr. Schmidtgoessling about the effects of Prozac. The problem here is that she had consulted with Eli Lilley's expert, Dr. Keck.

A.    ... "And I also consulted with Dr. Schmidtgoessling on that. And just by good luck she had been in the seminar at Cleveland where the expert that the State was dealing with had been at the same meeting.

Q.    Dr. Keck?

A.    I think that was it...."

(Krumbein at 14).

Krumbein further acknowledged that he knew Dr. Keck had testified on behalf of Eli Lilley.

Q.    This Dr. Keck that you talked about, that Dr. Schmidtgoessling talked to, are you aware that he had testified on behalf of Eli Lilley, which is the manufacturer of Prozac?

15

A.   Yes.

Q.   So realistically you wouldn't expect him to say anything bad about Prozac, would you?

A.   No..."

Obviously, the only investigation into Prozac that either counsel did was to consult with people who were aligned with the manufacturer of the drug and take their word as gospel. No independent investigation was done, even though ample material was available. This cannot be reasonable professional judgment. Once again, we have the fox guarding the henhouse.

As claimed in sub claim D of the nineteenth ground for relief, counsel made no effort to get an expert on Prozac, even though they knew that the State had an expert in the person of Dr. Keck. (Affidavit of Gerald Clemons. J.A. Vol. VIII - 21).

The possibility of the Court appointing Prozac expert was brought up numerous times prior to trial. On February 7, 1996, the following exchange took place:

The Court: Fine. Mr. Krumbein, something came up in chambers and maybe you could answer it if you can. Are there going to be experts or a request for the appointment of experts concerning a possibility of the Prozac defense?

Mr. Krumbein: Your Honor, we are investigating and searching for someone we think would be appropriate to consult with and at some point soon we do expect that we would ask the Court to consider appointing an expert so we could perhaps use the Prozac

16

defense.

The Court: Okay. That will be brought to the Court on April 10th?

Mr. Krumbein: Yes, most probably.

The Court: Because if you are going to be appointing or at least if there is a request for appointing experts, we should be taking care of that so that we can proceed to trial on September 24th. (J.A. Vol. I - 22-23).

Again, on April 29, 1996, the Court addressed the issue.

The Court: So basically you are still looking into - and we did have some discussion about that about proceeding with the so-called Prozac defense.

Mr. Krumbein: Yes, we are still actively pursuing that. At this point we have not come to any decision, but that may be one of the defenses that we will use in this case.

The Court: Okay. Will you have expert witnesses for that?

Mr. Krumbein: Your Honor, if we do go forward with that we will need to have expert witnesses. (J.A. Vol. I - 36).

In addressing petitioner's claim that he was prejudiced by a lack of funds necessary to conduct an adequate defense, the Ohio Supreme Court noted, "First, defendant never requested an independent private investigator. Second, the trial court indicated on several occasions that it was willing to consider appointing an expert witness of Prozac. However, the defense never made such a request." State v. Clemons (1998) 82 Ohio St. 3d 438, 443. (J.A.

17

Vol. VI - 221).

The decision not to request such an expert was based on an abysmally insufficient investigation of Prozac, as noted previously. It was, in fact, based on the functional equivalent of no investigation at all.

What the defense did do was to bring in Dr. Day, who was not an expert on Prozac, and had not in fact seen petitioner for a long time. His testimony probably hurt petitioner more than it helped. The prosecutor made effective use of counsel's lack of diligence in closing argument:

"The first witness was Dr. James Day. What did we learn from him? Basically nothing. The defendant is impotent, the defendant has a lump on his skin, the defendant complained about venereal warts and the defendant had high blood pressure, the defendant claimed to be depressed, and I don't think there is much weight you should give that testimony. What weight do you give venereal warts or a lump on his skin? What weight?" (J.A. Vol. III - 1331).

Then, speaking about Prozac, the prosecutor said, "If there is any question in your mind about Prozac, remember Dr. Keck's testimony, remember his background. Uncontroverted by the doctor. Totally uncontroverted. Not a single witness to contradict Dr. Keck and what he said about Prozac." (J.A. Vol. III - 1333). "If they had a single person who could testify otherwise, you would have heard from them." (J.A. Vol. III - 1334).

Left with no evidence of Prozac's bad side effects, counsel

18

had to argue, as respondent claims, that it was a "mitigating factor only, only in respect that this proves that he was being treated with prescription medication for depression." (J.A. Vol. III - 55). The defense was stuck with that because they did not request an expert. That bad decision was, in turn, based on virtually no independent investigation whatsoever. Counsel totally abandoned their duty and left it to the court clinic to investigate.

The United States Supreme Court has analyzed the <u>Strickland</u> standard for ineffective counsel a couple times in recent years.

In <u>Williams v. Taylor</u> 529 U.S. 362, 120 S.Ct. 1495 (2000), trial counsel made a "tactical" decision to concentrate on Williams' self reporting of his crime and his voluntary confession rather than conduct an extensive investigation of his background. The Court noted that counsel did not begin to prepare for the mitigation phase until a week before the trial, and found that "...[T]he failure to introduce the comparatively voluminous amount of evidence that did speak in Williams' favor was not justified by a tactical decision to focus on Williams' voluntary confession." <u>Id</u>. at 396.

The evidence offered in mitigation in <u>Williams</u> consisted of the testimony of Williams' mother, two neighbors (one of whom counsel had never talked to), and a taped excerpt from a statement from a psychiatrist. That is more evidence than Petitioner Clemons' counsel presented. It also appears that Williams' counsel started

19

preparing at an earlier stage of the proceedings than did petitioner's counsel. (Affidavit of Alice McMichen, J.A. Vol. X - 201).

The most recent analysis of the <u>Strickland</u> standard by the United States Supreme Court is <u>Wiggins v. Smith</u> 539 U.S. 510, 123 S.Ct. 2527 (2003). In that case, Wiggins' attorneys, Schlaich and Nethercott, made a decision at mitigation to concentrate on his role in the offense, rather than his dysfunctional background. Although counsel told the jury in opening statement of the mitigation phase that they would hear about Wiggins' difficult life, such evidence was never presented.

The court expressed concern that counsel's failure to thoroughly investigate Wiggins' background may have been unreasonable thus rendering subsequent decisions unreasonable.

"In this case, as in <u>Strickland</u>, petitioner's claim stems from counsel's decision to limit the scope of their investigation into potential mitigating evidence. <u>Id</u>., at 673, 104 S.Ct. 2052. Here, as in <u>Strickland</u>, counsel attempt to justify their limited investigation as reflecting a tactical judgment not to present mitigating evidence at sentencing and to pursue an alternate strategy instead. In rejecting Strickland's claim, we defined the deference owed such strategic judgments in terms of the adequacy of the investigations supporting those judgments: