'[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and <u>strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation</u>. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.' <u>Id</u>., at 690-691, 104 S.Ct. 2052.

Our opinion in <u>Williams v. Taylor</u> is illustrative of the proper application of these standards. In finding Williams' ineffectiveness claim meritorious, we applied <u>Strickland</u> and concluded that counsel's failure to uncover and present voluminous mitigating evidence at sentencing could not be justified as a tactical decision to focus on Williams' voluntary confessions, because counsel had not 'fulfill[ed] their obligation to conduct a thorough investigation of the defendant's background.' 529 U.S. at 396, 120 S.Ct. 1495 (citing 1 ABA Standards for Criminal Justice 4-4.1, commentary, p. 4-55 (2d ed. 1980)). ... In highlighting counsel's duty to investigate, and in referring to the ABA Standards for Criminal Justice as guides, we applied the same 'clearly established' precedent of Strickland we apply today. Cf. <u>Strickland</u>, 466 U.S., at 690-691, 104 S.Ct. 2052 (establishing that 'thorough investigations' are 'virtually unchallengeable' and underscoring that 'counsel has a duty to make reasonable

21

investigations'); see also id., at 688-689, 104 S.Ct. 2052 ('Prevailing norms of practice as reflected in American Bar Association standards and the like ... are guides to determining what is reasonable').

In light of these standards, our principal concern in deciding whether Schlaich and Nethercott exercised 'reasonable professional judgmen[t],' id., at 691, 104 S.Ct. 2052, is not whether counsel should have presented a mitigation case. Rather, we focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of Wiggins' background was itself reasonable. Ibid. Cf. Williams v. Taylor, supra, at 415, 120 S.Ct. 1495 (O'CONNOR, J., concurring) (noting counsel's duty to conduct the 'requisite, diligent' investigation into his client's background). In assessing counsel's investigation, we must conduct an objective review of their performance, measured for 'reasonableness under prevailing professional norms,' Strickland, 466 U.S., at 688, 104 S.Ct. 2052, which includes a context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time,' id., at 689, 104 S.Ct. 2052 ('Every effort [must] be made to eliminate the distorting effects of hindsight'). (emphasis in original)."

Wiggins v. Smith 123 S.Ct. at 2535-36.

In Wiggins (and earlier in Williams v. Taylor), the Supreme Court has re-emphasized the principle that a thorough and independent investigation into a defendant's background is a

22

prerequisite to reasonable strategic decision making concerning the penalty phase of a capital case. Counsel's "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations of investigation." Strickland, 466 U.S. at 690. Absent a reasonable investigation, the Court will not defer to the decisions of counsel as being reasonable or strategic. Id.

Under Wiggins, this Court must "conduct an objective review of [counsel's] performance, measured for 'reasonableness under prevailing professional norms,' ... which includes a context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time. ...'" (citations omitted.) Wiggins, 123 S.Ct. at 2536. The ultimate question for this court is whether counsel's failure to investigate was reasonable under the prevailing professional norms of 1996.

Following Wiggins, the Sixth Circuit next addressed the question of ineffective assistance of counsel at the penalty phase in Hamblin V. Mitchell 354 F.3d 482 (6th Cir. 2003) (rehearing en banc denied March 15, 2004).

The offense in Hamblin occurred in 1983 and his conviction was affirmed by the Ohio Supreme Court in 1988. In the penalty phase of his trial, only two witnesses were presented, Hamblin himself and a female acquaintance. Counsel did not seek any advice or expert consultation for the penalty phase. In reversing the District Court's denial of habeas relief, the Sixth Circuit concluded that

23

even though Hamblin had been tried and convicted in the early 1980's, he was still entitled to have counsel's performance under the 1989 ABA standards because the 1989 standards merely confirmed the prevailing professional norms as they had developed throughout the eighties.

"Thus, the Wiggins case now stands for the proposition that the ABA standards for counsel in death penalty cases provide the guiding rules and standards to be used in defining the 'prevailing professional norms' in ineffective assistance cases. This principle adds clarity, detail and content to the more generalized and indefinite 20 year old language of Strickland...." Id. at 486.

"The [ABA] standards merely represent a codification of longstanding, common sense principles of representation understood by diligent, competent counsel in death penalty cases. The ABA standards are not aspirational in the sense that they represent norms newly discovered after Strickland. They are the same type of longstanding norms referred to in Strickland in 1984 as 'prevailing professional norms' as 'guided' by American Bar Association standards and the like." Id. at 487.

The guidelines are an "articulation of long established 'fundamental' duties of trial counsel." Cone v. Bell 359 F.3d 785, 804 (6ᵗʰ Cir. 2004, Merritt, J., concurring).

The Hamblin court then says that the new ABA guidelines adopted in 2003 simply explain in greater detail than the 1989 guidelines the obligation of counsel to investigate mitigating

24

evidence and do not depart in principle or concept from Strickland, Wiggins or other previous cases. Hamblin at 487.

The Hamblin court concluded: "In sum, we recognize that we must measure counsel's performance in this case against the prevailing standards at the time of Hamblin's trial. We cite the 1989 and 2003 ABA Guidelines simply because they are the clearest exposition of counsel's duties at the penalty phase of a capital case, duties that were recognized by this court as applicable to the 1982 trial of the defendant in Glenn v. Tate, 71 F.3d 1204, 1206-08 (6th Cir. 1995). Since that trial took place even before the trial in the present case, the same standards regarding counsel's duty to investigate mitigating evidence, as articulated in the ABA Guidelines, are relevant here.", at 487-88.

In footnote 2 of the Hamblin decision, the Court refers to the 2003 ABA Guidelines.

"The 2003 ABA Guidelines at section 10.7 contain ten pages of discussion about counsel's 'obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty.' The description of counsel's obligation to investigate mitigating evidence for the sentencing phase of the case is as follows (omitting quotation marks and the lengthy footnotes attached to the test):

Counsel's duty to investigate and present mitigating evidence is now well established. The duty to investigate exists regardless of the expressed desires of a client. Nor may counsel sit idly by, thinking that investigation would be futile. Counsel cannot responsibly advise a

25

client about the merits of different courses of action, the client cannot make informed decisions, and counsel cannot be sure of the client's competency to make such decisions unless counsel has first conducted a thorough investigation with respect to both phases of the case.

Because the sentences in a capital case must consider in mitigation, anything in the life of the defendant which might militate against the appropriateness of the death penalty for the defendant, penalty phase preparation requires extensive and generally unparalleled investigation into personal and family history. In the case of the client, this begins with the moment of conception [i.e. undertaking representation of the capital defendant]. Counsel needs to explore:

(1) Medical history, (including hospitalizations, mental and physical illness or injury, alcohol and drug use, pre-natal and birth trauma, malnutrition, developmental delays, and neurological damage);

(2) Family and social history, (including physical, sexual or emotional abuse; family history of mental illness, cognitive impairments, substance abuse, or domestic violence; poverty, familial instability, neighborhood environment and peer influence); other traumatic events such as exposure to criminal violence, the loss of a loved one or a natural disaster; experiences of racism or other social or ethnic bias; cultural or religious influences; failures of government or social intervention (e.g., failure to intervene or provide necessary services, placement in poor quality foster care or juvenile detention facilities);

(3) Educational history (including achievement, performance, behavior, and activities), special educational needs (including cognitive limitations and learning disabilities) and opportunity or lack thereof, and activities;

(4) Military service, (including length and type of service, conduct, special training, combat exposure, health and mental health services);

(5) Employment and training history (including skills and performance, and barriers to employability);

26

(6) Prior juvenile and adult correctional experience
(including conduct while under supervision, in
institutions of education or training, and regarding
clinical services).

The mitigation investigation should begin as quickly as
possible, because it may affect the investigation of
first phase defense (e.g. by suggesting additional areas
for questioning police officers or other witnesses),
decisions about the need for expert evaluation (including
competency, mental retardation, or insanity), motion
practice, and plea negotiations.

It is necessary to locate and interview the client's
family members (who may suffer from some of the same
impairments as the client), and virtually everyone else
who knew the client and his family, including neighbors,
teachers, clergy, case workers, doctors, correctional,
probation or parole officers, and others. Records - from
courts, government agencies, the military, employers,
etc. - can contain a wealth of mitigating evidence,
documenting or providing clues to childhood abuse,
retardation, brain damage, and/or mental illness, and
corroborating witnesses' recollections. Records should be
requested concerning not only the client, but also his
parents, grandparents, siblings, and children. A multi-
generational investigation frequently discloses
significant patterns of family dysfunction and may help
establish or strengthen a diagnosis or underscore the
hereditary nature of a particular impairment. The
collection of corroborating information from multiple
sources - a time-consuming task - is important wherever
possible to ensure the reliability and thus the
persuasiveness of the evidence."

ABA Guidelines for the Appointment and Performance of Defense
Counsel in Death Penalty Case P 10.7 (2003) at pp. 80-83.

Clearly, Petitioner Clemons' counsel fell well below the
accepted standards in several respects.

They did not prepare for mitigation until after trial and when
they did, their investigation was woefully inadequate, as has
already been detailed.

They abandoned their investigation into the effects of Prozac

27

and accepted the manufacturer's propaganda on its effects. This is especially egregious since counsel Krumbein testified on deposition that he had seen studies indicating serious side effects.

Having been made aware that such information exists, no reasonable, competent counsel would fail to pursue it further. The decision to not even ask the court for an expert was unreasonable as it was not based on a reasonable investigation.

In subpart E of the nineteenth claim for relief, Petitioner Clemons says that he was denied the effective assistance of counsel at the mitigation phase due to counsel's failure to obtain the services of an independent psychologist.

At the outset of this case, counsel stated that they were going to investigate a Prozac defense. (J.A. Vol. I - 22).

Counsel never abandoned the contention that petitioner's intent and mental state were at issue. In fact, prior to and during trial there was much publicity surrounding that issue. There were numerous newspaper headlines referring to a "Prozac defense" that were listed earlier in this ground for relief. In addition to those headlines, the following headlines appeared in local newspapers: "Clemons mental state on trial" (J.A. Vol. V - 485); "Clemons' intent is issue" (J.A. Vol. V - 499).

The court appointed Dr. Nancy Schmidtgoessling, of the court clinic, as the mitigation specialist. "That means Dr. Schmidtgoessling will be the mitigation specialist and anybody at the clinic who she wishes to assist her." (J.A. Vol. I - 29). Note

28

that the court did not say "mitigation specialist for the defense."

Dr. Schmidtgoessling worked for the Community Diagnostic and Treatment Center (the clinic). The court ordered the clinic to provide it with all records regarding the examination of the defendant, including, but not limited to, the following: all notes, statements, records, test results, raw data, and documents that were used to form any opinion and any and all opinions whether oral or written, reports or summaries of any opinions or letters or notes dealing with any opinions of any expert witness who examined the defendant. (J.A. Vol. IX - 210). Interestingly enough, the order was also signed by the prosecutor, but not the defense. The records were also given to the prosecution. (J.A. Vol. III - 991).

That the clinic was working for the court, not the defendant, is also made clear in the records of the clinic. In a psychiatric evaluation done by Gail Hellman, M.D., staff psychiatrist, Dr. Hellman notes that Mr. Clemons was informed of the non-confidential nature of the evaluation. (J.A. Vol. IX - 2). Any evaluation performed for the defense would be confidential.

The "forensic question" listed in the intake diagnostic assessment by Jenny O'Donnell, M.A., psychology assistant of the clinic, was "not guilty by reason of insanity and mitigation of the death penalty."

Dr. Hellman was, in fact, prepared to testify for the State at the mitigation hearing, (J.A. Vol. III - 1236), but the prosecutor chose at the last minute not to call her. (J.A. Vol. III - 1264).

29

It is clear that the clinic was operating as "a friend of the court" and not on petitioner's behalf. In fact, no one was working on petitioner's behalf.

In a deposition taken April 1, 1996, in relation to another capital case, that of Terry J. Collins, Dr. Schmidtgoessling explained how the process works when she is appointed by the court and the difference between that and when she is working for the defense:

Q.   Can you tell us what typically you were asked to do in a mitigation evaluation when you were appointed by the court to do an independent evaluation and were notified by a probation officer?

A.   Nothing special is told to you. You simply get a paper that says the court wants a mitigation report and it needs to be done by so and so date and usually lists the two prosecutors and the two defense attorneys, and that's pretty much it.

(J.A. Vol. IX - 86).

Q.   Now, you indicate here that, in your report, that prior to beginning the evaluation, the nonconfident nature of the session was explained, that [defendant] acknowledged an understanding and consented to be evaluated, nevertheless. What do you mean by that, "The nonconfident nature of the session"?

A.   That a report goes back to the judge as to what was discussed, and we tell the client anything that is discussed could possibly go into the report.

Q.   And your role in that regard is different than it would have been if you had been engaged as a consultant for the defense lawyers?

A.   That's correct.

30

Q.    In other words, you could have, if you had been appointed
      as an expert consultant for the defense lawyers, you
      could have interviewed [defendant] and advised his
      defense counsel without having to reveal the contents of
      those interviews to the prosecutor and to the Court?

A.    That's correct.

(J.A. Vol. IX - 113).

Defense counsel never even asked for an independent
psychologist even though it is specifically authorized by section
2929.024 of the Ohio Revised Code, which reads in part as follows:

> If the court determines that the defendant is
> indigent and that investigation services,
> experts, or other services are reasonably
> necessary for the proper representation of a
> defendant charged with aggravated murder at
> trial or at the sentencing hearing, the court
> shall authorize the defendant's counsel to
> obtain the necessary services <u>for the</u>
> <u>defendant</u>, and shall order that payment of the
> fees and expenses for the necessary services
> be made in the same manner that payment for
> appointed counsel is made pursuant to Chapter
> 120. of the Revised Code. (emphasis supplied).

Clemons' counsel had every right to ask for expert assistance.
Besides the statute referenced above, the United States Supreme
Court has held that when a defendant has made a preliminary showing
that his sanity at the time of the offense may be a factor, the
Constitution requires that the State provide access to psychiatric
assistance if the defendant cannot afford it. Ake v. Oklahoma 470
U.S. 68, 105 S.Ct. 1087 (1985).

Ake stands for much more than that narrow holding. At the
capital sentencing phase in Ake, the defendant had no expert
witness to rebut the prosecution's testimony as to future

31

dangerousness, an aggravating factor, and the jury sentenced him to death. The Supreme Court held that Ake was entitled to expert assistance at the penalty phase also, which was not related to the issue of insanity.

"We have repeatedly recognized the defendant's compelling interest in fair adjudication at the sentencing phase of a capital case." 470 U.S. at 83, 105 S.Ct. at 1096.

"Without a psychiatrist's assistance, the defendant cannot offer a well-informed expert's opposing view, and thereby loses a significant opportunity to raise in the jurors' minds questions about the State's proof of an aggravating factor. In such a circumstance, where the consequence of error is so great, the relevance of responsive psychiatric testimony so evident, and the burden on the State so slim, due process requires access to a psychiatric examination on relevant issues, to the testimony of the psychiatrist, and to assistance in preparation at the sentencing phase." 470 U.S. at 84, 105 S.Ct. at 1097.

The Court explained the role of a psychiatrist.

> These statutes and court decisions reflect a reality that we recognize today, namely, that when the State has made the defendant's mental condition relevant to his criminal culpability and to the punishment he might suffer, the assistance of a psychiatrist may well be crucial to the defendant's ability to marshal his defense. In this role, psychiatrists gather facts, through professional examination, interviews, and elsewhere, that they will share with the judge or jury; they analyze the information gathered and from it draw plausible conclusions about the

32

> defendant's mental condition, and about the
> effects of any disorder on behavior; and they
> offer opinions about how the defendant's
> mental condition might have affected his
> behavior at the time in question.

470 U.S. at 80, 105 S.Ct. at 1095.

It should be noted that although in Ake the Court was speaking

of a psychiatrist, the same rationale would obviously apply to any

other mental health expert, such as a psychologist.

The similarity of Ake's situation to Petitioner Clemons is

striking. At the penalty phase, the prosecution introduced the

testimony of Dr. Paul Keck, who basically said that Prozac reduces

suicidal thoughts and depression and has not been linked to any

aggressive or violent behavior. (J.A. Vol. III - 1221-22).

This testimony was devastating, as the defense had made a

half-hearted attempt to imply that Prozac had an effect on

petitioner. An attempt that can be described as half-hearted

because of inadequate investigation by the defense.

Petitioner Clemons testified that he believed the blackouts

were caused by Prozac (J.A. Vol. II - 948), petitioner's mother

testified that after her son began taking Prozac he was "different"

(J.A. Vol. II - 1201), and counsel alluded to it in opening

statements. "I expect the evidence to show that he was under

treatment and prescribed the medicine Prozac. He had great fits of

depression and other problems that bothered him in his life and

that he was under this prescription." (J.A. Vol. II - 595). "All we

are asking is to show that he was under that treatment and whether

33

or not that had anything to do with some of the elements of the crime as charged by the prosecuting attorney of first degree murder as to the prior calculation and design." (J.A. Vol. II - 596).

Dr. Keck was not effectively cross-examined and his testimony was un-rebutted. The Ake court also acknowledged that part of the value of experts is that they know probative questions to ask of the opposing expert and how to interpret this answer. 470 U.S. at 80, 105 S.Ct. at 1095.

Clemons' counsel completely abandoned their duty to investigate and turned the case over to the court clinic, which was not acting on petitioner's behalf. As a result, the prosecution's evidence was not tested at all.

" ... [A] fair trial is one in which evidence subject to adversarial testing is presented to an impartial tribunal for resolution of issues defined in advance of the proceeding." Strickland 466 U.S. at 692, 104 S.Ct. at 2063. This requirement of adversarial testing also applies at the sentencing phase. "A capital sentencing proceeding like the one involved in this case, however, is sufficiently like a trial in its adversarial format and in the existence of standards for decision, see Barclay v. Florida 463 U.S. 939, 952-954 (1983); Bullington v. Missouri 451 U.S. 430 (1981), that counsel's role in the proceeding is comparable to counsel's role at trial - to ensure that the adversarial testing process works to produce a just result under the standards governing decision. For purposes of describing counsel's duties,

34

therefore, Florida's capital sentencing proceeding need not be distinguished from an ordinary trial. Strickland 466 U.S. at 693, 104 S.Ct. at 2064.

Respondent contends that because Dr. Schmidtgoessling, the court appointed psychologist, found that Prozac had no effect on Clemons, counsel cannot be deemed ineffective for not challenging that. This is precisely where counsel was ineffective in failing to investigate or failing to request a psychologist for the defense.

The Sixth Circuit has reviewed this identical issue, involving, coincidentally, the same people, Dr. Schmidtgoessling and the court clinic in Hamilton County.

In Powell v. Collins (6th Cir. 2003) 332 F.3d 376, the Court of Appeals reversed a death sentence principally on this subject.

The facts show that Petitioner Powell's trial counsel filed a written motion for appointment of a psychiatrist or psychologist to assist in his defense. The presiding judge orally denied the motion. Later on there was a request for reconsideration of the court's decision after defense counsel had received juvenile court records and psychological evaluations revealing mental deficiencies. The trial court, in response to the above, "*** ordered that Petitioner undergo psychological testing at the court's psychiatric center. Dr. Nancy Schmidtgoessling, a clinical psychologist at the center, was appointed as a 'friend of the court' and about a week later performed a psychological evaluation of Petitioner. On January 5, 1987, defense counsel orally renewed

35

their request for the appointment of an expert to assist them in reviewing Dr. Schmidtgoessling's report 'so that [counsel] can understand exactly what it means.' *** But the trial court once again denied the oral motion 'for a psychiatrist or psychologist to be at [their] elbows[s] during the course of the trial, or to have a Court-appointed psychiatrist or psychologist to discuss this Central Psychiatric report with you.'," Powell at 382-83.

In the footnote in Powell at page 390, the Sixth Circuit states, "This circuit and others have extended Ake's command of expert assistance to instances beyond those where a defendant's mental condition is at issue at trial, and beyond those of capital cases. See e.g. Glenn v. Tate, 71 F.3d 1204, 1211 (6th Cir. 1995) (holding that the capital defendant was prejudiced and thereby denied the effective assistance of counsel by his counsel's failure to seek expert testimony at sentencing regarding the defendant's organic brain problem) ***".

Importantly, the Powell decision at 391 states that "Several circuits have interpreted Ake to mean that due process is not satisfied unless the defendant is provided an independent psychiatrist to aid in his defense - i.e., the appointment of a neutral court psychiatrist, such as in the matter at hand, does not satisfy due process. See, e.g., Starr v. A.L. Lockhart, 23 F.3d 1280, 1289 (8th Cir. 1994) ('[T]he trial court's ... finding, that [the defendant's] due process right to expert assistance was satisfied by the court-ordered examination and by the defense's

36

ability to subpoena the state examiners, [was] erroneous [because] the ability to subpoena a state examiner and to question that person on the stand does not amount to the expert assistance required by Ake.'); Smith v. McCormick, 914 F.2d 1153, 1158-59 (9th Cir. 1990) ('[U]nder Ake, evaluation by a 'neutral' court psychiatrist does not satisfy due process.... [The defendant] was entitled to his own competent psychiatric expert.'); United States v. Sloan, 776 F.2d 926, 929 (10th Cir. 1985) (finding that a state's duty under Ake 'cannot be satisfied with the appointment of an expert who ultimately testifies contrary to the defense on the issue of competence'); United States v. Byers, 740 F.2d 1104, 1114 (D.C. Cir. 1984) (holding that the defendant was denied psychiatric assistance sufficient to prepare an adequate defense where he was only allowed access to psychiatrists for the government)."

After stating case law which does not support the position, the Sixth Circuit, at 392, holds "Today, we join with those circuits that have held that an indigent criminal defendant's constitutional right to psychiatric assistance in preparing an insanity defense is not satisfied by court appointment of a 'neutral' psychiatrist - i.e., one whose report is available to both the defense and the prosecution. See Starr, 23 F.3d at 1289; Smith, 914 F.2d at 1159; Sloan, 776 F.2d at 929; Byers, 740 F.2d at 1114. As a result, in the matter before us, so long as Petitioner made the requisite preliminary showing that his sanity at the time of the offense was to be a 'significant factor at trial,' the trial

court erred in failing to grant Petitioner's motion for an independent psychiatrist. See Ake, 470 U.S. at 83, 105 S.Ct. 1087."

In concluding that the denial of an expert was prejudicial, the trial decision, at 395, "The trial court's denial of an Ake expert in this case cannot be considered harmless error inasmuch as, by her own admission, Dr. Schmidtgoessling was not equipped to conduct the appropriate examination required for her to set forth all of the facts or information the jury should have considered at mitigation. ***Dr. Schmidtgoessling indicated that such testing would require a referral to a comprehensive medical facility and specialists in the appropriate fields - precisely the type of assistance Petitioner sought but was denied.

Accordingly, under these facts, unlike with guilt phase of Petitioner's trial, the testimony of an independent psychiatrist - particularly one who was qualified to conduct the appropriate testing of which Dr. Schmidtgoessling spoke - may have provided facts and information for the jury to consider at mitigation, which may have led to a different recommendation by the jury at sentencing."

As the Powell decision says, reliance on an expert appointed by the court that is not working for the defendant is not sufficient. Counsel for petitioner never even attempted to obtain their own expert, even though they were clearly authorized to do so, especially for the mitigation phase. Instead, they turned their case over to the court clinic, an agency of the government and,

either through inattention or ineptitude utterly failed to investigate any of the available information that was contrary to the clinic opinion.

Had counsel investigated Prozac, which they did not, they would have found sufficient information to enable them to find an expert such as Dr. Hugh Turner, who could actually work for the defense. The affidavit of Dr. Turner, (J.A. Vol. X - 161), sets forth in detail a comprehensive account of petitioner's mental and emotional development, long history of drug and alcohol abuse, significant stressors in his life and his mental disposition. He hypothesized that "his delusions associated with paranoid personality were so exacerbated that, at the time of the instant offense, he was unable to perceive reality and acted on what he perceived to be threats to his self identity." Dr. Turner finally said that the proximal factor contributing to the demise in ego structure and impulse control was the uncontrolled use of Prozac.

Had the jury heard all of this, they almost certainly would have reached a different verdict.

The last reasoned decision of Ohio's First District Court of Appeals, which found that counsel were not ineffective in the mitigation phase, is both contrary to the holding in Strickland and also an unreasonable application of the facts.

39

TWENTY-THIRD GROUND FOR RELIEF: PETITIONER CLEMONS' SENTENCE OF DEATH IS CONSTITUTIONALLY INFIRM BECAUSE THE TRIAL COURT ERRONEOUSLY INSTRUCTED THE JURY THAT THEY MUST UNANIMOUSLY FIND THAT THE AGGRAVATING CIRCUMSTANCES DO NOT OUTWEIGH THE MITIGATING CIRCUMSTANCES IN ORDER TO RECOMMEND A LIFE SENTENCE.

Petitioner agrees with this Court's well reasoned opinion finding that this claim is not procedurally defaulted.

Respondent asserts that no cause and prejudice should be found because appellate counsel cannot be found deficient for not raising a claim found meritless by the Ohio Supreme Court, citing State v. Goff 82 Ohio St. 3d 123 (1998) and State v. Taylor 78 Ohio St. 3d 15 (1997) as support. The instructions objected to in Taylor and Goff were substantially different than the instruction at issue here.

In Goff, the jury was instructed that it must be unanimous in finding that the aggravating circumstances outweighed the mitigating factors. It was also instructed that if it did not make that unanimous finding, one of the life verdicts would be appropriate. The Court held that the substance of what the jury must determine was given in the charge. Although, the charge may have been incomplete, it was not a misstatement of the law.

Similarly, in Taylor, the jury was told that if it found the State of Ohio failed to prove that the aggravating circumstance outweighed the mitigating factors, it would proceed to determine which of the life sentences to recommend to the court. The Supreme Court specifically held that this was not an "acquittal first"

40

instruction as was condemned in State v. Brooks 75 Ohio St. 3d 160
(1996).

The instruction at issue here is clearly an "acquittal first"
instruction and the assertion that it has been considered meritless
by the Ohio Supreme Court simply is not true.

The specific instruction at issue here is as follows:

The second verdict form in Count 1: State of Ohio versus
Gerald L. Clemons and same case number: We, the jury,
unanimously find that the aggravating circumstances the
defendant was found guilty of committing in Count 1 do
not outweigh the mitigating factors, and recommend that
the defendant be sentenced to life imprisonment with
parole   eligibility   after   thirty   full   years   of
imprisonment. (J.A. Vol. III - 1361).

This  was  read  to  the  jury  six  times  and  the  written
instruction was sent back with them.

Just prior to that, the court charged the jury on unanimity.

All twelve jurors must agree on a verdict. If all twelve
members of the jury find, by proof beyond a reasonable
doubt, that the aggravating circumstances the defendant
was found guilty of committing, outweigh the mitigating
factors, then you must return such finding to the Court,
and as a matter of law, you would have no choice but to
recommend to the Court that the sentence of death be
ordered.

. . .

On the other hand, if after considering all of the
relevant evidence admitted at the two trials, and the
arguments of counsel, you find that the State failed to
prove that the Aggravating Circumstances which the
defendant was found guilty of committing outweigh the
mitigating factors, then you will return a verdict
reflecting this decision. In this event, you will
determine which of two possible life imprisonment
sentences to recommend to the Court. (J.A. Vol. III -
1358-60).

These two instructions are in very close proximity to part of

41

each other, each appearing on the same page of the transcript. This instruction (on pp. 1358-60) is almost identical to the instruction found to be defective and prejudicial in Davis v. Mitchell 318 F.3d 682 (6th Cir. 2003).

In Petitioner Clemons' case, the prejudice is exacerbated by the instruction on the verdict form that was read to the jury six times.

Ohio's statutory law at the time is found in R.C. 2929.03(D)(2), which in pertinent part provides: If the trial jury unanimously finds by proof beyond a reasonable doubt that the aggravating circumstances the defender was found guilty of committing outweigh the mitigating factors, the trial jury shall recommend to the court that the sentence of death be imposed on the offender. Absence such a finding, the jury shall recommend that the offender be sentenced to life imprisonment with parole eligibility after serving twenty full years of imprisonment or life imprisonment with parole eligibility after serving thirty full years of imprisonment.

In Davis, supra, the Sixth Circuit briefly held there was a likelihood that the jury believed it could not render a verdict in favor of life rather than death unless the jury was unanimous with respect to its reasoning on mitigating factors; and unless the jury was unanimous in rejecting the death penalty.

In reviewing the jury instruction in Petitioner Davis' trial, at page 685, the decision notes the court instructed "***that is,

42

you must find that the State has failed to prove beyond a reasonable doubt that the aggravating circumstances which the defendant was found guilty of committing outweigh the mitigating factors. In this event you will then proceed to determine which of the possible life imprisonment sentences to recommend to the Court."

In the body of his decision, Judge Merritt analyzed the law regarding this issue. His analysis is so crucial to this particular claim in Petitioner Goff's petition that it needs to be fully brought forth here, at 686-87:

"The developing law regarding the balancing of mitigating factors against aggravating factors in death penalty cases is of relatively recent vintage and many questions about its application remain unanswered. Thirteen years before the Supreme Court decided Furman v. Georgia 408 U.S. 238, 33 L. Ed. 2d 346, 92 S. Ct. 2726 (1972) (holding death sentences imposed under statutes that left juries with untrammeled discretion to impose or withhold the death penalty violative of the Eighth and Fourteenth Amendments), the drafters of the American Law Institute's 1962 Model Penal Code proposed the balancing of statutorily specified aggravating and mitigating circumstances as a method to restrain unguided discretion in the capital sentencing process. See American Law Institute, Model Penal Code §201.6 (Tent. Draft No. 9, 1959) (eventually adopted as §210.6 of the 1962 Model Penal Code). Although the drafters did not elaborate on any particular method

43

for weighing the two sets of circumstances, they sought to guide the discretion of jurors by requiring them to find that, in light of the statutorily defined mitigating circumstances and any other facts deemed relevant, "there are no mitigating circumstances sufficiently substantial to call for leniency." Model Penal Code §210.6(2)(1962). Nor was it clear in these proposals when unanimity among jurors should be required at any given stage of the proceedings, except that unanimity would be required for the imposition of the death sentence. See Model Penal Code §201.6(2) (alternative formulation), at 60 & commentary at 78-79 (Tent. Draft No. 9 1959); Model Penal Code §210.6(2)(1962). After Furman was decided in 1972, many states incorporated aspects of the Model Penal Code in their statutes reinstating the death penalty. These states adopted, with varying degrees of modification, the Code's aggravator-mitigator dual standard. In Gregg, the Supreme Court approved the Code's balancing standard as a general solution to the Eighth Amendment problem of uncertain, standardless state laws found invalid in Furman. See Gregg v. Georgia 428 U.S. 153, 193-95, 49 L. Ed. 2d 859, 96 S. Ct. 2909 & nn. 44-45 (1976).

In 1994, Congress enacted the Federal Death Penalty Act using this dual standard. That Act states that 'the finder of fact shall consider any mitigating factor' raised by the defendant in deciding whether to impose the death penalty and that such: